IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island Company, as Subrogee of Post Holdings, Inc., a Missouri corporation, Michael Foods of Delaware, Inc., a Delaware corporation, and M.G. Waldbaum Company, a Nebraska Company, | ) ) ) ) ) ) ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| v. | ) ) | **(DEMAND FOR JURY TRIAL)** |
| | ) | |
| HENNING COMPANIES, LLC, an Iowa Limited Liability Company, | ) ) | |
| | ) | |
| Defendant. | ) | |

Comes now Plaintiff Factory Mutual Insurance Company, and for its subrogation Complaint against the Defendant Henning Companies, LLC, alleges and states as follows:

1.       Plaintiff Factory Mutual Insurance Company (hereinafter "Factory Mutual") is a Rhode Island company and is engaged in the business of providing property and time element insurance.  Factory Mutual is hereby asserting subrogation rights for losses arising out of a fire that occurred on or about February 27, 2020 at its insured's facility located in Knox County, Nebraska.

2.       M.G. Waldbaum Company ("Waldbaum") is a Nebraska corporation doing business in Nebraska, and is engaged in the poultry business.  Waldbaum is a wholly owned subsidiary of Michael Foods of Delaware, Inc. ("Michael Foods"), a Delaware corporation. Michael Foods is a wholly owned subsidiary of Post Holdings, Inc. ("Post"), a Missouri corporation.  Post, Michael Foods, and Waldbaum are all insured by Factory Mutual for property

and time element insurance coverage under an FM Global Advantage Policy bearing Policy No. 1061352.

3.      Defendant Henning Companies, LLC (hereinafter "Defendant Henning") is an Iowa Limited Liability Company, and did business in Nebraska at all times relevant herein.

4.      A written contract was entered into by Waldbaum and Defendant Henning for the design and construction of twelve layer poultry houses and associated facilities, including site work at the project address at 54080 Highway 84, Bloomfield, Knox County, Nebraska 68718. Waldbaum owned all of the structures, contents, and poultry at the Bloomfield facility.

5.      A copy of such contract is attached hereto as Exhibit 1, and incorporated as if fully set forth herein, and consisting of 28 pages plus Exhibit A through Exhibit E.

## JURISDICTION

6.      This Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332, as this is an action for damages in excess of $75,000.00, and the parties, Plaintiff Factory Mutual, its Insureds Waldbaum, Michael Foods, and Post, and Defendant Henning, are all of diverse citizenship.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

7.      On or about April 20, 2017, a Contract was entered into by Waldbaum and Defendant Henning for the construction of a poultry house/egg laying and processing facility at the site of the project address of 54080 Highway 84, Bloomfield, Knox County, Nebraska 68718.

8.      Defendant Henning, pursuant to such Contract, was authorized to design and construct twelve layer houses including associated facilities, and employ such subcontractors as necessary to complete such project.  The standard of care for professional services agreed to pursuant to such contract is set forth at § 2.21. p.2.

9.      A warranty provision extending to all materials and equipment furnished by or through Defendant Henning states that they would be of good quality; in conformance with contract documents, and free from defective workmanship and materials was set forth at § 3.7.1 of said Contract.

10.      Waldbaum and Defendant Henning agreed in the Contract that Defendant would address any "Defective Work" within one year of "substantial completeness of the work," or for a longer period as set forth in the warranty document.  With respect to Defective Work discovered <u>after</u> the one-year correction period, it was agreed that it "shall be determined by the law," as set forth in § 3.8.4 of said Contract.

11.      On or about February 27, 2020, a fire erupted in the northeast portion of the upper floor of the recently constructed facility covered by the aforesaid Contract.  This particular building is known as Building 12.  A manure blower fan assembly ignited chicken feed dust and other dust that collected on, in, and around the fan.

12.      Building 12, its contents, including poultry, were destroyed in the fire and deemed a total loss.  Portions of Building 11 and connecting structures, contents, including poultry, were also damaged or destroyed.

13.      Defendant Henning breached its agreement with Waldbaum with respect to the design, construction, selection, use and installation of the manure blower fan assembly.  These and other non-conforming items caused the fire and ensuing damages.  Defendant Henning and subcontractors also created conditions that allowed the fire to rapidly spread.  Defendant Henning failed to honor its contractual warranty obligations.

14.      Damages to Waldbaum were sustained in the amount of Twenty-four Million Nine Hundred Eight Thousand Six Hundred Thirty-Three and no/100 dollars ($24,908,633.00).

Plaintiff Factory Mutual has subrogation rights to the extent of its payments that totaled $22,408,633.  All rights of recovery against Defendant Henning are assigned to Plaintiff Factory Mutual and so ratified under Rule 17(a), Federal Rules of Civil Procedure.

WHEREFORE, Plaintiff Factory Mutual prays as set forth below.

## SECOND CAUSE OF ACTION
### (WARRANTY)

15.     Plaintiff Factory Mutual realleges and reaffirms paragraphs 1. through 14. of the Complaint as if fully set forth herein.

16.     As provided by § 2.2.1 STANDARD OF CARE, and § 3.7 WARRANTY, including the Design-Builder's Responsibilities, pursuant to Article 3, and others, Defendant Henning was in breach of such warranties and responsibilities represented therein by such provisions.

17.     As a result of such breaches, Waldbaum sustained damages in an amount of Twenty-four Million Nine Hundred Eight Thousand Six Hundred Thirty-Three and no/100 dollars ($24,908,633.00).  Plaintiff Factory Mutual has subrogation rights to the extent of its payments of $22,408,633.00.  All rights of recovery against Defendant Henning are assigned to Plaintiff Factory Mutual and so ratified under Rule 17(a), Federal Rules of Civil Procedure.

WHEREFORE, Plaintiffs Waldbaum and Factory Mutual pray as set forth below.

## THIRD CAUSE OF ACTION
### (NEGLIGENCE)

18.     Factory Mutual realleges and reaffirms paragraphs 1. through 17. as if fully set forth herein.

19.    Defendant Henning breached the standard of care it owed to Waldbaum, and its subrogated Insurer Factory Mutual, by its negligent actions with respect to the materials, equipment, construction, design and installation of the same.

20.    That such breach of the standard of care was the proximate cause of damage to Waldbaum, and its subrogated Insurer, Factory Mutual.

21.    As a result of such breaches, Waldbaum sustained damages in an amount of Twenty-four Million Nine Hundred Eight Thousand Six Hundred Thirty-Three and no/100 dollars ($24,908,633.00).  Plaintiff Factory Mutual has subrogation rights to the extent of its payments of $22,408,633.00.   All rights of recovery against Defendant Henning are assigned to Plaintiff Factory Mutual and so ratified under Rule 17(a), Federal Rules of Civil Procedure.

WHEREFORE, Plaintiff Factory Mutual Insurance Company prays for damages in the fair and reasonable amount of $22,408,633.00, plus interest and costs as allowed by law.

## DESIGNATION OF PLACE FOR TRIAL

Comes now the Plaintiff Factory Mutual, and pursuant to Fed. R. 40.1.b and designates Omaha, Nebraska as the place of trial in this matter.

Dated this 15th day of December, 2022.

*s/Vincent Valentino*
Vincent Valentino
Bar No. 14288
ATTORNEY FOR PLAINTIFF
7413 South 169th Street
Omaha, NE  68136
Telephone: (402) 355-1720
Email:  vv@windstream.net
              vvalentino@neb.rr.com

AND

*s/Daniel W. Berglund*
David S. Evinger
MN Bar No. 0027935
Daniel W. Berglund
MN Bar No. 0329010
ATTORNEYS FOR PLAINTIFF
Grotefeld Hoffmann LLP
150 S. Fifth Street, Suite 3650
Minneapolis, MN 55402
Telephone: (612) 564-4883
Email: devinger@ghlaw-llp.com
Email: dberglund@ghlaw-llp.com

#497676

# ConsensusDocs® 415
## STANDARD DESIGN-BUILD AGREEMENT AND GENERAL CONDITIONS BETWEEN OWNER AND DESIGN-BUILDER

### TABLE OF ARTICLES

1. AGREEMENT
2. GENERAL PROVISIONS
3. DESIGN-BUILDER'S RESPONSIBILITIES
4. OWNER'S RESPONSIBILITIES
5. SUBCONTRACTS
6. CONTRACT TIME
7. CONTRACT PRICE
8. CHANGES IN THE WORK
9. PAYMENT
10. INDEMNITY, INSURANCE, AND BONDS
11. SUSPENSION, NOTICE TO CURE, AND TERMINATION
12. DISPUTE MITIGATION OR RESOLUTION
13. MISCELLANEOUS
14. CONTRACT DOCUMENTS
    AMENDMENT 1

### ARTICLE 1 AGREEMENT

Job Number: 555-00-00

This Agreement is made this 20th Day of April in the year 2017, by and between the

OWNER: MG Waldbaum Company
       105 N. Main
       Wakefield, NE 68784

and the

DESIGN-BUILDER: Henning Companies LLC
       5800 Merle Hay Road, Suite 14 – PO Box 394
       Johnston, IA 50131

for services in connection with the following:

PROJECT: Design and construction of eleven layer houses and associated facilities and site work, in two phases, this contract applies to Phase 1 work only: Phase 1 is the design and construction of 6 layer houses. Construction to state in April of 2017 and be completed in February of 2019. Project Address: 54080 HWY 84, Bloomfield, NE 68718.

Notice to the Parties shall be given at the above addresses.

### ARTICLE 2 GENERAL PROVISIONS

1



ConsensusDocs®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

EXHIBIT 1

2.1. TEAM RELATIONSHIP The Parties each agree to proceed with the Project on the basis of trust, good faith, and fair dealing. The Design-Builder agrees to furnish or procure, as permitted by Law, the architectural and engineering services set forth below and the construction and administration of the Work.

2.1.1. The Design-Builder represents that it is an independent contractor and that it is familiar with the type of work it is undertaking.

2.1.2. Neither the Design-Builder nor any of its agents or employees shall act on behalf of or in the name of the Owner unless authorized in writing by the Owner's Representative.

2.1.3. ETHICS The Parties shall perform their obligations with integrity, ensuring at a minimum that each: (a) avoids conflicts of interest or promptly discloses any to the other Party, and (b) warrants that it has not and shall not pay nor receive any contingent fees or gratuities to or from the other Party, including its agents, officers and employees, Subcontractors, or others for whom they may be liable, to secure preferential treatment.

2.2. DESIGN PROFESSIONAL Architectural and engineering services shall be procured from licensed, independent design professionals retained by the Design-Builder or furnished by licensed employees of the Design-Builder, as permitted by the Law. The person or entity providing architectural and engineering services shall be referred to as the Design Professional.

2.2.1. STANDARD OF CARE The Design Professional shall furnish and provide the architectural and engineering services necessary to design the Project in accordance with the Owner's requirements, as outlined in the Owner's Program and other relevant data defining the Project. The architectural and engineering services shall be performed in accordance with the standard of professional skill and care required for a Project of similar size, scope, and complexity, during the time in which the Services are provided.

2.2.2. If the Design Professional is an independent design professional, the architectural and engineering services shall be procured pursuant to a separate agreement between the Design-Builder and the Design Professional. The Design Professional for the Project is Enery Panel Structures, Inc. – BUILDING/STRUCTURAL; Advanced Consulting Engineering Services – CIVIL VGI Design - ELECTRICAL.

2.3. EXTENT OF AGREEMENT  This Agreement is solely for the benefit of the Parties, represents the entire and integrated agreement between the Parties, and supersedes all prior negotiations, representations or agreements, either written or oral. The Owner and the Design-Builder agree to look solely to each other with respect to the performance of the Agreement. The Agreement and each and every provision is for the exclusive benefit of the Owner and the Design-Builder and not for the benefit of any third party nor any third party beneficiary, except to the extent expressly provided in the Agreement.

2.4. DEFINITIONS

2.4.1. "Business Day" means all Days, except weekends and official federal or state holidays where the Project is located.

2.4.2. A "Change Order" is a written order signed by the Owner and the Design-Builder after execution of this Agreement, indicating changes in the scope of the Work or Contract Time, including substitutions proposed by the Design-Builder and accepted by the Owner. The Design-Builder may request or the Owner may order changes in the Work or the timing or sequencing of performance of the Work that impacts the Contract Price or the Contract Time. All changes in the Work that affect the contract Time or Contract Price shall be formalized in a Change Order.



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

2.4.3. The "Contract Documents" consist of this Agreement, including all documents identified in section 14.1, as well as other documents attached to or incorporated by reference in this Agreement or in any Change Order, Work Order or amendment of the Contract Documents.

2.4.4. The "Contract Time" is the period between the Date of Commencement and Final Completion.

2.4.5. "Day" means calendar day.

2.4.6. "Date of Commencement" is as provided for in section 6.1.

2.4.7. "Defective Work" is any portion of the Work not in conformance to the requirements of the Contract Documents.

2.4.8. "Final Completion" occurs on the date when the Design-Builder's obligations under this Agreement are complete and accepted by the Owner and final payment becomes due and payable.

2.4.9. "Laws" means federal, state, and local laws, ordinances, codes, rules, and regulations applicable to the Work with which the Design-Builder must comply that are enacted as of the Agreement date.

2.4.10. A "Material Supplier" is a person or entity retained by the Design-Builder to provide material and equipment for the Work.

2.4.11. "Others" means other contractors and all persons at the Worksite who are not employed by the Design-Builder, its Subcontractors, or Material Suppliers.

2.4.12. "Overhead" shall mean (a) payroll costs and other compensation of Design-Builder's employees in the Design-Builder's principal and branch offices; (b) general and administrative expenses of the Design-Builder's principal and branch offices including charges against the Design-Builder for delinquent payments; and (c) the Design-Builder's capital expenses, including interest on capital used for the Work.

2.4.13. The "Owner" is the person or entity identified in ARTICLE 1, and includes the Owner's representative.

2.4.14. The "Owner's Program" is a description of the Owner's objectives, budgetary and time criteria, space requirements and relationships, flexibility and expandability requirements, special equipment and systems, and site requirements, together with Schematic Design Documents which shall include drawings, outline specifications, and other conceptual documents illustrating the Project's basic elements, scale, and their relationship to the Worksite.

2.4.15. The "Parties" are collectively the Owner and Design-Builder.

2.4.16. The "Project," as identified in ARTICLE 1, is the building, facility, or other improvements for which the Design-Builder is to perform the Work under this Agreement. It may also include improvements to be undertaken by the Owner or Others.

2.4.17. A "Subcontractor" is a person or entity retained by the Design-Builder as an independent contractor to provide the labor, materials, equipment, or services necessary to complete a specific portion of the Work. The term Subcontractor does not include the Design Professional or any separate contractor employed by the Owner or any separate contractor's subcontractors.

2.4.18. "Substantial Completion" of the Work, or of a designated portion, occurs on the date when construction is sufficiently complete in accordance with the Contract Documents so that the Owner

3



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

can occupy or utilize the Project, or a designated portion, for the use for which it is intended, without unscheduled disruption. The issuance of a certificate of occupancy is not a prerequisite for Substantial Completion if the certificate of occupancy cannot be obtained due to factors beyond the Design-Builder's control. This date shall be confirmed by a certificate of Substantial Completion signed by the Owner and Design-Builder. The certificate shall state the respective responsibilities of the Owner and Design-Builder for security, maintenance, heat, utilities, damage to the Work, and insurance. The certificate shall also list the items to be completed or corrected, and establish the time for their completion and correction within the timeframe, if any, established in subsection 6.2.3 for the Date of Final Completion.

2.4.19. A "Subsubcontractor" is a party or entity who has an agreement with a Subcontractor or other Subsubcontractor to perform any portion of the Subcontractor's work.

2.4.20. "Terrorism" means a violent act, or an act that is dangerous to human life, property, or infrastructure, that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion. Terrorism includes, but is not limited to, any act certified by the United States Secretary of Treasury as an act of terrorism pursuant to the Terrorism Risk Insurance Act, as amended.

2.4.21. The "Work" is the design services procured in accordance with section 3.1, the construction services provided in accordance with section 3.2, additional services in accordance with section 3.10, and other services which are necessary to complete the Project in accordance with and reasonably inferable from the Contract Documents.

2.4.22. "Worksite" means the geographical area of the Project location mentioned in ARTICLE 1 where the Work is to be performed.

## ARTICLE 3 DESIGN-BUILDER'S RESPONSIBILITIES

The Design-Builder shall be responsible for procuring or furnishing the design and for the construction of the Work consistent with the Owner's Program. The Design-Builder shall exercise reasonable skill and judgment in the performance of the Work.

3.1. DESIGN SERVICES Pursuant to a mutually agreeable schedule, the Design-Builder shall submit for the Owner's written approval, as applicable, Design Development Documents or Construction Documents, based on the Contract Documents in existence at the time of the execution of this Agreement or any further development of Contract Documents that have been approved in writing by the Owner.

3.1.1. If required, the Design Development Documents shall further define the Project, including drawings and outline specifications fixing and describing the Project size and character as to site utilization, and other appropriate elements incorporating the structural, architectural, mechanical, and electrical systems.

3.1.2. The Construction Documents shall set forth in detail the requirements for construction of the Work, and shall be based upon codes, laws, or regulations enacted at the time of their preparation. Construction shall be in accordance with the approved Construction Documents. One set of these documents shall be furnished to the Owner before commencing construction.

3.1.3. OWNERSHIP OF DOCUMENTS

3.1.3.1. OWNERSHIP OF TANGIBLE DOCUMENTS The Owner shall receive ownership of the property rights, except for copyrights, of all documents, drawings, specifications,

4



**ConsensusDocs®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

electronic data, and information (hereinafter "Documents") prepared, provided or procured by the Design-Builder, its Design Professional, Subcontractors, or consultants and distributed to the Owner for this Project, upon the making of final payment to the Design-Builder or in the event of termination under 11, upon payment for all sums due to Design-Builder pursuant to 11.

3.1.3.2. COPYRIGHT The Parties agree that Owner shall not obtain ownership of the copyright of all Documents. The Owner's acquisition of the copyright for all Documents shall be subject to the making of payments as required by subsection 3.1.3.1 and the payment of the fee reflecting the agreed value of the copyright set forth below:

3.1.3.3. USE OF DOCUMENTS IN EVENT OF TERMINATION In the event of a termination of this Agreement pursuant to 11, the Owner shall have the right to use, to reproduce, and to make derivative works of the Documents to complete the Project, regardless of whether there has been a transfer of copyright under subsection 3.1.3.1, provided payment has been made pursuant to subsection 3.1.3.1

3.1.3.4. OWNER'S USE OF DOCUMENTS AFTER COMPLETION OF PROJECT After completion of the Project, the Owner may reuse, reproduce, or make derivative works from the Documents solely for the purposes of maintaining, renovating, remodeling, or expanding the Project at the Worksite. The Owner's use of the Documents without the Design-Builder's involvement or on other projects is at the Owner's sole risk, except for the Design-Builder's indemnification obligations, and the Owner shall indemnify and hold harmless the Design-Builder, its Design Professional, Subcontractors, and consultants, and the agents, officers, directors, and employees of each of them, from and against any and all claims, damages, losses, costs, and expenses, including reasonable attorneys' fees and costs, arising out of or resulting from any such prohibited use.

DESIGN-BUILDER'S USE OF DOCUMENTS Where the Design-Builder has transferred its copyright interest in the Documents under subsection 3.1.3.1, the Design-Builder may reuse Documents prepared by it pursuant to this Agreement in its practice, but only in their separate constituent parts and not as a whole.

3.1.4. DESIGN DEVELOPMENT DOCUMENTS, BUDGET AND SCHEDULE. Design Development Documents shall include (1) preliminary drawings and specifications in sufficient detail to describe the Work, including where applicable specific products and material to be provided by the Design-Builder, (2) and construction schedule for each Phase of the Work, and (3) Design-Builder's good faith estimate of the contract Price based on the preliminary drawing and specifications and project schedule. Design-Builder shall revise the Design Development Documents at Owner's request to reconcile Owner's budget, schedule, and program.

3.2. CONSTRUCTION SERVICES

3.2.1. Construction will commence upon the issuance by the Owner of a written notice to proceed.

3.2.2. In order to complete the Work, the Design-Builder shall provide all necessary construction supervision, inspection, construction equipment, construction labor, materials, tools, and subcontracted items.

5


ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

3.2.3. COMPLIANCE WITH LAWS The Design-Builder shall give all notices and comply with all Laws at its own costs. The Design-Builder shall be liable to the Owner for all loss, cost, and expense attributable to any acts or omissions by the Design-Builder, its employees, subcontractors, and agents resulting from the failure to comply with Laws, including fines, penalties, or corrective measures. However, liability under this subsection shall not apply if notice to Owner was given, and advance approval by appropriate authorities, including the Owner, is received.

3.2.4. The Design-Builder shall maintain the Schedule of Work. This schedule shall indicate the dates for the start and completion of the various stages of the construction, including the dates when information and approvals are required from the Owner. It shall be revised as required by the conditions of the Work.

3.2.5. The Design-Builder shall obtain the building permits necessary for the construction of the Project as Cost of the Work.

3.2.6. The Design-Builder shall keep such full and detailed accounts as may be necessary for proper financial management under this Agreement.

3.2.7. The Design-Builder shall provide periodic written reports to the Owner on the progress of the Work in such detail as is required by the Owner and as agreed to by the Owner and Design-Builder.

3.2.8. The Design-Builder shall regularly remove debris and waste materials at the Worksite resulting from the Work. At the completion of the Work, the Design-Builder shall remove from the Worksite all construction equipment, tools, surplus materials, waste materials, and debris.

3.2.9. The Design-Builder shall prepare and submit to the Owner either:

> Final marked up as-built drawings
> Updated electronic data

that generally document how the various elements of the Work including changes were actually constructed or installed, or as defined by the Parties by attachment to this Agreement.

3.2.10 Before Commencing Work on the site for each phase of the Work, Design-Builder shall submit to the Owner a work plan for the phase, including a schedule for the Work, evidence of insurance, and for each subcontractor, before the subcontractor commences Work on the site, copies of subcontracts and evidence of subcontractor insurance, and any permit required for performance of the Work.

3.3. SCHEDULE OF THE WORK The Design-Builder shall prepare and submit a Schedule of Work for the Owner's acceptance and written approval as to milestone dates. This schedule shall indicate the commencement and completion dates of the various stages of the Work, including the dates when information and approvals are required from the Owner. The Schedule shall be revised as required by the conditions of the Work.

3.4. SAFETY OF PERSONS AND PROPERTY

3.4.1. SAFETY PRECAUTIONS AND PROGRAMS The Design-Builder shall have overall responsibility for safety precautions and programs in the performance of the Work. However, such obligation does not relieve Subcontractors of their responsibility for the safety of persons or property in the performance of their work, nor for compliance with the provisions of Laws.



ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

3.4.2. The Design-Builder shall seek to avoid injury, loss, or damage to persons or property by taking reasonable steps to protect:

3.4.2.1. its employees and other persons at the Worksite;

3.4.2.2. materials, supplies, and equipment stored at the Worksite for use in performance of the Work; and

3.4.2.3. the Project and all property located at the Worksite and adjacent to work areas, whether or not said property or structures are part of the Project or involved in the Work.

3.4.3. DESIGN-BUILDER'S SAFETY REPRESENTATIVE The Design-Builder shall designate an individual at the Worksite in the employ of the Design-Builder who shall act as the Design-Builder's designated safety representative with a duty to prevent accidents. Unless otherwise identified by the Design-Builder in writing to the Owner, the designated safety representative shall be the Design-Builder's project superintendent. The Design-Builder will report immediately in writing all accidents and injuries occurring at the Worksite to the Owner. When the Design-Builder is required to file an accident report with a public authority, the Design-Builder shall furnish a copy of the report to the Owner.

3.4.4. The Design-Builder shall provide the Owner with copies of all notices required of the Design-Builder by Law. The Design-Builder's safety program shall comply with the requirements of governmental and quasi-governmental authorities having jurisdiction over the Work.

3.4.5. Damage or loss not insured under property insurance which may arise from the performance of the Work, to the extent of the negligence attributed to such acts or omissions of the Design-Builder, or anyone for whose acts the Design-Builder may be liable, shall be promptly remedied by the Design-Builder. Damage or loss attributable to the acts or omissions of the Owner or Others and not to the Design-Builder shall be promptly remedied by the Owner.

3.5. EMERGENCIES In any emergency affecting the safety of persons or property, the Design-Builder shall act in a reasonable manner to prevent threatened damage, injury, or loss. Any change in the Contract Price, the Date of Substantial Completion, or the Date of Final Completion, and if appropriate the compensation for Design Phase services, on account of emergency work shall be determined as a Change Order.

3.6. HAZARDOUS MATERIAL

3.6.1. A Hazardous Material is any substance or material identified now or in the future as hazardous under any Laws, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirements governing handling, disposal, or clean-up. The Design-Builder shall not be obligated to commence or continue Work until all Hazardous Material discovered at the Worksite has been removed, rendered, or determined to be harmless by the Owner as certified by an independent testing laboratory and approved by the appropriate government agency.

3.6.2. If after commencing the Work, Hazardous Material is discovered at the Project, the Design-Builder shall be entitled to immediately stop Work in the affected area. The Design-Builder shall report the condition to the Owner and, if required, the government agency with jurisdiction.

3.6.3. The Design-Builder shall not be required to perform any Work relating to or in the area of Hazardous Material without written mutual agreement.

7



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) ©2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this document is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

3.6.4. The Owner shall be responsible for retaining an independent testing laboratory to determine the nature of the material encountered and whether it is a Hazardous Material requiring corrective measures or remedial action. Such measures shall be the sole responsibility of the Owner, and shall be performed in a manner minimizing any adverse effect upon the Work of the Design-Builder. The Design-Builder shall resume Work in the area affected by any Hazardous Material only upon written agreement between the Parties after the Hazardous Material has been removed or rendered harmless and only after approval, if necessary, of the governmental agency or agencies with jurisdiction.

3.6.5. If the Design-Builder incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, the Design-Builder shall be entitled to an equitable adjustment in the Contract Price or the date of Substantial Completion.

3.6.6. To the extent not caused by the negligent acts or omissions of the Design-Builder, its Subcontractors and Subsubcontractors, and the agents, officers, directors, and employees of each of them, the Owner shall indemnify and hold harmless the Design-Builder, its Subcontractors and Subsubcontractors, and the agents, officers, directors, and employees of each of them, from and against all claims, damages, losses, costs, and expenses, including but not limited to reasonable attorneys' fees, costs, and expenses incurred in connection with any dispute resolution process, to the extent permitted pursuant to section 6.4, arising out of or relating to the performance of the Work in any area affected by Hazardous Material.

3.6.7. Safety Data Sheets (SDS) as required by law and pertaining to materials or substances used or consumed in the performance of the Work, whether obtained by the Design-Builder, Subcontractors, the Owner or Others, shall be maintained at the Project by the Design-Builder and made available to the Owner and Subcontractors.

3.6.8. During the Design-Builder's performance of the Work, the Design-Builder shall be responsible for the proper handling of all materials brought to the Worksite by the Design-Builder. Upon the issuance of the Certificate of Substantial Completion, the Owner shall be responsible under this section for materials and substances brought to the site by the Design-Builder if such materials or substances are required by the Contract Documents.

3.6.9. Section 3.6 shall survive the completion of the Work under this Agreement or any termination of this Agreement.

## 3.7. WARRANTY

3.7.1. The Design-Builder warrants that all materials and equipment furnished under this Agreement will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials. Warranties shall commence on the date of Substantial Completion of the Work or of a designated portion.

3.7.2. Products, equipment, systems, or materials incorporated in the Work shall be covered exclusively by the warranty of the manufacturer. There are no warranties which extend beyond the description on the face thereof. To the extent products, equipment, systems, or materials incorporated in the Work are specified by the Owner but purchased by the Design-Builder and are inconsistent with selection criteria that otherwise would have been followed by the Design-Builder, the Design-Builder shall assist the Owner in pursuing warranty claims. ALL OTHER WARRANTIES EXPRESSED OR IMPLIED INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED.



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

3.7.3. The Design-Builder shall secure required certificates of inspection, testing, or approval and deliver them to the Owner.

3.7.4. The Design-Builder shall collect all written warranties and equipment manuals and deliver them to the Owner in a format directed by the Owner.

3.7.5. With the assistance of the Owner's maintenance personnel, the Design-Builder shall direct the checkout of utilities and start-up operations, and adjusting and balancing of systems and equipment for readiness.

## 3.8. CORRECTION OF WORK WITHIN ONE YEAR

3.8.1. If, prior to Substantial Completion and within one year after the date of Substantial Completion of the Work or for such longer periods of time as may be set forth with respect to specific warranties required by the Contract Documents, any Defective Work is found, the Owner shall promptly notify the Design-Builder in writing. Unless the Owner provides written acceptance of the condition, the Design-Builder shall promptly correct the Defective Work at its own cost and time and bear the expense of additional services required for correction of any Defective Work for which it is responsible. If within the one-year correction period the Owner discovers and does not promptly notify the Design-Builder or give the Design-Builder an opportunity to test or correct Defective Work as reasonably requested by the Design-Builder, the Owner waives the Design-Builder's obligation to correct that Defective Work as well as the Owner's right to claim a breach of the warranty with respect to that Defective Work.

3.8.2. With respect to any portion of Work first performed after Substantial Completion, the one-year correction period shall be extended by the period of time between Substantial Completion and the actual performance of the later Work. Correction periods shall not be extended by corrective work performed by the Design-Builder.

3.8.3. If the Design-Builder fails to correct Defective Work within a reasonable time after receipt of written notice from the Owner prior to final payment, the Owner may correct it in accordance with the Owner's right to carry out the Work. In such case, an appropriate Change Order shall be issued deducting the cost of correcting such deficiencies from payments then or thereafter due the Design-Builder. If payments then or thereafter due Design-Builder are not sufficient to cover such amounts, the Design-Builder shall pay the difference to the Owner.

3.8.4. The Design-Builder's obligations and liability, if any, with respect to any Defective Work discovered after the one-year correction period shall be determined by the Law. If, after the one-year correction period but before the applicable limitation period has expired, the Owner discovers any Work which the Owner considers Defective Work, the Owner shall, unless the Defective Work requires emergency correction, promptly notify the Design-Builder and allow the Design-Builder an opportunity to correct the Work if the Design-Builder elects to do so. If the Design-Builder elects to correct the Work, it shall provide written notice of such intent within fourteen (14) Days of its receipt of notice from the Owner and shall complete the correction of Work within a mutually agreed timeframe. If the Design-Builder does not elect to correct the Work, the Owner may have the Work corrected by itself or Others , and, if the Owner intends to seek recovery of those costs from the Design-Builder, the Owner shall promptly provide the Design-Builder with an accounting of the correction costs it incurs.

3.8.5. If the Design-Builder's correction or removal of Defective Work causes damage to or destroys other completed or partially completed Work or existing buildings, the Design-Builder shall be responsible for the cost of correcting the destroyed or damaged property.

9



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

3.8.6. The one-year period for correction of Defective Work does not constitute a limitation period with respect to the enforcement of the Design-Builder's other obligations under the Contract Documents.

3.8.7. Prior to final payment, at the Owner's option and with the Design-Builder's agreement, the Owner may elect to accept Defective Work rather than require its removal and correction. In such case the Contract Price shall be equitably adjusted for any diminution in the value of the Project caused by such Defective Work.

3.9. CONFIDENTIALITY The Design-Builder shall treat as confidential and not disclose to third persons, except Subcontractors, Subsubcontractors, and the Design Professional as is necessary for the performance of the Work, or use for its own benefit any of the Owner's developments, confidential information, know-how, discoveries, production methods, and the like that may be disclosed to the Design-Builder or which the Design-Builder may acquire in connection with the Work. The Owner shall treat as confidential information all of the Design-Builder's estimating systems and historical and parameter cost data that may be disclosed to the Owner in connection with the performance of this Agreement. The Owner and the Design-Builder each specify those items to be treated as confidential and shall mark them as "Confidential."

3.10. ADDITIONAL SERVICES The Design-Builder shall provide or procure the following Additional services upon the request of the Owner. A written agreement between the Owner and Design-Builder shall define the extent of such Additional services. Such Additional services shall be considered a Change in the Work, unless they are specifically included in sections 3.1 or 3.2.

3.10.1. development of the Owner's Program, establishing the Project budget, investigating sources of financing, general business planning, and other information and documentation as may be required to establish the feasibility of the Project;

3.10.2. consultations, negotiations, and documentation supporting the procurement of Project financing;

3.10.3. surveys, site evaluations, legal descriptions, and aerial photographs;

3.10.4. appraisals of existing equipment, existing properties, new equipment, and developed properties;

3.10.5. soils, subsurface, and environmental studies, reports, and investigations required for submission to governmental authorities or others having jurisdiction over the Project;

3.10.6. consultations and representations before governmental authorities or others having jurisdiction over the Project other than normal assistance in securing building permits;

3.10.7. investigation or making measured drawings of existing conditions or the verification of Owner-provided drawings and information;

3.10.8. artistic renderings, models, and mockups of the Project or any part of the Project or the Work;

3.10.9. inventories of existing furniture, fixtures, furnishings, and equipment which might be under consideration for incorporation into the Work;

3.10.10. interior design and related services including procurement and placement of furniture, furnishings, artwork, and decorations;



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

3.10.11. making revisions to design documents after they have been approved by the Owner when revisions are due to causes beyond the control of the Design-Builder. Causes beyond the control of the Design-Builder do not include acts or omissions on the part of Subcontractors, Subsubcontractors, or the Design Professional;

3.10.12. design, coordination, management, expediting, and other services supporting the procurement of materials to be obtained, or work to be performed, by the Owner, including but not limited to telephone systems, computer wiring networks, sound systems, alarms, security systems, and other specialty systems which are not a part of this Agreement;

3.10.13. estimates, proposals. appraisals, consultations, negotiations, and services in connection with the repair or replacement of an insured loss, provided such repair or replacement did not result from the negligence of the Design-Builder;

3.10.14. the premium portion of overtime work ordered by the Owner including productivity impact costs, other than that required by the Design-Builder to maintain the Schedule of Work;

3.10.15. out-of-town travel by the Design Professional in connection with the Work, except between the Design Professional's office, Design-Builder's office, Owner's office, and the Project site;

3.10.16. obtaining service contractors and training maintenance personnel; assisting and consulting in the use of systems and equipment after the initial start up;

3.10.17. services for tenant or rental spaces not a part of this Agreement;

3.10.18. services requested by the Owner or required by the Work which are not specified in the Contract Documents and which are not normally part of generally accepted design and construction practice;

3.10.19. serving or preparing to serve as an expert witness in connection with any proceeding, legal or otherwise, regarding the Project;

3.10.20. document reproduction exceeding the limits provided for in this Agreement;

3.10.21. providing services relating to Hazardous Material discovered at the Worksite; and

3.10.22. other services as agreed to by the Parties and identified in an attached exhibit.

3.11. DESIGN-BUILDER'S REPRESENTATIVE The Design-Builder shall designate a person who shall be the Design-Builder's authorized representative. The Design-Builder's Representative is David Burgus, Senior Project Manager.

## ARTICLE 4 OWNER'S RESPONSIBILITIES

4.1. INFORMATION AND SERVICES PROVIDED BY OWNER

The Owner's responsibilities under this article shall be provided with reasonable detail and in a timely manner.

4.2. FINANCIAL INFORMATION Before commencing the Work and thereafter at the written request of the Design-Builder, the Owner shall provide the Design-Builder evidence of Project financing. Evidence of such financing shall be a condition precedent to the Design-Builder's commencing or continuing the Work. The Design-Builder shall be notified prior to any material change in Project financing.

11

**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** ® **2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

4.3. WORKSITE INFORMATION To the extent the Owner has obtained, or is required elsewhere in the Contract Documents to obtain, the following Worksite information, the Owner shall provide at the Owner's expense and with reasonable promptness:

4.3.1. information describing the physical characteristics of the site, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface conditions, and environmental studies, reports, and investigations. Legal descriptions shall include easements, title restrictions, boundaries, and zoning restrictions. Worksite descriptions shall include existing buildings and other construction and all other pertinent site conditions. Adjacent property descriptions shall include structures, streets, sidewalks, alleys, and other features relevant to the Work. Utility details shall include available services, lines at the Worksite and adjacent thereto, and connection points. The information shall include public and private information, subsurface information, grades, contours, and elevations, drainage data, exact locations and dimensions, and benchmarks that can be used by the Design-Builder in laying out the Work;

4.3.2. tests, inspections, and other reports dealing with environmental matters, Hazardous Material, and other existing conditions, including structural, mechanical, and chemical tests, required by the Contract Documents or by Law; and

4.3.3. any other information or services requested in writing by the Design-Builder which are required for Design-Builder's performance of the Work and under the Owner's control.

4.4. MECHANICS AND CONSTRUCTION LIEN INFORMATION Within seven (7) Days after receiving the Design-Builder's written request, the Owner shall provide the Design-Builder with the information necessary to give notice of or enforce mechanics lien rights and, where applicable, stop notices. This information shall include the Owner's interest in the real property on which the Project is located and the record legal title.

4.5. RESPONSIBILITIES DURING DESIGN

4.5.1. The Owner shall review and approve further development of the drawings and specifications as set forth in ARTICLE 3.

4.6. RESPONSIBILITIES DURING CONSTRUCTION

4.6.1. The Owner shall review the Schedule of Work, timely approve milestone dates set forth, and timely respond to its obligations.

4.6.2. If the Owner becomes aware of any error, omission, or failure to meet the requirements of the Contract Documents or any fault or defect in the Work, the Owner shall give prompt written notice to the Design-Builder. The failure of the Owner to give such notice shall not relieve the Design-Builder of its obligations to fulfill the requirements of the Contract Documents.

4.6.3. The Owner shall have no contractual obligations to Subcontractors, suppliers, or the Design Professional.

4.6.4. The Owner shall provide insurance for the Project as provided in ARTICLE 10.

4.7. OWNER'S REPRESENTATIVE The Owner's representative is David Morton, VP of Farm Operations. The representative:

12



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) © 2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

4.7.1. shall be fully acquainted with the Project;

4.7.2. agrees to furnish the information and services required of the Owner pursuant to section 4.3 so as not to delay the Design-Builder's Work; and

4.7.3. shall have authority to bind the Owner in all matters requiring the Owner's approval, authorization, or written notice. If the Owner changes its representative or the representative's authority as listed above, the Owner shall notify the Design-Builder in writing in advance.

4.8. TAX EXEMPTION If in accordance with the Owner's direction the Design-Builder claims an exemption for taxes, the Owner shall indemnify and hold the Design-Builder harmless from all liability, penalty, interest, fine, tax assessment, attorneys' fees, or other expense or cost incurred by the Design-Builder as a result of any action taken by the Design-Builder in accordance with the Owner's direction.

## ARTICLE 5 SUBCONTRACTS

Work not performed by the Design-Builder with its own forces shall be performed by Subcontractors or the Design Professional.

5.1. MANAGEMENT OF SUBCONTRACTORS The Design-Builder shall be responsible for the management of the Subcontractors in the performance of their work. The Design-Builder shall enter into written subcontracts with each subcontractor. The subcontracts shall require each subcontractor to (a) acknowledge the Owner as a third-party beneficiary of the subcontract, (b) provide Owner with evidence of insurance satisfying the insurance requirements of this Agreement, and (c) indemnify the Owner to the extent Design-Builder is required to indemnify the Owner.

5.2. CONTINGENT ASSIGNMENT OF SUBCONTRACT AGREEMENTS

5.2.1. If this Agreement is terminated, each subcontract agreement shall be assigned by the Design-Builder to the Owner, subject to the prior rights of any surety, provided that:

5.2.1.1. this Agreement is terminated by the Owner pursuant to sections 11.2 or 11.3; and

5.2.1.2. the Owner accepts such assignment, after termination by notifying the Subcontractor and Design-Builder in writing, and assumes all rights and obligations of the Design-Builder pursuant to each subcontract agreement.

5.2.2. If the Owner accepts such an assignment, and the Work has been suspended for more than thirty (30) consecutive Days, following termination, if appropriate, the Subcontractor's compensation shall be equitably adjusted as a result of the suspension.

## ARTICLE 6 CONTRACT TIME

6.1. DATE OF COMMENCEMENT The Date of Commencement is the Agreement date in ARTICLE 1 unless otherwise set forth below. The Work shall proceed in general accordance with the Schedule of Work as such schedule may be amended from time to time, subject, however, to other provisions of this Agreement.

6.2. SUBSTANTIAL COMPLETION/FINAL COMPLETION

6.2.1. Substantial Completion of the Work to be determined per Article 3.1.4.

13



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

6.2.2. Time is of the essence for this Agreement and Contract Documents.

6.2.3. Unless instructed by the Owner in writing, the Design-Builder shall not knowingly commence the Work before the effective date of insurance that is required to be provided by the Design-Builder and the Owner.

6.3. DELAYS AND EXTENSIONS OF TIME

6.3.1. If the Design-Builder is delayed at any time in the commencement or progress of the Work by any cause beyond the control of the Design-Builder, the Design-Builder shall be entitled to an equitable extension of the Date of Substantial Completion or the Date of Final Completion. Examples of causes beyond the control of the Design-Builder include, but are not limited to, the following: (a) acts or omissions of the Owner or Others; (b) changes in the Work or the sequencing of the Work ordered by the Owner, or arising from decisions of the Owner that impact the time of performance of the Work; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) delay authorized by the Owner pending dispute resolution or suspension by the Owner under Section 12.1; (e) transportation delays not reasonably foreseeable; (f) labor disputes not involving the Design-Builder; (g) general labor disputes impacting the Project but not specifically related to the Worksite; (h) fire; (i) Terrorism; (j) epidemics; (k) adverse governmental actions, (l) unavoidable accidents or circumstances; (m) adverse weather conditions not reasonably anticipated. The Design-Builder shall process any requests for equitable extensions of the Date of Substantial Completion or the Date of Final Completion in accordance with the provisions of ARTICLE 8.

6.3.2. In addition, if the Design-Builder incurs additional costs as a result of a delay that is caused by acts or omissions of the Owner or Others, changes in the Work or the sequencing of the Work ordered by the Owner, or arising from decisions of the Owner that impact the time of performance of the Work, encountering Hazardous Materials unanticipated by the Design-Builder or concealed or unknown conditions, delay authorized by the Owner pending dispute resolution, and suspension by the Owner under section 11.1, the Design-Builder shall be entitled to an equitable adjustment in the Contract Price subject to section 6.4.

6.3.3. In the event delays to the project are encountered for any reason, the Parties agree to undertake reasonable steps to mitigate the effect of such delays.

6.4. LIMITED MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES Except for damages mutually agreed upon by the Parties as liquidated damages in section 6.1 and excluding losses covered by insurance required by the Contract Documents, the Owner and the Design-Builder agree to waive all claims against each other for any consequential damages that may arise out of or relate to this Agreement, except for those specific items of damages excluded from this waiver as mutually agreed upon by the Parties and identified below. The Owner agrees to waive damages including but not limited to the Owner's loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, as well as the loss of business, loss of financing, principal office overhead and expenses, loss of profits not related to this Project, loss of reputation, or insolvency. The Design-Builder agrees to waive damages including but not limited to loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, or insolvency.

6.4.1. The following items of damages are excluded from this mutual waiver:

6.4.2. The provisions of this section shall also apply to the termination of this Agreement and shall survive such termination. The Owner and the Design-Builder shall require similar waivers in contracts with Subcontractors and Others retained for the Project.

14



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

## ARTICLE 7 CONTRACT PRICE

The Contract Price shall be determined based on Exhibit E: Contract Price, of this agreement, subject to adjustment in accordance with the provisions of ARTICLE 8.  Design and preconstruction work shall be cost plus fee, and construction services will be lump sum.

## ARTICLE 8 CHANGES IN THE WORK

Changes in the Work which are within the general scope of this Agreement may be accomplished without invalidating this Agreement by Change Order, Interim Directed Change, or a minor change in the Work, subject to the limitations stated in the Contract Documents.

8.1. CHANGE ORDERS

8.1.1. The Design-Builder may request or the Owner, without invalidating this Agreement, may order changes in the Work within the general scope of the Contract Documents consisting of adjustment to the Contract Price or the Date of Substantial Completion or the Date of Final Completion. All such changes in the Work shall be authorized by applicable Change Order, and processed in accordance with this article. Each adjustment in the Contract Price resulting from a Change Order shall clearly separate the amount attributable to Design services.

8.1.2. The Owner and the Design-Builder shall negotiate an appropriate adjustment to Contract Price or the Date of Substantial Completion or the Date of Final Completion in good faith and conclude negotiations as expeditiously as possible. Acceptance of the Change Order and any adjustment in the Contract Price or the Date of Substantial Completion or the Date of Final Completion shall not be unreasonably withheld.

8.1.3. NO OBLIGATION TO PERFORM The Design-Builder shall not be obligated to perform changes in the Work until a Change Order has been executed or a written Interim Directed Change has been issued.

8.2. INTERIM DIRECTED CHANGE

8.2.1. The Owner may issue a written Interim Directed Change directing a change in the Work prior to reaching agreement with the Design-Builder on the adjustment, if any, in the Contract Price or the Date of Substantial Completion or the Date of Final Completion, and if appropriate, the compensation for Design services.

8.2.2. The Owner and the Design-Builder shall negotiate expeditiously and in good faith for appropriate adjustments, as applicable, to the Contract Price or the Date of Substantial Completion or the Date of Final Completion, and if appropriate the compensation for Design services, arising out of Interim Directed Changes. As the changed work is completed, the Design Builder shall submit its costs for such work with its Application for Payment beginning with the next Application for Payment within thirty (30) Days of the issuance of the Interim Directed Change. Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment and shall be paid by Owner.

8.2.3. If the Owner and the Design-Builder agree upon the adjustments in the Contract Price or the Date of Substantial Completion or the Date of Final Completion, and if appropriate, the compensation for Design services, for a change in the Work directed by an Interim Directed

15



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

Change, such agreement shall be the subject of an appropriate Change Order. The Change Order shall include all outstanding Interim Directed Changes issued since the last Change Order.

## 8.3. MINOR CHANGES IN THE WORK

8.3.1. The Design-Builder may make minor changes in the design and construction of the Project consistent with the intent of the Contract Documents which do not involve an adjustment in the Contract Price or the Date of Substantial Completion or the Date of Final Completion; and do not materially and adversely affect the design of the Project, the quality of any of the materials or equipment specified in the Contract Documents, the performance of any materials, equipment, or systems specified in the Contract Documents, or the quality of workmanship required by the Contract Documents.

8.3.2. The Design-Builder shall promptly inform the Owner in writing of any such changes and shall record such changes on the Design-Build Documents maintained by the Design-Builder.

## 8.4. DETERMINATION OF COST

8.4.1. An increase or decrease in the Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

8.4.1.1. unit prices set forth in this Agreement or as subsequently agreed;

8.4.1.2. a mutually accepted, itemized lump sum.

**8.5. CONCEALED OR UNKNOWN SITE CONDITIONS** If the conditions encountered at the Worksite are (a) subsurface or other physical conditions materially different from those indicated in the Contract Documents, or (b) unusual and unknown physical conditions materially different from conditions ordinarily encountered and generally recognized as inherent in Work provided for in the Contract Documents, the Design-Builder shall stop affected Work after the condition is first observed and give prompt written notice of the condition to the Owner and the Design Professional. The Design-Builder shall not be required to perform any Work relating to the unknown condition without the written mutual agreement of the Parties. Any change in the Contract Price or the Contract Time as a result of the unknown condition shall be determined as provided in this article.

**8.6. CLAIMS FOR ADDITIONAL COST OR TIME** For any claim for an increase in the Contract Price or an extension in the Date of Substantial Completion or the Date of Final Completion, the Design-Builder shall give the Owner written notice of the claim within twenty-one (21) Days after the occurrence giving rise to the claim or within twenty-one (21) Days after the Design-Builder first recognizes the condition giving rise to the claim, whichever is later. Except in an emergency, notice shall be given before proceeding with the Work. Claims for design and estimating costs incurred in connection with possible changes requested by the Owner, but which do not proceed, shall be made within twenty-one (21) Days after the decision is made not to proceed. Thereafter, the Design-Builder shall submit written documentation of its claim, including appropriate supporting documentation, within twenty-one (21) Days after giving notice, unless the Parties mutually agree upon a longer period of time. The Owner shall respond in writing denying or approving the Design-Builder's claim no later than fourteen (14) Days after receipt of the Design-Builder's documentation of claim. Owner's failure to so respond shall be deemed a denial of the Design-Builder's claim. Any change in Contract Price or the Date of Substantial Completion or the Date of Final Completion resulting from such claim shall be authorized by Change Order.

**8.7. CHANGES IN LAW** In the event any changes in laws or regulations affecting the performance of the Work, including taxes, were not reasonably anticipated and then enacted after the date of this Agreement,


**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

the Contract Price and the Date of Substantial Completion or the Date of Final Completion, and if appropriate the compensation for Design services, shall be equitably adjusted by Change Order.

**ARTICLE 9 PAYMENT**

9.1. PROGRESS PAYMENT

9.1.1. Prior to submitting the first application for payment, the Design-Builder shall provide a Schedule of Values satisfactory to the Owner, consisting of a breakdown of the Contract Price, with a separate line item for Design services. As a condition precedent to each payment, Design-Builder shall deliver a general waiver of lien with each application for payment, conditioned only on receipt of payment from Owner. After the first payment, Contractor shall also provide lien waivers from each subcontractor and material supplier for Work that was paid for by Owner.

9.1.2. On or before the 20th  Day of each month after the Work has commenced, the Design-Builder shall submit to the Owner an application for payment in accordance with the Schedule of Values based upon the Work completed and materials suitably stored on the Worksite or at other locations approved by the Owner. Approval of payment applications for such stored materials shall be conditioned upon submission by the Design-Builder of bills of sale and applicable insurance or such other procedures satisfactory to the Owner to establish the Owner's title to such materials, or otherwise to protect the Owner's interest including transportation to the site.

9.1.3. Within five (5) Days after receipt of each monthly application for payment, the Owner shall give written notice to the Design-Builder of the Owner's acceptance or rejection, in whole or in part, of such application for payment. Within seven (7) Days after accepting such Application, the Owner shall pay directly to the Design-Builder the appropriate amount for which application for payment is made, less amounts previously paid by the Owner. If such application is rejected in whole or in part, the Owner shall indicate the reasons for its rejection. If the Owner and the Design-Builder cannot agree on a revised amount, then, within seven (7) Days after its initial rejection in part of such application, the Owner shall pay directly to the Design-Builder the appropriate amount for those items not rejected by the Owner for which application for payment is made, less amounts previously paid by the Owner. Those items rejected by the Owner shall be due and payable when the reasons for the rejection have been removed.

9.1.4. If the Owner fails to pay the Design-Builder at the time payment of any amount becomes due, then the Design-Builder may, at any time thereafter, upon serving written notice that the Work will be stopped within seven (7) Days after receipt of the notice by the Owner, and after such seven (7) Day period, stop the Work until payment of the amount owing has been received.

9.1.5. Payments due but unpaid pursuant to subsection 9.1.3, less any amount retained pursuant to section 9.2 or 9.3, may bear interest from the date payment is due at the prime rate prevailing at the place of the Project.

9.1.6. The Design-Builder warrants and guarantees that title to all Work, materials, and equipment covered by an application for payment, whether incorporated in the Project or not, will pass to the Owner upon receipt of such payment by the Design-Builder free and clear of all liens, claims, security interests, or encumbrances, hereinafter referred to as "liens."

9.1.7. The Owner's progress payment, occupancy, or use of the Project, whether in whole or in part, shall not be deemed an acceptance of any Work not conforming to the requirements of the Contract Documents.



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) ©** 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

9.1.8. Upon Substantial Completion of the Work, the Owner shall pay the Design-Builder the unpaid balance of the Contract Price, less a sum equal to one hundred fifty percent (150%) of the Design-Builder's estimated cost of completing any unfinished items as agreed to between the Owner and Design-Builder as to extent and time for completion. The Owner thereafter shall pay the Design-Builder monthly the amount retained for unfinished items as each item is completed.

9.1.9. STORED MATERIALS AND EQUIPMENT Unless otherwise provided in the contract documents, applications for payment may include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage and costs incurred transporting the materials to an offsite storage facility. Approval of payment applications for stored materials and equipment stored offsite shall be conditioned on submission by the Design-Builder of bills of sale and proof of required insurance, or such other procedures satisfactory to the Owner to establish the proper valuation of the stored materials and equipment, the Owner's title to such materials and equipment, and to otherwise protect the Owner's interests therein, including transportation to the site.

9.2. RETAINAGE From each progress payment made prior to the time of Substantial Completion, the Owner may retain five percent (5%) of the amount otherwise due after deduction of any amounts as provided in section 9.3, and in no event shall such percentage exceed any applicable statutory requirements. If the Owner chooses to use this retainage provision:

9.2.1. after the Work is fifty percent (50%) complete, the Owner shall withhold no additional retainage and pay the Design-Builder the full amount due on account of subsequent progress payments;

9.2.2. the Owner may, in its sole discretion, reduce the amount to be retained at any time;

9.2.3. the Owner may release retainage on that portion of the Work a Subcontractor has completed, in whole or in part, and which work the Owner has accepted;

9.3. ADJUSTMENT OF DESIGN-BUILDER'S APPLICATION FOR PAYMENT The Owner may adjust or reject an application for payment or nullify a previously approved application for payment, in whole or in part, as may reasonably be necessary to protect the Owner from loss or damage based upon the following, to the extent that the Design-Builder is responsible under this Agreement:

9.3.1. the Design-Builder's repeated failure to perform the Work as required by the Contract Documents;

9.3.2. except as accepted by the insurer providing Builders Risk or other property insurance covering the project, loss or damage arising out of or relating to this Agreement and caused by the Design-Builder to the Owner, or Others to whom the Owner may be liable;

9.3.3. the Design-Builder's failure to pay the Design Professional or Subcontractors for labor, materials, equipment, or supplies properly furnished in connection with the Work, provided that the Owner is making payments to the Design-Builder in accordance with the terms of this Agreement;

9.3.4. Defective Work not corrected in a timely fashion;

9.3.5. reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Date of Substantial Completion or the Date of Final Completion, and that the unpaid balance of the Contract Price is not sufficient to offset any direct damages that may be sustained by the Owner as a result of the anticipated delay caused by the Design-Builder;

18



ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

9.3.6. reasonable evidence demonstrating that the unpaid balance of the Contract Price is insufficient to fund the cost to complete the Work;

9.3.7. uninsured third-party claims involving the Contractor or reasonable evidence demonstrating that third-party claims are likely to be filed unless and until the Contractor furnishes the Owner with adequate security in the form of a surety bond, letter of credit, or other collateral or commitment which are sufficient to discharge such claims if established; and

9.3.8. uninsured third-party claims involving the Design-Builder or reasonable evidence demonstrating that third-party claims are likely to be filed unless and until the Design-Builder furnishes the Owner with adequate security in the form of a surety bond, letter of credit, or other collateral or commitment sufficient to discharge such claims if established.

No later than seven (7) Days after receipt of an application for payment, the Owner shall give written notice to the Design-Builder, at the time of disapproving or nullifying all or part of an application for payment, stating its specific reasons for such disapproval or nullification, and the remedial actions to be taken by the Design-Builder in order to receive payment. When the above reasons for disapproving or nullifying an application for payment are removed, payment will be promptly made for the amount previously withheld.

## 9.4. OWNER OCCUPANCY OR USE OF COMPLETED OR PARTIALLY COMPLETED WORK

9.4.1. Portions of the Work that are completed or partially completed may be used or occupied by the Owner when (a) the portion of the Work is designated in a Certificate of Substantial Completion, (b) appropriate insurer(s) or sureties consent to the occupancy or use, and (c) appropriate public authorities authorize the occupancy or use. Such partial occupancy or use shall constitute Substantial Completion of that portion of the Work. The Design-Builder shall not unreasonably withhold consent to partial occupancy or use. The Owner shall not unreasonably refuse to accept partial occupancy or use, provided such partial occupancy or use is of value to the Owner.

## 9.5. FINAL PAYMENT

9.5.1. Final payment, consisting of the unpaid balance of the Contract Price, shall be due and payable when the Work is fully completed. Before issuance of final payment, the Owner may request satisfactory evidence that all payrolls, materials bills, and other indebtedness connected with the Work have been paid or otherwise satisfied.

9.5.2. In making final payment the Owner waives all claims except for:

9.5.2.1. outstanding liens;

9.5.2.2. improper workmanship or defective materials appearing within one year after the date of Substantial Completion;

9.5.2.3. Work not in conformance with the Contract Documents; and

9.5.2.4. terms of any special warranties required by the Contract Documents.

9.5.3. In accepting final payment, the Design-Builder waives all claims except those previously made in writing and which remain unsettled.

19


**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) © 2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

## ARTICLE 10 INDEMNITY, INSURANCE, AND BONDS

10.1. INDEMNITY

10.1.1. To the fullest extent permitted by law, the Design-Builder shall indemnify and hold harmless the Owner, Owner's officers, directors, members, consultants, agents, and employees (the Indemnitees) from all claims for bodily injury and property damage, other than to the Work itself and other property required to be insured under section 10.3, including reasonable attorneys' fees, costs, and expenses that may arise from the performance of the Work, but only to the extent caused by the negligent acts or omissions of the Design-Builder, Subcontractors, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. The Design-Builder shall not be required to indemnify or hold harmless the Indemnitees for any negligent acts or omissions of the Indemnitees. The Design-Builder shall be entitled to reimbursement of any defense costs paid above Design-Builder's percentage of liability for the underlying claim to the extent provided for by the subsection below.

10.1.2. To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Design-Builder, its officers, directors, or members, Subcontractors, or anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable from all claims for bodily injury and property damage, other than property insured under section 10.3, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Others, but only to the extent caused by the negligent acts or omissions of Others.  The Owner shall be entitled to reimbursement of any defense costs paid above the Owner's percentage of liability for the underlying claim to the extent provided for by the subsection above.

10.1.3. NO LIMITATION ON LIABILITY In any and all claims against the Indemnitees by any employee of the Design-Builder, anyone directly or indirectly employed by the Design-Builder or anyone for whose acts the Design-Builder may be liable, the indemnification obligation shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for the Design-Builder under Workers' Compensation acts, disability benefit acts, or other employee benefit acts.

10.2. DESIGN-BUILDER'S LIABILITY INSURANCE

10.2.1. Prior to commencing the Work and as a condition for payment, the Design-Builder shall procure and maintain in force Workers' Compensation Insurance, Employers' Liability Insurance, Business Automobile Liability Insurance, and Commercial General Liability Insurance (CGL). The CGL policy shall include coverage for liability arising from premises, operations, independent contractors, products-completed operations, personal injury and advertising injury, contractual liability, and broad form property damage.  The Design-Builder shall maintain completed operations liability insurance for one year after Substantial Completion, or as required by the Contract Documents, whichever is longer. The Design-Builder's Employers' Liability, Business Automobile Liability, and CGL policies shall be written with at least the following limits of liability:

10.2.1.1. Employers' Liability Insurance

(a)  $1,000,000 bodily injury by accident per accident
(b)  $1,000,000 bodily injury by disease policy limit
(c)  $1,000,000 bodily injury by disease per employee

10.2.1.2. Business Automobile Liability Insurance per accident $1,000,000.

10.2.1.3. Commercial General Liability Insurance

20



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) ©2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

(a) Per occurrence $2,000,000
(b) General aggregate $4,000,000
(c) Products/completed operations aggregate $4,000,000
(d) Personal and advertising injury limit $2,000,000

10.2.2. Employers' Liability, Business Automobile Liability, and Commercial General Liability coverage required under subsection 10.2.1 may be arranged under a single policy for the full limits required or by a combination of underlying policies with the balance provided by Excess or Umbrella Liability policies.

10.2.3. The Design-Builder shall maintain in effect all insurance coverage required under subsection 10.2.1 with insurance companies lawfully authorized to do business in the jurisdiction in which the Project is located. If the Design-Builder fails to obtain or maintain any insurance coverage required under this Agreement, the Owner may purchase such coverage and charge the expense to the Design-Builder, or terminate this Agreement.

10.2.4. To the extent commercially available to the Design-Builder and its current insurance company, insurance policies required under subsection 10.2.1 shall contain a provision that the insurance company or its designee must give the Owner written notice transmitted in paper or electronic format: (a) 30 Days before coverage is nonrenewed by the insurance company and (b) within 10 Business Days after cancelation of coverage by the insurance company. Prior to commencing the Work and upon renewal or replacement of the insurance policies, the Design-Builder shall furnish the Owner with certificates of insurance until one year after Substantial Completion or longer if required by the Contract Documents. In addition, if any insurance policy required under subsection 10.2.1 is not to be immediately replaced without lapse in coverage when it expires, exhausts its limits, or is to be cancelled, the Design-Builder shall give Owner prompt written notice upon actual or constructive knowledge of such condition.

## 10.3. PROPERTY INSURANCE

10.3.1. Before commencing the Work, the Design-Builder shall obtain and maintain Builder's Risk Policy. The Owner shall be solely responsible for any deductible amounts or coinsurance penalties.

10.3.2. Owner and Design-Builder waive all rights against each other and their respective employees, agents, contractors, subcontractors, and subsubcontractors and the Design Professional for damages caused by risks covered by the property insurance except such rights as they may have to the proceeds of the insurance and such rights as the Design-Builder may have for the failure of the Owner to obtain and maintain property insurance in compliance with subsection 10.3.1.

10.3.3. Design-Builder shall require its subcontractors to provide evidence of insurance in the same types that Design-Builder is required to provide, in amounts appropriate for the scope of Work of the Subcontractor.

10.3.4. RISK OF LOSS Except to the extent a loss is covered by applicable insurance, risk of loss or damage to the Work shall be upon the Design-Builder until the Date of Substantial Completion, unless otherwise agreed to by the Parties.

## 10.4. OWNER'S INSURANCE

21


**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

10.4.1. BUSINESS INCOME INSURANCE The Owner may procure and maintain insurance against loss of use of the Owner's property caused by fire or other casualty loss.

10.4.2. OWNER'S LIABILITY INSURANCE The Owner shall either self-insure or obtain and maintain its own liability insurance for protection against claims arising out of the performance of this Agreement by Owner, including, without limitation, loss of use and claims, losses and expenses arising out of the Owner's acts or omissions.

10.5. ROYALTIES, PATENTS, AND COPYRIGHTS The Design-Builder shall pay all royalties and license fees which may be due on the inclusion of any patented or copyrighted materials, methods, or systems selected by the Design-Builder and incorporated in the Work. The Design-Builder shall indemnify and hold the Owner harmless from all suits or claims for infringement of any patent rights or copyrights arising out of such selection. The Owner agrees to indemnify and hold the Design-Builder harmless from any suits or claims of infringement of any patent rights or copyrights arising out of any patented or copyrighted materials, methods, or systems specified by the Owner.

10.6. PROFESSIONAL LIABILITY INSURANCE The Design-Builder shall obtain, either itself or through the Design Professional, professional liability insurance for claims arising from the negligent performance of professional services under this Agreement, which shall be:

Practice Policy

written for not less than $1,000,000 per claim and in the aggregate with a deductible not to exceed $100,000. The Professional Liability Insurance shall include prior acts coverage sufficient to cover all services rendered by the Design Professional.

10.7. To the fullest extent permitted by law, Design-Builder shall defend, indemnify and hold Owner, Owner's officers, directors, members, consultants, agents and employees harmless from all claims for bodily injury and property damage, other than to the Work itself and other property insured by Owner, that may arise from the performance of the Work to the extent of the negligence attributed to such acts or omissions by Design-Builder, subcontractors or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. Design-Builder shall not be required to defend, indemnify or hold harmless Owner, or others retained by Owner from any liability to the extent arising from any acts, omissions or negligence of Owner or other retained by Owner.

## 11. SUSPENSION, NOTICE TO CURE, AND TERMINATION

11.1. SUSPENSION BY THE OWNER FOR CONVENIENCE

11.1.1. The Owner may order the Design-Builder in writing to suspend, delay, or interrupt all or any part of the Work without cause for such period of time as the Owner may determine to be appropriate for its convenience.

11.1.2. Adjustments caused by suspension, delay, or interruption shall be made for increases in the Contract Price or the Date of Substantial Completion or the Date of Final Completion. No adjustment shall be made if the Design-Builder is or otherwise would have been responsible for the suspension, delay, or interruption of the Work, or if another provision of this Agreement is applied to render an equitable adjustment.

11.2. OWNER'S RIGHT TO PERFORM DESIGN-BUILDER'S OBLIGATIONS AND TERMINATION BY THE OWNER FOR CAUSE

22



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

11.2.1. If the Design-Builder persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved Schedule of the Work, or fails to make prompt payment to its workers, Subcontractors, or Material Suppliers, disregards Laws or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this Agreement, the Design-Builder may be deemed in default.

If the Design-Builder fails within seven (7) Days after receipt of written notice to commence and continue satisfactory correction of such default, then the Owner shall give the Design-Builder a second notice to correct the default within a three (3) Day period.

11.2.2. If the Design-Builder fails to promptly commence and continue satisfactory correction of the default following receipt of such second notice, the Owner without prejudice to any other rights or remedies may: (a) take possession of the Worksite; (b) complete the Work utilizing any reasonable means; (c) withhold payment due to the Design-Builder; and (d) as the Owner deems necessary, supply workers and materials, equipment, and other facilities  for the satisfactory correction of the default, and charge the Design-Builder the costs and expenses, including reasonable Overhead, profit, and attorneys' fees.

11.2.3. In the event of an emergency affecting the safety of persons or property, the Owner may immediately commence and continue satisfactory correction of a default without first giving written notice to the Design-Builder, but shall give prompt written notice of such action to the Design-Builder following commencing the action.

11.2.4. If the Design-Builder files a petition under the bankruptcy code, this Agreement shall terminate if the Design-Builder or the Design-Builder's trustee rejects the Agreement or, if there has been a default, the Design-Builder is unable to give adequate assurance that the Design-Builder will perform as required by this Agreement or otherwise is unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.2.5. In the event the Owner exercises its rights under subsections 11.2.1 or 11.2.2, upon the request of the Design-Builder the Owner shall provide a detailed accounting of the cost incurred by the Owner.

11.2.6. If the Owner terminates this Agreement for default, and it is later determined that the Design-Builder was not in default, or that the default was excusable under the terms of the Contract Documents, then, in such event, the termination shall be deemed a termination for convenience, and the rights of the Parties shall be as set forth in section 11.3.

11.2.7. If Design-Builder is adjudged bankrupt; makes a general assignment for the benefit of its creditors; then the Owner may, without prejudice to any right or remedy and after giving Design-Builder seven (7) Days written notice, terminate this Agreement and take possession of the Work without further notice.

11.3. TERMINATION BY OWNER FOR CONVENIENCE If the Owner terminates this Agreement other than as set forth in section 11.2, the Owner shall pay the Design-Builder for all Work executed and for all proven loss, cost, or expense in connection with the Work, plus all demobilization costs. In addition, the Design-Builder shall be paid an amount calculated as set forth below: 8% of expenses.

11.3.1. If the Owner terminates this Agreement before commencing construction, the Design-Builder shall be paid the unpaid balance of the Design-Builder's design costs as set forth in the Schedule of Values and a premium as set forth below:  8%.



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

11.3.2. If the Owner terminates this Agreement after commencing construction, the Design-Builder shall be paid the unpaid balance of the Design-Builder's design costs as set forth in the Schedule of Values, the Construction services provided to date, and a premium as set forth below: 8%.

11.3.3. The Owner shall also pay to the Design-Builder fair compensation, either by purchase or rental at the election of the Owner, for all equipment retained. The Owner shall assume and become liable for obligations, commitments, and unsettled claims that the Design-Builder has previously undertaken or incurred in good faith in connection with the Work or as a result of the termination of this Agreement. As a condition of receiving the payments provided under this article, the Design-Builder shall cooperate with the Owner by taking all steps necessary to accomplish the legal assignment of the Design-Builder's rights and benefits to the Owner, including the execution and delivery of required papers.

11.3.4. The Owner may, at any time, terminate the Agreement for the Owner's convenience and without cause.

11.3.4.1. Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Design-Builder shall (a) cease operations as directed by the Owner in the notice, (b) take actions necessary, or that the Owner may direct, for the protection and preservation of the Work, and (c) except for Work directed to be performed prior to the effective date of terminations stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

11.3.4.2. In case of such termination for the Owner's convenience, the Design-Builder shall be entitled to receive payment for Work executed in accordance with the Contract Documents, unpaid balance of design costs as stated in the schedule of values, and premium as set forth below: 8% of expenses.

## 11.4. TERMINATION BY THE DESIGN-BUILDER

11.4.1. Upon seven (7) Days' written notice to the Owner, the Design-Builder may terminate this Agreement for any of the following reasons:

11.4.1.1. if the Work has been stopped for a thirty (30) Day period (a) under court order or order of other governmental authorities having jurisdiction, or (b) as a result of the declaration of a national emergency or other governmental act emergency during which, through no act or fault of the Design-Builder, materials are not available;

11.4.1.2. if the Work is suspended by the Owner for thirty (30) Days; or

11.4.1.3. if the Owner fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project in accordance with section 4.2 of this Agreement.

11.4.2. If the Owner has for thirty (30) Days failed to pay the Design-Builder pursuant to subsection 9.1.3, the Design-Builder may give written notice of its intent to terminate this Agreement. If the Design-Builder does not receive payment within seven (7) Days of giving

24



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) © 2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

written notice to the Owner, then upon seven (7) Days' additional written notice to the Owner, the Design-Builder may terminate this Agreement.

11.4.3. Upon termination by the Design-Builder in accordance with subsection 11.4.1, the Design-Builder shall be entitled to recover from the Owner payment for all Work executed and for all proven loss, cost, or expense in connection with the Work, plus all demobilization costs and reasonable damages. In addition, the Design-Builder shall be paid an amount calculated as set forth either in subsection 11.3.1 or 11.3.2, depending on when the termination occurs, and subsection 11.3.3.

## 12. DISPUTE MITIGATION OR RESOLUTION

12.1. WORK CONTINUANCE AND PAYMENT Unless otherwise agreed in writing, the Design-Builder shall continue the Work and maintain the approved schedules during any dispute mitigation or resolution proceedings. If the Design-Builder continues to perform, the Owner shall continue to make payments in accordance with the Agreement.

12.2. DIRECT DISCUSSIONS If the Parties cannot reach resolution on a matter relating to or arising out of this Agreement, the Parties shall endeavor to reach resolution through good faith direct discussions between the Parties' representatives, who shall possess the necessary authority to resolve such matter and who will record the date of first discussions. If the Parties' representatives are not able to resolve such matter within five (5) Business Days of the date of first discussion, the Parties' representatives shall immediately inform senior executives of the Parties in writing that resolution was not affected. Upon receipt of such notice, the senior executives of the Parties shall meet within five (5) Business Days to endeavor to reach resolution. If the dispute remains unresolved after fifteen (15) Days from the date of first discussion, the Parties shall submit such matter to the dispute mitigation and dispute resolution procedures selected herein.

12.3. BINDING DISPUTE RESOLUTION  If the matter remains unresolved after submission of the matter to a mitigation procedure or to mediation, the Parties shall submit the matter to the binding dispute resolution procedure selected herein:  Arbitration using the current Construction Industry Arbitration Rules of the American Arbitration Association or the Parties may mutually agree to select another set of arbitration rules. The administration of the arbitration shall be as mutually agreed by the Parties.:

12.3.1. The costs of any binding dispute resolution processes shall be borne by the non-prevailing Party, as determined by the adjudicator of the dispute.

12.3.2. VENUE The venue of any binding dispute resolution procedure shall be Des Moines, Iowa.

12.3.3. Notwithstanding anything to the contrary in this Agreement, (1) Owner shall have the right to join the Design-Builder in any dispute with any third party in any forum in which Owner is required to appear and (2) Owner shall have the right to litigate in a state or federal court of competent jurisdiction any dispute in which the amount in controversy is $250,000 or more, regardless of who commenced the action or whether a demand for arbitration has been delivered or arbitration has commenced.

12.4. MULTIPARTY PROCEEDING The Parties agree that all Parties necessary to resolve a matter shall be Parties to the same dispute resolution procedure. Appropriate provisions shall be included in all other contracts relating to the Work to provide for the joinder or consolidation of such dispute resolution proceedings.



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price)** © 2012. Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**

12.5. LIEN RIGHTS Nothing in this article shall limit any rights or remedies not expressly waived by the Design-Builder that the Design-Builder may have under lien laws.

12.6. ADDITIONAL REMEDIES. In addition to any other remedy that may be available to the Owner under Article 12, or at law or in equity, Design-Builder expressly agrees that payment otherwise due Design-Builder from Owner may be withheld for default under this Agreement and held until the default is cured, and all costs incurred by the Owner, including any applicable re-inspection fees, shall be charged against payments otherwise due to Design-Builders under this Agreement, if:

> 12.6.1. The work provided by Design-Builder pursuant to this Agreement is found to be defective or incomplete and is not remedied in accordance with this Agreement;

> 12.6.2. Design-Builder does not make prompt and proper payments to its employees, agents and/or subcontractors, or fails to pay for any labors, material or equipment furnished to Design-Builder by third parties;

> 12.6.3. Owner's Work is damaged by an act for which Design-Builder, or its employees, agents or subcontractors, is responsible, provided Owner shall release any funds it withholds upon recovery of insurance, if any, for the damage;

> 12.6.4. Claims or liens are filed against the Site or other property of Owner as a result of Design-Builder's acts or omissions;

> 12.6.5. Owner reasonably believes that Design-Builder's Work is not progressing satisfactorily or that the Work cannot or may not be completed in accordance with the terms of this Agreement or the specifications;

> 12.6.6. Design-Builder fails to timely provide evidence of insurance required pursuant to this Agreement.

> 12.6.7. Design-Builder fails to performs, or to pay the costs and expenses of, warranty service that Design-Builder is obligated to provide under this Agreement;

> 12.6.8. Contractor fails to comply with any other provision of this Agreement.

12.7   OWNER'S RIGHT TO CORRECT WORK. If the Design-Builder defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a ten-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design-Builder the reasonable cost of correcting such deficiencies, including Owner's expenses. Such action by the Owner and amounts charged to the Design-Builder are both subject to prior approval of the Architect. If payments then or thereafter due the Design-Builder are not sufficient to cover such amounts, the Design Builder shall pay the difference to the Owner.

## 13. MISCELLANEOUS

13.1. EXTENT OF AGREEMENT Except as expressly provided, this Agreement is solely for the benefit of the Parties, represents the entire and integrated agreement between the Parties, and supersedes all prior negotiations, representations, or agreements, either written or oral. This Agreement and each and every provision is for the exclusive benefit of the Owner and Design-Builder and not for the benefit of any third party.

26



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) ©2012**, Revised April 2014. THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
CONTENT SECURE ID: 6D20E063-1F8F

13.2. ASSIGNMENT Neither the Owner nor the Design-Builder shall assign its interest in this Agreement without the written consent of the other except as to the assignment of proceeds. The terms and conditions of this Agreement shall be binding upon both Parties, their partners, successors, assigns, and legal representatives. Neither Party to this Agreement shall assign the Agreement as a whole without written consent of the other except that the Owner may assign the Agreement to a wholly owned subsidiary of the Owner when the Owner has fully indemnified the Design-Builder or to an institutional lender providing construction financing for the Project as long as the assignment is no less favorable to the Design-Builder than this Agreement. In the event of such assignment, the Design-Builder shall execute all consents reasonably required. In such event, the wholly-owned subsidiary or lender shall assume the Owner's rights and obligations under the Contract Documents. If either Party attempts to make such an assignment, that Party shall nevertheless remain legally responsible for all obligations under the Agreement, unless otherwise agreed by the other Party.

13.3. GOVERNING LAW This Agreement shall be governed by Iowa law.

13.4. SEVERABILITY The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision.

13.5. NO WAIVER OF PERFORMANCE The failure of either Party to insist, in any one or more instances, on the performance of any of the terms, covenants, or conditions of this Agreement, or to exercise any of its rights, shall not be construed as a waiver or relinquishment of such term, covenant, condition, or right with respect to further performance.

13.6. TITLES AND GROUPINGS The title given to the articles and sections are for ease of reference only and shall not be relied upon or cited for any other purpose.

13.7. JOINT DRAFTING The Parties expressly agree that this Agreement was jointly drafted, and that both had opportunity to negotiate its terms and to obtain the assistance of counsel in reviewing its terms prior to execution. Therefore, this Agreement shall be construed neither against nor in favor of either Party, but shall be construed in a neutral manner.

13.8. RIGHTS AND REMEDIES The Parties' rights, liabilities, responsibilities, and remedies with respect to this Agreement, whether in contract, tort, negligence, or otherwise, shall be exclusively those expressly set forth in this Agreement.

## 14. CONTRACT DOCUMENTS

14.1. CONTRACT DOCUMENTS The Contract Documents are as follows:

    (a) This Agreement
    (b) Exhibit A, Scope of Work
    (c) Exhibit B, Contract Documents
    (d) Exhibit C, Project Schedule
    (e) Exhibit D, Allowances
    (f) Exhibit E, Contract Price

14.2. ORDER OF PRECEDENCE In case of any inconsistency, conflict, or ambiguity among the Contract Documents, the documents shall govern in the following order: (a) Change Orders and written amendments to this Agreement, including Amendment 1; (b) this Agreement; (c) design documents approved by the Owner pursuant to subsection 2.4.14 and section 3.1.3 in order of the most recently approved; (d) information furnished by the Owner pursuant to section 4.1 or designated as a contract document in section 14.1; (e) other documents listed in this Agreement. Except as otherwise provided,



**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) ©2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited. **CONTENT SECURE ID: 6D20E063-1F8F**

among categories of documents having the same order of precedence, the term or provision that includes the latest date shall control. Information identified in one Contract Document and not identified in another shall not be considered a conflict or inconsistency.

OWNER: [ ✓ ]

BY: _David Morton_   NAME: DAVID MORTON   TITLE: V. Pres. Farm Ops

WITNESS: _Corey Gerdes_   NAME: Corey Gerdes   TITLE: Ops. Manager

DESIGN-BUILDER: [ ✓ ]

BY: _____   NAME: KEVIN M WALKER   TITLE: PRESIDENT

WITNESS: _____   NAME: James Feret   TITLE: VP Operations

END OF DOCUMENT.

28

**ConsensusDocs ®415 – Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder (Lump Sum Price) ©2012. Revised April 2014.** THIS DOCUMENT MAY HAVE BEEN MODIFIED. The ConsensusDocs technology platform creates a redline comparison to the standard language which the purchaser of this contract is authorized to share for review purposes. Consultation with legal and insurance counsel are strongly encouraged. You may only make copies of finalized documents for distribution to parties in direct connection with this contract. Any other uses are strictly prohibited.
**CONTENT SECURE ID: 6D20E063-1F8F**



☒ **Johnston Office**
P.O. Box 394
5800 Merle Hay Rd.
Suite 14
Johnston, IA 50131
515.253.0943
515.253.0942 Fax

☐ **Latimer Office**
P.O. Box 669
113 N. Akir
Latimer, IA 50452
641.579.6000
641.579.6006 Fax

## General Contractors · Construction Managers
### Agricultural · Commercial

www.henningcompanies.com

---

## EXHIBIT A

### 212' x 452' x 31'-10" - 2 Level Panelized Framed Cage Free Layer House

**SCOPE OF WORK DESCRIPTION**

The following outline specification describes the scope of work included in our proposed price. The scope of work listed below will supersede any and all conversations and correspondence unless specifically listed below. This scope of work is solely based upon the construction / design drawings and documents per exhibit "B"

### Scope of Work

**Site Work / Excavation**
1. HCLC included cost and coordination of soils engineering for the buildings.
2. Based on conditions and recommendations pricing will be adjusted accordingly.
3. Included in the estimate are temporary construction roads.
4. Permanent roads not included in base price.
5. Grading and compacted fill is included.
6. Compaction testing and erosion control plan as required is included.

**Concrete**
1. Concrete footings and foundation walls will be reinforced and detailed as on the EPS drawings
2. Concrete slab will be 4" thick non-reinforced
3. Concrete work for the manure and transfer pit are included. 6'-0" wide x 7'-0" tall – Pit to include ventilation fan.
   a. Manure trench inside building to be covered with 3" bridge planks, and steel H-frames at manure openings.
4. Portion of manure tunnel between buildings is included in each layer barn price.
   a. Manure tunnel to be poured in place concrete
   b. Steel span decking, with poured in place concrete deck on tunnel lid. Tunnel to be traffic rated.
5. Concrete material is included at 4000 psi mix for all concrete flatwork and walls, Footings 3500 psi minimum.
6. Supply and installation necessary anchor bolts and embeds.

**Framing**
1. Complete materials and labor package included.
2. Base 212' x 452' base Structural Insulated Panelized Structure.
3. Overall length of building including end wall overhangs is 484'
4. 15'-0" overall wall height Per Floor (31'-10" overall)
5. 24" concrete stem wall first floor only
6. Sidewalls to be 15'-0" from floor to bottom of LVL
   a. 7-1/4" wide earthafoam sill seal
   b. Treated 2" x 8" sill plate, Double SPF 2"x8" top plate
   c. Interior laminate face to be .060 FRP
   d. Interior wall substrate 5/8" cc pts Douglas fir plywood
   e. 7-3/8" 1.0 lb. density expanded polystyrene (boron treated)
   f. Exterior wall 1/2" cdx plywood
   g. Interior wall seam covered with extruded aluminum batten
   h. Exterior walls have Horizontal Painted white 29 ga G-60 galvanized steel
7. Endwalls to be same as sidewall design
   a. Exterior siding to be roll form steel

    b. 29 ga thick prime steel
    c. Painted White Siliconized polyester paint system
    d. G-60 base galvanized
    e. Siding to run horizontal
    f. Trim to include painted corner trim, rake trim

8. Roof System:
    a. Trusses 4' o.c. 1 pc mono per side with piggy back and center truss at air inlet
    b. 2/12 roof pitch; See Design Verification page for loadings
    c. SPF #2 or better 2"x4" pre-cut roof purlins 24" o.c.
    d. Purlin clips at top and bottom run of purlins
    e. 38 runs of SPF #2 2"x4"x12' lateral bracing required
    f. Diagonal bracing supplied of SPF 2"x4"x12'/16'
    g. Wind framing/bearing clips on each side of truss
    h. Solar Guard Roofline insulation which starts at wall of building
    i. Painted white 29 ga G-60 galvanized HIGH RIB roof steel screw fastened on
    j. Butyl Tape all side seams and end laps
    k. 3 pc roof steel
    l. #10x1-1/2" painted white plated roof screws with neoprene washer
    m. Siliconized polyester paint system, white
    n. White ridgecap, rake and corner trim
    o. 4' overhang 9' down eave frame with 1x1 bird wire at opening

9. Ceiling System under trusses only
    a. White liner steel ceiling system
    b. Painted white 31 ga G-30 galvanized steel
    c. Fastened with #9x1" painted white roof screws w/washer
    d. Anti-siphon lock lap pattern
    e. .5 mil polyester paint system
    f. 82,000 psi minimum Grade E steel
    g. 6 mil polyfilm with #STCR staples

10. Sidewall to truss wrapped with (R-21) 8" thick friction fit fiberglass batt insulation
11. Batt insulation to be cut to 8'0" lengths on site
12. House wrap placed over fiberglass batt in that area (see drawing detail)
13. Gable end to be:
    a. 29 ga thick prime steel
    b. Painted white Siliconized polyester paint system
    c. G-60 based galvanized
    d. EPS pattern; ¾" tall major ribs 9" o.c. (2) smaller ribs between
    e. Screw fastened with painted Light Stone #9x1" screws
    f. Siding to run horizontal
    g. Trim to include painted corner trim, rake trim

14. Feed bulkheads included in ceiling at upper level.
15. 2 pcs attic access doors
    a. Includes insulated door; SPF 2"x8" framing; "J" metal trim
16. 2' Mansard truss designed for light trap 2 run down ea. sidewall
    a. Steel, girts, framing, and doors w/ birdwire
17. 7 Moment Frame approximately 60' o.c.
    a. 2 W-10x26 I beam columns with X bracing consisting of 4x4x1/2" angle iron
18. 8  5' wide fan rooms with floor (4 per side) includes framing for 8'x38' light trap
    a. 2x6 studs with horizontal liner interior/ 29ga steel ext.
    b. F/G Batt insulation in wall cavity
    c. 2x6 floor system 16" o.c. w/ ¾" plywood deck. Liner steel ceiling w/batt insulation
    d. 2x10 rafters with 2x4 purlins on top. 5' overhang over fans
19. 4 – 12'x12' Blower rooms with floor (2 per side) with Bulkheads
    a. 2x6 studs with horizontal liner interior/29ga steel ext. F/G Batt insulation in wall cavity
20. 1 – Electrical room incorporated into egg hallway
    a. 2x6 studs with horizontal liner interior/29ga steel ext. F/G batt insulation in wall cavity
    b. 2x6 Floor system 16" o.c. w/ ¾" plywood deck. Liner steel ceiling w/batt insulation
    c. 2x10 rafters with 2x4 purlins on top.
21. Floor system to be as follows:
    a. 4 ply 20" LVL 12' o.c.
    b. SPF 2x8x12' floor joist 12" o.c. and double under all cage leg locations

    c.  ¾" CDX T&G Plywood (unfinished)
    d.  Open exposed lumber on bottom side
    e.  5 ply 2x8 columns 15' tall spaced at cage edges and 12' o.c. length of building
    f.  75' of two story panelized breezeway 12'-0" wide and second floor wood deck.
        i.  Each breezeway includes a 2-hour fire rated wall assembly consisting of fire rated drywall.
    g.  8x8 manure drop chimney on each house running full height with access floor for maintenance

## Thermal and Moisture Protection
1. HCLC will provide R-38 stabilized blown fiberglass insulation in the attic.

## Doors and Openings
1. 34 pcs - AJ 5100 3'0"X6'8" Interior steel doors w / lever/lever locksets
2. Framing, headers, and "J" metal trim provided

## Equipment
1. HCLC will provide and install:
    a.  Cages (based on Vencomatic Bolegg Gallery cage system)
    b.  Ventilation System
        i.  Sixty-four (64) – Valco Hemisphere Fans 72"
            1.  Sixteen (16) fans per bird compartment
            2.  VFD Controlled
        ii.  Sixteen (16) – 36" M Drive Exhaust Fans w/ poly cones
            1.  Includes insulated closure panels for Exhaust Fans
        iii.  Eighty-eight (88) – 51" M Drive Exhaust Fans w/ poly cones
            1.  Includes insulated closure panels for Exhaust Fans
        iv.  576 Sidewall Inlets (Reventa ZEW Professional 2900)
            1.  Includes 32 actuators and cable accessories to operate inlets
            2.  Includes 80 hoods with light filter – This is for the lower level exterior inlets.
        v.  208 Rack-N-Vent Inlets – 24" x 8 feet – System includes four (4) – 440 ft. long rows of continuous 24" vent
            1.  Includes 12 actuators and cable accessories to operate inlets
            2.  Includes bird screen
        vi.  Miscellaneous
            1.  Includes 832 light trap panels 96"H x 12" W x 11" D – Eave and Fan light trap
            2.  Includes 720 light trap panels 96"H x 12" W x 11" D – Center Plenum light trap
    c.  Waterers (integral to Vencomatic cage system)
    d.  Feed System and Bins
        i.  Eight (8) – 32 Ton – Meridian Bin
        ii.  Four (4) – Big Dutchman High Volume Fill Systems
        iii.  Eight (8) – Big Dutchman 6" Solid Core Auger Systems
    e.  Heaters
        i.  Twenty-Four (24) – LB White Heaters, 250,000 BTU per heater
        ii.  Heaters will be installed three per blower house per floor with the heaters outside the blower house.
        iii.  This includes the gas piping from the entrance to the building to each heater.
    f.  Manure Conveyor
        i.  30" Wide Troughing Mining Conveyor by Sure
        ii.  Vulcanized Belts
    g.  Egg Belts
        i.  30" Wide belt by Sure on each level
    h.  Scraper System – included in Vencomatic cage system, one per 2 cage rows

## Mechanical Systems
1. Included in the scope is underground piping for water to the buildings
2. Gas piping from outside building to heaters and from regulator to main utility lines within (50').
3. All electrical work is included for the buildings which includes:
    a.  Ventilation system
    b.  Drives
    c.  Motors and Starters
    d.  LED Lighting
    e.  Controls

      f.  Feed systems
      g.  Cage systems
      h.  Conveyor systems
      i.  Generators
4.  Electrical scope includes transformers and main feeders from power source.

## Design Verification

The structural integrity of the building design and concrete footing design will meet the requirements for the following loads:

| | |
|---|---|
| Code Body | IBC 2012 |
| Risk Category | I |
| Ground Snow load | (Pg) = 35 psf |
| | (Is) = 0.8 |
| | (Ce) = 1.0 |
| | (Cs) = 0.93 |
| Roof live load | 25 psf |
| Roof dead load | 5 psf |
| Ceiling live load | 0 psf |
| Ceiling dead load | 5 psf |
| Wind load | 90 MPH |
| Exposure factor C | |
| Soil bearing pressure | by others |

All framing plans and specifications will be reviewed by a professional engineer

## Colors Scheme To Be:

| | |
|---|---|
| Sidewall Steel | White |
| Eave steel | White |
| Roof Steel | White |
| Gable end steel | White |
| Ridge cap | White |
| Fascia trim | N/A |
| Soffit trim | N/A |
| Rake | White |
| Corner trim | White |

## General Conditions

1. General Condition items included are project management, basic 48 hour bio security policy, field supervision, general liability insurance, construction equipment and tools as required, field communication costs, construction debris removal into dumpsters.
2. Henning Companies LLC will provide porta potties for our staff and subcontractors only.
3. All permits and fees are excluded.
4. Sales tax on material is included.
5. Henning Companies LLC will provide builders risk insurance.
    a. In the event that a claim is made; the owner will be billed and responsible for the deductible and any other unforeseen conditions.
6. *Excluded* from the general conditions are bond expense, or security guards.
7. Any damage and repair/replacement required from non-Henning Companies LLC venders or staff is excluded and will be a cost to the Owner above and beyond the contract amount.

## Owner Responsibilities

1. If at any point the construction progress is placed on hold due to bio security concerns or an event directly onsite; the Owner agrees to incur and reimburse Henning Companies LLC for placement of field staff, equipment charges, mobilization and de mobilization fees, storage rental for materials, etc. Also the owner agrees to immediately fund a special pay application for construction on any materials on order, equipment rentals, and transportation costs.
2. Owner will be responsible for any hourly charges incurred if accessibility to the construction site is delayed or deterred from excessive wait lines to wash in/wash out. Excessive is longer than 30 minutes.
3. The Owner agrees to provide any personal bio security clothing such as suits, masks, boots, etc. to all workers onsite if it is a requirement made by the Owner. It shall also be assumed that replacement of these items may be needed often due to the nature of the work being performed.

4.  When a bio security policy is in place prior to construction and then altered during construction; Henning Companies LLC and its venders reserve the right to bill additional dollars to cover unforeseen circumstances.

5.  Owner is responsible for all utility or connection fees (if required), building permits, DNR reports, temporary power and water service costs, pollution and/or hazardous material control or abatement, and any special assessments made by authorities.

6.  Owner will cooperate in providing timely information on color schedules, shop drawing and submittal reviews, and other information required for the timely execution of the work.

7.  Owner will be responsible for providing adequate temporary power during the construction phases.

8.  As changes are made to current pre-contract documents, amendments to proposed cost shall be made as a cost addition or deduction to the current price via change order. Change order rates and pricing is based on the terms and conditions in the prime contract agreement and the following:

     i.   Jobsite Superintendent $85.00 per hour (does not include per diem)
    ii.   Sr. Project Manager $95.00 per hour
   iii.   Project Manager $85.00 per hour
   iv.   Carpenter $55.00 per hour
    v.   Carpenter Foreman $60.00 per hour
   vi.   Cage Laborer $45.00 per hour
  vii.   Cage Crew Foreman $55.00 per hour
 viii.   Sky track $800.00 per week
  ix.   Skid loader $400.00 per week
   x.   Scissor Lifts $175.00 Hard tire
  xi.   525.00 Allterrain scissor lift



**General Contractors · Construction Managers**
**Agricultural · Commercial**

☒ **Johnston Office**
P.O. Box 394
5800 Merle Hay Rd.
Suite 14
Johnston, IA 50131
515.253.0943
515.253.0942 Fax

☐ **Latimer Office**
P.O. Box 669
113 N. Akir
Latimer, IA 50452
641.579.6000
641.579.6006 Fax

www.henningconstruction.com

---

## Exhibit "B" Drawings

April 19, 2017

Michael Foods, Inc. – Bloomfield Layers Phase 1
54080 Highway 84
Bloomfield, NE 68718

-Vencomatic Group, Michael Foods, Phase 1 – NW Layers Equipment Drawings

-VGI Design – Progress Drawings E-101, E-102, E-103, E-104, E-201, E-202, E-203, and E-204

## Michael Foods - Layer
## Energy Panel Structures

| Sheet No. | Drawing Name | Date |
|---|---|---|
| S0 | TITLE SHEET | 4/12/2017 |
| F1.0 | FOUNDATION PLAN VIEW | 4/12/2017 |
| F1.1 | FOUNDATION PLAN VIEW | 4/12/2017 |
| F1.2 | FOUNDATION DETAIL PLAN VIEW | 4/12/2017 |
| F1.3 | FOUNDATION DETAIL PLAN VIEW | 4/12/2017 |
| F2.0 | FOUNDATION SECTIONS | 4/12/2017 |
| F2.1 | FOUNDATION SECTIONS | 4/12/2017 |
| F2.2 | FOUNDATION SECTIONS | 4/12/2017 |
| S1.0 | PLAN VIEW - LOWER LEVEL NORTH | 4/12/2017 |
| S1.1 | PLAN VIEW - LOWER LEVEL SOUTH | 4/12/2017 |
| S2.0 | BUILDING SECTIONS | 4/12/2017 |
| S2.0.1 | BUILDING SECTION DETAILS | 4/12/2017 |
| S2.0.2 | BUILDING SECTION DETAILS | 4/12/2017 |
| S2.1 | ENDWALL SECTION DETAILS | 4/12/2017 |
| S2.2 | FAN SECTION DETAILS | 4/12/2017 |
| S2.3 | BLOWER ROOM SECTION DETAILS | 4/12/2017 |
| S2.4 | HALLWAY SECTION | 4/12/2017 |
| S3.0 | BUILDING DETAILS | 4/12/2017 |



<table>
<tr><td>☒ <b>Johnston Office</b><br>P.O. Box 394<br>5800 Merle Hay Rd.<br>Suite 14<br>Johnston, IA  50131<br>515.253.0943<br>515.253.0942 Fax</td><td>☐ <b>Latimer Office</b><br>P.O. Box 669<br>113 N. Akir<br>Latimer, IA  50452<br>641.579.6000<br>641.579.6006 Fax</td></tr>
</table>

## General Contractors · Construction Managers
### Agricultural · Commercial

www.henningconstruction.com

---

## Exhibit "C" Schedule

April 19, 2017

Michael Foods, Inc. – Bloomfield Layers Phase 1
54080 Highway 84
Bloomfield, NE 68718

**Project Schedule**

A PDF of the CPM project schedule for Phase 1 is attached. This schedule is based off anticipated bird dates provided by Michael Foods, Inc. This schedule will be continuously monitored and updated throughout the project duration.









☒ **Johnston Office**
P.O. Box 394
5800 Merle Hay Rd.
Suite 14
Johnston, IA  50131
515.253.0943
515.253.0942 Fax

☐ **Latimer Office**
P.O. Box 669
113 N. Akir
Latimer, IA  50452
641.579.6000
641.579.6006 Fax

# General Contractors · Construction Managers
## Agricultural · Commercial

www.henningconstruction.com

## Exhibit "D" Allowances and Escalators

April 19, 2017

Michael Foods, Inc. – Bloomfield Layers Phase 1
54080 Highway 84
Bloomfield, NE 68718

**Allowances included in Contract:**

Bird Lift – Allowance included of $40,000.00

Electrical – Allowance included of $872,000.00

Generator/Building – Allowance included of $157,950.00

**Cost Escalators/Benchmark Pricing:**

To be forwarded under a separate cover letter.



☒ **Johnston Office**
P.O. Box 394
5800 Merle Hay Rd.
Suite 14
Johnston, IA  50131
515.253.0943
515.253.0942 Fax

☐ **Latimer Office**
P.O. Box 669
113 N. Akir
Latimer, IA  50452
641.579.6000
641.579.6006 Fax

## General Contractors · Construction Managers
### Agricultural · Commercial

www.henningconstruction.com

## Exhibit "E" Contract Price

April 19, 2017

Michael Foods, Inc. – Bloomfield Layers Phase 1
54080 Highway 84
Bloomfield, NE 68718

**Contract Price for One (1) 212'x452'x31'-10" Layer Barn:**

Reference attached Michael Foods, Inc. – Bloomfield Layer Budget.
Reference attached Quote from Vencomatic Group
Reference attached Quotes from Poultry Management Systems, Inc.

Total Price/Layer Barn: **Fourteen Million Six Hundred Thirty-Eight Thousand Four Hundred Twenty-Eight Dollars and 00/100 ($14,638,428.00)**

Total Price for 6 Layer Barns included in Phase 1: **Eighty-Seven Million Eight Hundred Thirty Thousand Five Hundred Sixty-Eight Dollars and 00/100 ($87,830,568.00)**

## Michael Foods, Inc. - Bloomfield Layer Budget

| ITEM | June 30, 2016 Proposal | 3/1/17 Budget Update | +/- from Original Proposal | 4/17/17 Update | +/- from 3/1/17 Budget Update | Summary of Changes |
|---|---|---|---|---|---|---|
| Supervision, Builder's Risk Insurance, General Liability Insurance, Construction Trailers, Equipment Rental, Sitework, Concrete, Building Package, Overhead Doors | $ 5,082,732.52 | $ 5,211,335.67 | $ 128,603.15 | $ 5,211,335.67 | $ - | Increased Manure Tunnel/Trench depth from 6' to 7' ($57,928); Included center plenum light trap framing material and labor; including enlarging fan rooms to 5' deep; includes framing of manure chimney rooms; reduced moment frames from 11 to 7; added four 12'x12' blower rooms; removed inlet eyebrows in center plenum; increased floor system from 3-ply 18" LVL to 4-ply 20" LVL; (Total add for building package increase - $70,675) |
| Cage Equipment Material | $ 3,914,516.60 | $ 4,439,612.00 | $ 525,095.40 | $ 4,218,776.50 | $ (220,835.50) | Added Airduct and cross ducting ($130,118) Added Blower fans and Electrical Control ($41,290.11) Upgrade to HD Black Egg Belt, inc. DM Discount ($167,085.22) Upgrade to 4" Feed Option (Inc. In base) |
| Cage Installation | $ 916,090.00 | $ 940,350.00 | $ 24,260.00 | $ 940,350.00 | $ - | |
| Feed System | $ 225,000.00 | $ 224,252.84 | $ (747.16) | $ 224,252.84 | $ - | Vencomatic installation increase |
| Heaters | $ 28,000.00 | $ 22,529.05 | $ (5,470.95) | $ 22,529.05 | $ - | |
| Ventilation Package | $ 837,168.88 | $ 688,621.88 | $ (148,547.00) | $ 768,381.88 | $ 79,760.00 | Reduce QTY of Hemisphere fans from 20 to 16/compartment (-$18,645) Deduct Air Plenums for Hemisphere Fans, First Level (-$112,000) Remove Chimneys from Hemisphere Fans, Upper Level (-$17,902) Add Light trap in center plenum ($79,760) |
| Egg Cross Collection | $ 101,480.00 | $ 115,596.67 | $ 14,116.67 | $ 115,596.67 | $ - | |
| Manure Conveyors | $ 212,070.00 | $ 197,125.00 | $ (14,945.00) | $ 197,125.00 | $ - | |
| Bird Lift (Allowance) | $ 40,000.00 | $ 40,000.00 | $ - | $ 40,000.00 | $ - | |
| Air Inlets, Fans, Light Trap Installation | $ 208,746.00 | $ 208,746.00 | $ - | $ 208,746.00 | $ - | |
| PMSI Controls | $ 316,424.00 | $ 396,303.33 | $ 79,879.33 | $ 396,303.33 | $ - | Added Photohelic Baffle Enclosure ($12,202.00) Revised Bin scales from BinTrac to Rice Lake ($6,290) Add motor panels ($36,150) Increased Manual VS Drive Control from 12 to 48 ($6,060) M-Drive Fans increased from 48 to 112 ($7,591.68) Cost Increase to Hemisphere Fan Panel Assemblies ($4,000) Baffle/Inlet Control increase ($8,800) Misc. minor adds/deletions |
| Electrical (Allowance) | $ 872,000.00 | $ 872,000.00 | $ - | $ 872,000.00 | $ - | |
| Generator/Building (Allowance) | $ 160,000.00 | $ 157,950.00 | $ (2,050.00) | $ 157,950.00 | $ - | |
| Sales Tax | $ 124,222.00 | $ 132,522.00 | $ 8,300.00 | $ 180,752.96 | $ 48,230.96 | |
| FEE (8%) | $ 1,043,076.00 | $ 1,091,755.56 | $ 48,679.56 | $ 1,084,328.00 | $ (7,427.56) | |
| TOTAL | $ 14,081,526.00 | $ 14,738,700.00 | $ 657,174.00 | $ 14,638,427.90 | $ (100,272.10) | |





Think
ahead with
**poultry
people**

**Michael Foods**

**Phase I - NW Layers - Houses 1-3**

*Quotation Number: 2160VEN1601311-3MOD*





**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 2/18 |

Michael Foods
68718 Bloomfield
USA

Dear Mr./Mrs.,

Thank you for your quotation request. Further to your meeting(s) with our representative, we are pleased to present you this personal proposal.

**Think ahead in commercial layer housing**
This quotation has been created with the Vencomatic Group knowhow and expertise of commercial layer housing, gained over many years of experience. Our specialists put together this quotation, knowing that our equipment is the key element for the management of laying hens, and gaining the best possible results.



**Project description**
The project consists of 1 houses for Layers with:
- Bolegg Gallery
- Vencomatic Manurebelt System
- Feed system
- Drink system
- Perches
- Light
- Compartment
- Vencobelt
- Airducts and Blowers
- Scrapers
- Electrical control

In the next pages you will find the detailed proposal. We hope that our proposal matches your expectations. If you have any further questions or remarks, please do not hesitate to contact us.

Best regards,

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca


**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

| Quotation Number: | 2160VEN1601311-3MOD |
|---|---|
| Quote date: | Jan 23, 2017 |
| Page: | 3/18 |

## Number of Birds

**Surface**

| House surface | 30.00 | width | 124.20 | length (net.) | | 3,726 | m² |
|---|---|---|---|---|---|---|---|
| Bolegg Gallery | 6 | nestrows | 54.0 | sections 2,3m | | 4,819 | m² |
| | | | | Total width of section 6.47 m | | | |
| VMS | 3 | rows | 54.0 | sections | | 734 | m² |
| | | | | Total surface | | 9,279 | m² |
| | | | | Number of birds based on total surface | | 99,845 | birds |
| | | | | (max. birds/m²) | | 10.76 | |

**Nests**

| Bolegg Gallery | 6 | nestrows | 54.0 | nestsections 2,3m | 99,144 | birds |
|---|---|---|---|---|---|---|
| | | | | Number of birds based on total nest surface | 99,144 | birds |
| | | | | (max. birds/nest) | 306 | |

**Feeding system**

| Chainfeeding | 16 | circuits | 54.0 | sections 2,3m | 104,314 | birds |
|---|---|---|---|---|---|---|
| | | | | Number of birds based on feeding system | 104,314 | birds |
| | | | | (min. cm/bird) | 7.62 | |

**Drinking system**

| Drinknipples | 12 | lines | 54.0 | nestsections 2,3m | 103,680 | birds |
|---|---|---|---|---|---|---|
| Nipples | 16 | nipples per section | | | | |
| | | | | Number of birds based on drinking system | 103,680 | birds |
| | | | | (max. birds/nipple) | 10.0 | |

**Total number of perches**

| Bolegg Gallery | 48 | lines | 54.0 | sections 2,3m | 5,961.60 m | 39,118 | birds |
|---|---|---|---|---|---|---|---|
| Feeding system | 32 | lines | 54.0 | sections 2,3m | 3,974.40 m | 26,079 | birds |
| Extra perches | 42 | lines | 54.0 | sections 2,3m | 5,216.40 m | 34,228 | birds |
| | | | | Number of birds based on number of perches | | 99,425 | birds |
| | | | | (min. cm/bird) | | 15.24 | |

| **This house is suitable for** | | **99,144** | **birds** |
|---|---|---|---|
| | Total surface: | 10.68 | birds / m² |
| | Nests: | 306 | birds / nest |
| | Feeding system: | 8.02 | cm / bird |
| | Drinking system: | 9.56 | birds / nipple |
| | Perches: | 15.28 | cm perch / bird |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 4/18 |

## Bolegg Gallery

**Managing aviary birds is easier than you think.**

The Bolegg Gallery is Vencomatics new multi-tier aviary system for layers that combines user friendliness with a clever and economic design. While birds can follow their natural behaviour resulting in optimal laying performance, it allows you to collect eggs in an efficient way, preserving the quality after lay.



At the heart of the Bolegg Gallery you'll find the Vencomatic laying nest. This nest is based on Vencomatic innovations, such as the Vencomat, the tipping floor and the egg belt. Innovations that make the difference ensuring outstanding egg quality. By using vertical space the Bolegg Gallery increases the number of birds for the floor area used. Its open structure allows easy inspection and access to all levels. This design combined with easy operation makes the Bolegg Gallery an easy to manage system.

Specifications:
- 3 Rows left + 3 Rows right with 54.0 sections (2.3m) per row
- 4 Flapmotors per row
- Egg collection by elevator

For partslist Bolegg Gallery, see "Appendix: Bolegg Gallery partslist".

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



## Vencomatic Group
Agro Supply – Prinzen – Vencomatic

| Quotation Number: | 2160VEN1601311-3MOD |
|---|---|
| Quote date: | Jan 23, 2017 |
| Page: | 5/18 |

## VMS

VMS is the abbreviation for the Vencomatic Manure belt System, which can be placed in between two rows of Bolegg Terrace. Manure falls through the floor on the manure belt, which enables regular manure removal. This reduces the emission of ammonia to a minimum. An integrated frame with the Bolegg Terrace guarantees a strong and stable construction.



| Code | Quantity | Description |
|---|---|---|
| 9004200051 | 1 | VMS special: 3 times a row of 54 section vms on top of 2 rows Bolegg Gallery |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

Quotation Number: 2160VEN1601311-3MOD
Quote date: Jan 23, 2017
Page: 6/18

## Chain Feeding System

The Vencothrough is an efficient feeding system. It is integrated in the Vencomatic Aviary. A perch can be added on top of the through.



| Code | Quantity | Description |
|------|----------|-------------|
| 5500100015 | 16 | Chainfeeder direct drive 1.1kW 18m/min |
| 6110002033 | 660 | Suspensionset feedcircuit + perch |
| 6110002034 | 110 | Suspensionset feedcircuit under beam |
| 6110002046 | 6 | BG13 Feed frame for 3 feedcircuits |
| 6110002049 | 4 | BG13 Feed frame exten. set 7th feedline |
| 6110000529 | 5 | Base chain feeding system + hopper R |
| 6110000528 | 5 | Base chain feeding system + hopper L |
| 6110002047 | 3 | Base chain feeder CTC550mm Left model |
| 6110002048 | 3 | Base chain feeder CTC550mm Right model |
| 9002300025 | 864 | Chain feeding system medium (circuit). Excl. perches. Length 2 x 2,30m. |
| 6110000530 | 16 | Set of 2 feedchain corners + susp. mat. |
| 6110002193 | 1 | Tools for chain feeding system |
| 9002300006 | 16 | Feed hopper extension 75L for chain feeding system. |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 7/18 |

## Nipple Drinking System

Drinking lines are integrated in the aviary system. The water supply from these nipples is perfectly adjusted to the water consumption of the layers.



| Code | Quantity | Description |
|---|---|---|
| 6110002032 | 1308 | BG13 Suspensionset drinking line |
| 6110002040 | 24 | BG13 Pressure reducer in the middle |
| 6110002042 | 48 | BG13 Endset drinking line |
| 6110002419 | 324 | Drinker line 32 nipples L=4.6m Lubing |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



Quotation Number:     2160VEN1601311-3MOD
Quote date:           Jan 23, 2017
Page:                 8/18

## Lighting

In the Vencomatic Aviary systems we use LED-tubes. These are located underneath the system and in the system. A good spread of the light is ensured by these tubes. Hereby it prevents any dark spots and thus reduces changes of out-of-nest eggs. The very efficient energy consumption of these LED-tubes ensure a minimal use of energy.

| Code | Quantity | Description |
|---|---|---|
| 9007900002 | 60 | Set of 2 connection leads of 4 m. length, incl. 2 end stops. CSA/UL certified. |
| 9007900003 | 1620 | LED tube lamp for whole section, providing diffused white light. including suspension wire and mounting clips. CSA certified. |
| 8300400071 | 15 | LED power box 2x300W |
| 9007900007 | 15 | Cover above power unit |
| 9007900009 | 3 | LED box frame for max 4 boxes. W=2,30m |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



Quotation Number:    2160VEN1601311-
3MOD
Quote date:          Jan 23, 2017
Page:                9/18

## Perches

Perches are integrated in the system, to support the movement of the hens through the system. Furthermore sufficient perches are placed on top of the system to provide enough room for the hens to rest at night.



| Code | Quantity | Description |
|------|----------|-------------|
| 5001800011 | 244 | Tube plug 1" |
| 6110000490 | 129 | Perch 1" thick-walled + fasteners |
| 6110000491 | 2552 | Perch tube 1" L=5.75m thin + conn mat |
| 6110002036 | 330 | Fastening 1" perch on beam |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 10/18 |

## Compartment

Houses are divided into compartments using partitions. These partitions are made of wire mesh and can be made fit for each house.  Doors are integrated so you can easily move from one compartment to another.

| Code | Quantity | Description |
|---|---|---|
| **House compartment** | | |
| 9003100103 | 10 | Assembly set for assembling compartment-door to house wall, with gauze for closing the frame with max. width of 0,6 meter. Incl. 6 meter angle iron, plugs and bolts. |
| 9003100104 | 10 | Materials for making a gauze wall of 1,2 meter height and 25 meter length. For assembly that is fitting up to a system or angle steel/tube. Inclusive box profile at the top. |
| 9003100105 | 25 | Perforated angle-iron of 6 meters long with coach bolts for installation on gurders. Other screws are to be discussed. |
| 9003100063 | 1 | Two component coating for posts. Appropriate for 200 sections Bolegg. |
| 6110002062 | 30 | BG13 Compart. closing under syst. Harm. |
| 6110002059 | 30 | BG13 Compart. in system 3 tier |
| 9003100101 | 65 | Door set for compartimentation, suitable for Bolegg Terrace and Veranda Laying. Maximum width span = 1,25 meter, max. height = 2,6 meter. |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca


## Vencomatic Group
Agro Supply – Prinzen – Vencomatic

| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 11/18 |

## Vencobelt System

Using the Vencobelt, eggs from different nest rows or houses, can be transported to a central collection area. The 40 cm wide Vencobelt VB40 conveyor system is designed for gentle transport of eggs with max. capacity of 26.000 eggs per hour (dependant on egg infeed). The one-chain system makes the belt flexible to use. Corners have an outer radius of only 865 mm. The durable plastic egg carriers are gentle to the egg, but also safe to work with. The design of the carriers allow a conveyor slope of up to 28 degrees.



| Code | Quantity | Description |
|---|---|---|
| 9008100010 | 2 | VB40 section straight 2,3 m |
| 9008100010 | 18 | VB40 section straight 2,3 m |
| 9008100011 | 1 | VB40 Return unit |
| 9008100012 | 1 | VB40 Incline/decline set |
| 9008100012 | 12 | VB40 Incline/decline set |
| 9008100043 | 12 | VB40 30 degree corner |
| 9008100068 | 12 | Incl.- declinebelt VB40: ret.+motor+tens |
| 9005400001 | 1 | Elevator and eggbelts to collect top 150 mm eggbelts |
| 9008100015 | 1 | VB40 Drive unit max 50 m |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



Quotation Number:    2160VEN1601311-3MOD
Quote date:    Jan 23, 2017
Page:    12/18

## Airduct on Gallery System

| Code | Quantity | Description |
|---|---|---|
| 9005400001 | 162 | Air tubes and connectors inside 2 rows Bolegg gallery system and 1 row vms, 7 tubes per section, price per section 2,3 m, available may 2017 |
| 9005400001 | 6 | Air tubes connection from system to cross airducts above system. Price per connection for 2 rows Bolegg Gallery and 1 row VMS |
| 9005400001 | 6 | Air tubes from fan to cross airducts above system. Price per connection for 2 rows Bolegg Gallery and 1 row VMS |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



Agro Supply – Prinzen – Vencomatic

Quotation Number:    2160VEN1601311-3MOD
Quote date:          Jan 23, 2017
Page:                13/18

## Blower Fan and Electrical Control

| Code | Quantity | Description |
|------|----------|-------------|
| 9007600042 | 2 | Blower fan, capacity 25,000 M3/hour, 7,5 Kw motor, 3f480v60hz, including Incl. protection cover + net and vibrabration dampers |
| 9307700042 | 2 | Freq. regelaar 7,5kW 3f 380-500V CSA |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 14/18 |

## Scrapers

The manure removal at the end of the system is provided with a horizontal manure discharge belt in combination with a manure conveyor belt.

| Code | Quantity | Description |
|---|---|---|
| 9007200186 | 1 | System for removing litter. Consisting of 2 lines (1 circuit) of 130m length each. Inclusive drive 1,5kW, bends and electrical control. |
| 9007200186 | 1 | System for removing litter. Consisting of 2 lines (1 circuit) of 130m length each. Inclusive drive 1,5kW, bends and electrical control. |
| 9007200186 | 1 | System for removing litter. Consisting of 2 lines (1 circuit) of 130m length each. Inclusive drive 1,5kW, bends and electrical control. |
| 9007200189 | 1 | Less price control box removing litter. 3 Systems connected to 1 control. |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



**Vencomatic Group**
Agro Supply ~ Prinzen ~ Vencomatic

| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 15/18 |

## Electrical Control

Vencomatic produces high standard electrical controls, which always meet the latest regulations, like the CE-norm. The control box offered in this quotation will be designed custom made by our electrical engineering department and is tested before it's delivered. This offers the highest flexibility and assurance of perfect fit-to-farm.

## System Cabinet

| Code | Quantity | Description |
|---|---|---|
| 9007300368 | 1 | Control panel. |
| 9007300369 | 1 | Switch box on the Floor. Height 2200mm incl. 200mm plinth. |
| **Power supply** | | |
| 9007300387 | 1 | Electrical box suitable for mains supply 3~ 60Hz 480V (3 phase + earth) |
| **Clock** | | |
| 9007300033 | 3 | Digital timer with two channels, for nest rows, lighting, feeding system, alarm nest not open, etc. |
| **Flapmotors** | | |
| 9007300244 | 24 | Motor connection in 2 directions with fixed speed, including thermal protection. |
| 9007300281 | 1 | Control of nest floors with auto-manual and open-0-close switch. |
| 9007300031 | 1 | Nests Alarm not open, incl. alarm lamp. Excl. switch. Possibility for connection to Alarm unit. |
| 9000100184 | 24 | Nest alarm switch for 1 flapmotor. Incl. fastening material. |
| **Belt motors** | | |
| 9007300288 | 4 | Frequency controller for 1.5 kW motor (s) with variable speed. |
| 9000800021 | 1 | Chicken circuit protection for elevator or egg belt incl. emergency lamp. Excl. detection switch(-es). |
| 9000800001 | 12 | Single blade switch in an elevator. |
| **Feed lines** | | |
| 9007300307 | 2 | Control of feed lines with auto-0-hand switch. |
| 9007300300 | 1 | Alarm detection, including alarm lamp and possibility for connection with alarm unit. |
| 9007300306 | 1 | Soft starter 11kW for motor(s) to 25A. |
| 9007300306 | 1 | Soft starter 11kW for motor(s) to 25A. |
| 9007300304 | 1 | Soft Starter 5.5kW for engine (s) to 12A. |
| **Elevator** | | |
| 9007300288 | 1 | Frequency controller for 1.5 kW motor (s) with variable speed. |
| 9000800021 | 1 | Chicken circuit protection for elevator or egg belt incl. emergency lamp. Excl. detection switch(-es). |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

| | |
|---|---|
| Quotation Number: | 2160VEN1601311-3MOD |
| Quote date: | Jan 23, 2017 |
| Page: | 16/18 |

| Code | Quantity | Description |
|---|---|---|
| **Lighting LED** | | |
| 9007300274 | 2 | Connection power supply lighting. Appropriate for up to 3 LED supplies and HFTL lighting. |
| 9007300269 | 2 | Selector switch auto-0-hand and potentiometer. In automatic position, control by a 0..10 Volt signal of a(n) (external) climate computer. In manual mode the lighting can be set with the potentiometer. |
| **Other options** | | |
| 9007300062 | 61 | Isolating switch, placed directly on the motor. Excl. wiring. |
| **Plastic box for cabling from steel cabinet** | | |
| 9006200052 | 16 | Thermal protection 2.50-4.00A including auxiliary contact. This is placed in the field, at the engine. |
| 9007300283 | 1 | Connection of motor, one direction fixed speed, Including thermal protection. |
| 9007300044 | 10 | Frequency controller 0.75 kW motor(s) with variable speed |
| 9007300285 | 10 | Vencobelt control with on/off switch, incl. possible connection for a lubrification unit. |

## Vencobelt Cabinet

| Code | Quantity | Description |
|---|---|---|
| 9007300368 | 1 | Control panel. |
| 9007300370 | 1 | Electrical cabinet wall mounting. Maximum size 1200x1200x300mm. |
| **Vencobelt** | | |
| 9007300042 | 1 | Switch on/off, packer, cross conveyer, VencoBelt system. |
| 9007300044 | 1 | Frequency controller 0.75 kW motor(s) with variable speed |
| 9007300069 | 1 | Switch 0-1 to bridge Exit/Release of the packer. |
| 9007300285 | 1 | Vencobelt control with on/off switch, incl. possible connection for a lubrification unit. |
| 9008100070 | 2 | Egg carrier detection switch with bracket. For all Vencobelt systems. |
| 9007300213 | 2 | Connection for protection egg carrier, incl. alarm lamp. Excl. detection switches. |
| 9007300055 | 1 | Connection of Vencobelt cabinet with a new subpanel of Vencomatic, or third parties. |

## Manure Cabinet

| Code | Quantity | Description |
|---|---|---|
| 9007300368 | 1 | Control panel. |
| 9007300370 | 1 | Electrical cabinet wall mounting. Maximum size 1200x1200x300mm. |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca


**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

| Quotation Number: | 2160VEN1601311-3MOD |
|---|---|
| Quote date: | Jan 23, 2017 |
| Page: | 17/18 |

| Code | Quantity | Description |
|---|---|---|
| **Power supply** | | |
| 9007300387 | 1 | Electrical box suitable for mains supply 3~ 60Hz 480V (3 phase + earth) |
| **Manure belts** | | |
| 9007300295 | 9 | Control system manure belt off/on. |
| 9007300283 | 21 | Connection of motor, one direction fixed speed, Including thermal protection. |

## For All Cabinets

| Code | Quantity | Description |
|---|---|---|
| **Extra price CSA** | | |
| 9007300375 | 1 | CSA Approval |

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca


**Vencomatic Group**
Agro Supply – Prinzen – Vencomatic

Quotation Number: 2160VEN1601311-3MOD
Quote date: Jan 23, 2017
Page: 18/18

# Quotation Summary

Customer: Michael Foods
Total number of birds: 99,144

| Subject: | Offered: | |
|---|---|---|
| Bolegg Gallery | EUR | 482,724.42 |
| Chain Feeding System | EUR | 48,409.73 |
| 4 Inch Feed Additonal Price | EUR | 20,743.53 |
| Nipple Drinker System | EUR | 15,849.01 |
| Perches | EUR | 23,384.49 |
| Lights LED's In-System | EUR | 49,523.78 |
| Compartments Walls x 5 | EUR | 17,090.62 |
| VMS | EUR | 97,602.81 |
| Scrapers 3 Loops | EUR | 15,779.29 |
| Vencobelt | EUR | 37,036.38 |
| Airduct on Gallery System incl X Ducting | EUR | 30,260.00 |
| Blower Fan and Electrical Control | EUR | 9,602.35 |
| Electrical Control | EUR | 26,747.38 |
| **Total Equipment Price – 1 Bird Area** | **EUR** | **874,753.80** |

| Freight | EUR | 67,500.00 |
|---|---|---|
| **Subtotal Before HD Egg Belt** | **EUR** | **942,253.80** |
| HD Black Eggbelt Option (freight incl) | EUR | +57,658.82 |
| Negotiated Discount / Dave Morton | EUR | -18,801.79 |
| **Total Price (excl VAT)** | **EUR** | **981,110.83** |

| | |
|---|---|
| Loading | After order in consultation |
| Payment | 10% of total quadrant due at signing |
| | 30% due 16 weeks prior to loading per compartment |
| | 60% due upon delivery per compartment |
| Guarantee | 12 months after delivery |
| Validity quotation | Up to 1 month after quotation date |

Installation will not begin until the parties have agreed on the rate to be charged for installation. The rates for installation will be quoted separately and shall not be binding until the parties have agreed to such quote in writing.

Date:...........................

Name:                                                        Name:



Signature for agreement                          Signature for agreement customer

## THIS SALES QUOTE IS SUBJECT TO THE GENERAL TERMS AND CONDITIONS ATTACHED

Think ahead with **poultry people**

Vencomatic Inc.
501 Visions Parkway
Adel, IA 50003

P: 403-241-7692
F: 403-241-7694
E: info@vencomatic.ca
www.vencomatic.ca



**PMSI**
POULTRY MANAGEMENT SYSTEMS

Office: 616.642.9050        Fax: 616.642.9826        www.pmsi.cc        6425 W. Grand River Ave.        Saranac, MI 48881

# Quotation for Rice Lake Scale System

Customer:  Attn: Dave Morton
Michael Foods
Bloomfield, NE

Date:        01/03/17

Price valid for 60 days
All Prices FOB Manufacturer

| Houses | Weight Capacity Per Bin (lbs.) | Bins per House | Legs per Bin |
|---|---|---|---|
| 1 | 80,000 | 8 | 4 |

| Quantity | Description | | Each | | Extended |
|---|---|---|---|---|---|
| 8 | IQ plus 480 Plus Legend Series | $ | 625.00 | $ | 5,000.00 |
| | *scale indicator w/ serial output for computer interface | | | | |
| 8 | Signal Excitation/Trim Junction Box | $ | 235.00 | $ | 1,880.00 |
| | *connects individual load cell cabling to the scale indicator | | | | |
| 32 | EZ Mount Frame | $ | 295.00 | $ | 9,440.00 |
| | *Steel, painted, 20,000 lb. capacity per cell | | | | |
| 32 | EZ Mount Load Cells | $ | 750.00 | $ | 24,000.00 |
| | *20,000 lb. capacity per cell | | | | |
| 32 | Ground Strap Kits - EZ Mount | $ | 31.27 | $ | 1,000.64 |
| | *provides for proper grounding of load cells and mounts for surge protection | | | | |
| 16 | Dummy Load Cells | $ | 75.00 | $ | 1,200.00 |
| | *for installation purposes only | | | | |

Low Voltage Wire at Actual Cost                                         Estimate        OPEN
Installation Supervisor at Actual Cost                                  Estimate        OPEN

List Price        $        -        42,520.64

Discount Multiplier        0.68

Cost per Bin  $        3,614.25                Total        $        28,914.04

*PLEASE RETURN SIGNED QUOTATION FORM AS WRITTEN ORDER CONFIRMATION.  THANK YOU!*

Signature:_____        Title:_____        Date:_____
Terms:        10% with order; 60% on delivery, balance due 30 days after completion
1.5% interest on all past due accounts

20K - 4 Legs



**PMSI**
POULTRY MANAGEMENT SYSTEMS,

Office: 616.642.9050     Fax: 616.642.9106     6425 W. Grand River Ave.     Saranac, MI 48881

| | Quote |
|---|---|
| Date | Quote # |
| 1/13/2017 | 1098 |

| Name / Address | Ship To |
|---|---|
| HENNING COMPANIES, LLC<br>PO BOX 394<br>JOHNSTON, IA 50131 | |

| P.O. # | Rep | Project |
|---|---|---|
| | DP | |

| Item | Description | Qty | Price Each | Total |
|---|---|---|---|---|
| MTRPNL-0020Q | Motor Panel 48" x 36" x 12" (36 motors max) | 4 | 2,562.70 | 10,250.80 |
| MTRPNL-0100Q | - Motor Starter 3-phase | 80 | 114.07 | 9,125.60 |
| MTRPNL-0300Q | - Selector Switch & LED Indicator Light- tiers 1,2,3,4 | 16 | 48.39 | 774.24 |
| MTRPNL-0300Q | - Selector Switch & LED Indicator Light Hi Volume Fill | 4 | 48.39 | 193.56 |
| MTRPNL-0310Q | - Emergency Stop Switches | 4 | 62.11 | 248.44 |
| MTRPNL-0500Q | - Control Relays 120VAC | 12 | 12.62 | 151.44 |
| LTINAC-0030 | TEL 120V PILOT LIGHT RED | 4 | 18.46 | 73.84 |
| LTINAC-0020 | TEL 120V PILOT LIGHT GREEN | 4 | 18.46 | 73.84 |
| VSD-7100 | VS Drive Assembly - CIII, E740 15HP 400V With Line Reactor | 8 | 1,888.00 | 15,104.00 |
| VSD-0005 | VSDRIVE ENCLOSURE FAN COOLING SYS | 4 | 38.68 | 154.72 |

PLEASE RETURN SIGNED QUOTATION FORM AS WRITTEN ORDER CONFIRMATION. THANK YOU!

Signature_____ Title_____ Date_____

Terms: 10% with order.
12% interest on all past due accounts

| Total | |
|---|---|
| | $36,150.48 |



**PMSI**
POULTRY MANAGEMENT SYSTEMS

| | Quote | |
|---|---|---|
| **Date** | | **Quote #** |
| 1/3/2017 | | 1092 |

Office: 616.642.9050     Fax: 616.642.9106     6425 W. Grand River Ave.    Saranac, MI 48881

| Name / Address |
|---|
| POULTRY MANAGEMENT SYSTEMS, INC.<br>6425 W. GRAND RIVER AVENUE<br>SARANAC, MI 48881 |

| Ship To |
|---|
| POULTRY MANAGEMENT SYSTEMS, INC.<br>6425 W. GRAND RIVER AVENUE<br>SARANAC, MI 48881 |

| P.O. # | Rep | Project |
|---|---|---|
| | JM1 | |

| Item | Description | Qty | Price Each | Total |
|---|---|---|---|---|
| Qt | Photohelic Baffle Enclosure (12 baffles) | 4 | 3,050.60 | 12,202.40 |

PLEASE RETURN SIGNED QUOTATION FORM AS WRITTEN ORDER CONFIRMATION.  THANK YOU!

Signature_____    Title_____    Date_____

| Terms:  10% with order.<br>12% interest on all past due accounts | **Total** | $12,202.40 |
|---|---|---|

*Add 2,000 Freight* *(handwritten)*



**PMSI**
POULTRY MANAGEMENT SYSTEMS

Office: 616.642.9050      Fax: 616.642.9826      www.pmsi.cc      6425 W. Grand River Ave.      Saranac, MI 48881

# Environmental/Egg Flow
# Command III System

| | | |
|---|---|---|
| Customer | Micahel Foods | |
| Address | Bloomfield, NE | |
| Attention | | |

**Date:** 1/10/2017
**Price valid for 60 days**
**All Prices FOB Manufacturer**

## Quote

| Rooms | Manufacturer | Rows | Tiers |
|---|---|---|---|
| 4 | Bowlegged Galleria | 3 | 4 |

| Quantity | Description | | Each | Extended |
|---|---|---|---|---|
| **Base System** | | | | |
| 4 | Command III Poultry House Computer | | $ 4,849.20 | $ 19,396.80 |
| | - 8 slot rack, CPU module, power supplies, and panel | | | |
| 4 | Command III Output Panel | | $ 1,113.72 | $ 4,454.88 |
| | - Command III output Panel for additional outputs | | | |
| 8 | Command III Digital Input Module (2 per CIII) | | $ 409.32 | $ 3,274.56 |
| | - 32 digital inputs per module | | | |
| 8 | Command III Digital Output Module (2 per CIII) | | $ 409.32 | $ 3,274.56 |
| | - 32 digital outputs per module | | | |
| 12 | Command III Analog Input/Output Module (3 per CIII) | | $ 502.20 | $ 6,026.40 |
| | - 24 analog inputs, 4 analog outputs per module | | | |
| 4 | Command III Remote Serial Input Module | | $ 517.32 | $ 2,069.28 |
| | - 4 serial inputs per module | | | |
| 4 | Command III Protective Door Cover | | $ 179.95 | $ 719.80 |
| | - Aluminum frame with plexiglass window to protect Touch Panel and door switches | | | |
| 4 | Operator Interface Touch Panel Unit | | $ 2,345.00 | $ 9,380.00 |
| | - 15" Touchscreen; industrially hardened | | | |
| **Network Communcation Options** | | | | |
| 1 | Fiber Optic Braided Ring Topology | Estimate Only | $ 4,875.30 | $ 4,875.30 |
| | - 10 Mbps speed; high integrity noise/lighting immune; cost effective; uses less fiber | | | |
| **Responsive Egg Flow (R.E.F) Flow Systems** | | | | |
| 1 | REF PC Monitoring and Control System | | $ 4,573.00 | $ 4,573.00 |
| | - includes 3.0 GHz Pentium 4 PC, 1 GB RAM, dual hard drives, CD-RW, Windows XP Pro, 19" flat screen monitor, HP5650 color printer, 56K modem. 800 VA UPS, and power isolator. | | | |
| 1 | Batching REF Control Hardware/Software | | $ 2,358.48 | $ 2,358.48 |
| | - Independent speed control of each house for specialty eggs | | | |
| **Egg Counting Hardware Options** | | | | |
| 12 | 8 Sensor Multiplexer (3 muxes per floor) | | $ 285.82 | $ 3,429.84 |
| | - allows for 8 egg counter inputs; mounted in single enclosures on the end of each cage row | | | |
| **Egg Sensor Options** | | | | |
| 36 | Sensors IR6 | | $ 286.67 | $ 10,320.12 |
| | - 6" image detecting sensor; counts eggs accurately without single-filling | | | |
| 48 | Sensors IR16 | | $ 1,642.85 | $ 78,856.80 |
| | - 16" image detecting sensor; counts eggs accurately without single-filling | | | |
| **Flow Control Options** | | | | |
| 1 | Egg Operation Sensor | | $ 541.57 | $ 541.57 |
| | - monitors on/off state of processing plant equipment | | | |
| 12 | Manual VS Drive Control (QTY1- 12 station MVSD Panel) | | $ 168.35 | $ 2,020.20 |
| | - Auto/Manual speed control of egg collection belts | | | |
| 4 | Variable Frequency Motor Control | Interface | $ 29.99 | $ 119.96 |
| | - VS Drive Frequency Converter w/ enclosure and door mounted parameter unit | | | |
| 4 | Mux Analog Output Module | | $ 235.57 | $ 942.28 |
| | - 1 analog output per module | | | |
| 4 | Egg Advancement | | $ 479.00 | $ 1,916.00 |
| | - Indexes egg belt forward when eggs are too heavy | | | |
| **Environmental Controls and Software** | | | | |
| **Environmental Software** | | | | |
| 1 | NOAH PC Monitoring and Control System | | $ 4,573.00 | $ 4,573.00 |
| | - includes PC, monitor, printer, modem, UPS, power isolator,etc. | | | |
| **Ventilation Monitoring and Control** | | | | |
| 52 | Temperature Sensors (12 inside room, 1 outside per CIII) | | $ 93.50 | $ 4,862.00 |
| | - house temperature sensing plus 1 outside temperature sensors | | | |
| 112 | M-Drive Fan Pulse RPM (28 per floor) | | $ 118.62 | $ 13,285.44 |
| | - Pulse per Rotation for M-drive RPMs | | | |
| 44 | VS Speed Control (7 per room for M-Drives, 4 per room Hemispheres) | | $ 113.97 | $ 5,014.68 |
| | - Speed control for variable fan controls | | | |
| 56 | Fan Control Relays (14 fan cntrl per CIII) | | $ 91.62 | $ 5,130.72 |

| | | | | | |
|---|---|---|---|---|---|
| | - fan staging controls | | | | |
| 4 | Hemisphere Fan Panel Assembly (1 per room) QB:1000 | | | $ 8,006.72 | 32,026.88 |
| | - (1) 30x24" panel w/ (1) 20HP drives w/ Line Reactor- 16 Motor Protection W/ enclosure | | | | |
| 4 | Static Pressure Sensors (1 per room) | | | $ 413.54 | 1,654.16 |
| | - monitors pressure differential in negative or positive pressure houses | | | | |
| 16 | Hemisphere Chimney Dampers -(4 per top room, 4 per bottom room (plenum)) | | | $ 277.71 | 4443.36 | ] - NOT NEEDED |
| | - controls the chimneys dampers for Hemisphere Fans | | | | |
| 48 | Baffle/Inlet,Tunnel Door Controls (16 per room) | | | $ 277.71 | 13,330.08 |
| | - 8 per room small inlets, 4 per room rack n vent | | | | |
| | - regulates air inlet openings for proper ventilation; includes Auto/Manual jog enclosures | | | | |

### Heater Control and Monitoring
| | | | | | |
|---|---|---|---|---|---|
| 24 | Heater Control Relays (6 box heaters per room) | | | $ 91.62 | 2,198.88 |
| | - heater staging controls | | | | |
| 24 | Heater Temperature Sensor | | | $ 91.62 | 2,198.88 |
| | -Temp sensor to monitor funcationality of box heaters | | | | |

### Manure Blower Controls
| | | | | | |
|---|---|---|---|---|---|
| 16 | Manure Blower Controls (Time Schedule) | | | $ 91.62 | $ 1,465.92 |
| | - ON/OFF Manure Belt | | | | |

### Feed & Litter Monitoring and Control
| | | | | | |
|---|---|---|---|---|---|
| 8 | Interface to Scale Indicators (2 bins per room) | | | $ 435.25 | 3,482.00 |
| | - provides feed inventory and feed usage information | | | | |
| 16 | Feeder Control Relays (4 per room) | | | $ 196.48 | 3,143.68 |
| | - On/Off control of up to 20 schedules per day including stimulation feedings | | | | |
| 8 | Bin Auger Control Relays (Feed Panel Supplied,*PMSI not supplying) | | | $ 424.44 | 3,395.52 |
| | - automatic bin switching and feed loop control | | | | |
| 4 | Feed Fill Input (1 per room) | | | $ 91.00 | 364.00 |
| | - monitors weight of feed | | | | |

### Light Monitoring and Control
| | | | | | |
|---|---|---|---|---|---|
| 4 | Light Verification Sensors (1 per room) | | | $164.84 | 659.36 |
| | - verifies proper operation of light controls; alerts if problems exist | | | | |
| 24 | Light Control Relays (6 per room) | | | $206.50 | 4,956.00 |
| | - On/Off control of lights with automatic advancement as a function of age | | | | |
| 24 | Light Dimmer Controls (6 per room) | | | $113.47 | 2,723.28 |
| | - Analog dimming control of lights with automatic advancement as a function of age | | | | |
| 24 | Light Dimmer Current Converter (6 per room) | | | $287.56 | 6,901.44 |
| | - convert /control power to dimmer | | | | |

### Water and Power Monitoring
| | | | | | |
|---|---|---|---|---|---|
| 12 | Water Meters - 5/8" x 3/4" ( 3 per room) | | | $165.10 | 1,981.20 |
| | - water monitoring with precise measurement per gallon consumed | | | | |
| 4 | Low Water Pressure Sensors (1 per room) | | | $93.39 | 373.56 |
| | - water monitoring for low water pressure conditions | | | | |
| 12 | Water Control Relays (3 per room) | | | $79.12 | 949.44 |
| | - On/Off control of water solenoid to prevent leaks at night | | | | |
| 8 | Power Sensors 3-phase and 1-phase (2 per house) | | | $428.58 | 3,428.64 |
| | - monitors critical circuits for phase loss or reversal | | | | |

### Back Up System and Alarms
| | | | | | |
|---|---|---|---|---|---|
| 1 | Alarm Dialer Interface- Ethernet Controller | | | $1,109.94 | 1,109.94 |
| | - 7 dialer outputs to customer supplied Alarm System | | | | |
| 52 | Backup Thermostats | | | $51.86 | 2,696.72 |
| | - 6 per room inlets, 5 per room fans, 2 per room hemisphere | | | | |
| | - recommended one per 3 fan stages w/baffle override provision | | | REMOVE | |
| 4 | Backup Time Clocks -for water control relays | | | $120.85 | 483.40 |
| | - recommended one per feeder and light control | | | | |
| 4 | A-B Power Source Dual Backup Provision | | | $413.60 | 1,654.40 |
| | - allows for two separate control voltage sources where dual backup generators are used | | | | |

| | | | |
|---|---|---|---|
| Low Voltage Wire at Actual Cost | | Estimate | OPEN |
| Installation Supervisor at Actual Cost | | Estimate | OPEN |
| | | Total: | $ 287,036.41 |

*PLEASE RETURN SIGNED QUOTATION FORM AS WRITTEN ORDER CONFIRMATION.  THANK YOU!*

Signature:_____ Title:_____ Date:_____

ALL PURCHASES FROM POULTRY MANAGEMENT SYSTEMS, INC. SHALL BE GOVERNED BY ITS
STANDARD TERMS OF SALE, A COPY OF WHICH MAY BE OBTAINED BY CALLING (616) 642-9050,
WRITING US AT 6125 Grand River Ave., Saranac, MI. OR BY VISITING OUR WEBSITE AT
www.PMSI.cc  WE OBJECT TO ANY DIFFERENT OR ADDITIONAL TERMS, EXCEPT TO THE
EXTENT, IF ANY, THAT WE HAVE ACCEPTED THEM IN A SIGNED WRITING.

10% with order, 80% on delivery,
Balance due 30 days after completion
12% interest on all past due accounts