IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island Company, as Subrogee of Post Holdings, Inc., a Missouri corporation, Michael Foods of Delaware, Inc., a Delaware corporation, and M.G. Waldbaum Company, a Nebraska Company,<br><br>Plaintiff,<br><br>vs.<br><br>HENNING COMPANIES, LLC, an Iowa Limited Liability Company,<br><br>Defendant. | **8:22CV432**<br><br><br>**MEMORANDUM AND ORDER ON MOTIONS TO EXCLUDE EXPERTS AND MOTIONS FOR SUMMARY JUDGMENT** |
| FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island Company,<br><br>Plaintiff,<br><br>vs.<br><br>VENCOMATIC, INC, an Illinois Company,<br><br>Defendant. | **8:24CV74**<br><br><br>**MEMORANDUM AND ORDER ON MOTIONS TO EXCLUDE EXPERTS AND MOTIONS FOR SUMMARY JUDGMENT** |

These consolidated cases arise from a fire on or about February 27, 2020, that destroyed a recently built poultry house and processing facility in Bloomfield, Nebraska. Filing 20 at 2 (¶ 5), 3 (¶ 10).[1] Plaintiff Factory Mutual Insurance Company (FM), as subrogee of its insureds, the owners of the poultry house, filed a Complaint on December 15, 2022, and an Amended Complaint on March 31, 2023, against Defendant Henning Companies, LLC (Henning), the designer and

---

[1] All record citations shown as "Filing # at #" are to the docket in the lead case, Case No. 8:22cv432. All record citations shown as "CM/ECF # at #" are to the docket in Case No. 8:24cv74. The Court will cite only the lead case when identical or similar factual allegations are found in both cases.

1

builder of the poultry house. Filing 1; Filing 20 at (¶¶ 3–4). Subsequently, on February 23, 2024, FM filed a Complaint in a separate action against Defendant Vencomatic, Inc. (Vencomatic), the provider of equipment and the manure blower fan assemblies incorporated into the poultry house. CM/ECF 1 at 2 (¶¶ 5, 7). FM seeks to recover from Henning and Vencomatic more than $22 million it has paid to its insureds for damage to the poultry house. Filing 20 at 4 (¶ 15).

These cases are now before the Court on several motions to exclude expert testimony.[2] However, in addition to the motions to exclude experts, Henning and Vencomatic have each filed a Motion for Summary Judgment on all claims in the case against them. Filing 111; CM/ECF 67. For the reasons stated below, the Court finds that the Motions for Summary Judgment are fully dispositive of these cases. Consequently, the Court grants the Motions for Summary Judgment and denies the Motions to Exclude Experts as moot.

## I.  INTRODUCTION

### A.  Factual Background

On Motions for Summary Judgment, the Court draws the factual background primarily from the parties' supporting statements of undisputed and disputed facts. The parties' various factual statements in relation to their Motions for Summary Judgment encompass allegations in support of and opposition to Henning's and Vencomatic's motions to exclude FM's experts, Richard Rambacher, a mechanical engineer, and Phillip Keena, a fire cause and origin expert, because their opinions are central to the Motions for Summary Judgment. The Court will set forth

---

[2] Henning and Vencomatic each filed a Motion (or Amended Motion) to Exclude Testimony of Richard Rambacher on *Daubert* grounds. Filing 108; CM/ECF 82. Each filed a Motion (or Amended Motion) to Exclude Testimony of Phillip Keena on *Daubert* grounds. Filing 105; CM/ECF 83. Vencomatic also filed an Amended Motion to Exclude the Testimony of Dr. Lauren Eichaker on *Daubert* grounds. CM/ECF 85. For its part, Factory Mutual filed in both cases identical Motions to Exclude Proposed Expert Opinions and Testimony as to five of Defendants' experts. Filing 115; CM/ECF 62. In the lead case only, Factory Mutual filed a Motion to Exclude Cumulative Expert Opinion Testimony pursuant to Federal Rule of Evidence 403 relating to Henning's experts Robert Whitemore and Scott Dillon. Filing 118. Additional motions in both cases challenging experts on Rule 26 and Rule 37 grounds are referred to United States Magistrate Judge Jacqueline M. DeLuca.

the parties' factual allegations only to the extent that the Court finds necessary to the disposition of the Motions for Summary Judgment. Unless otherwise indicated, the factual allegations set out here are undisputed.[3]

### 1. The Parties

Plaintiff FM is a Rhode Island company engaged in the business of selling property insurance. Filing 112 at 1 (¶ 1). FM provided property insurance coverage under a policy issued by FM to M.G. Waldbaum Company (Waldbaum), a Nebraska corporation, which was a wholly owned subsidiary of Michael Foods of Delaware, Inc. (Michael Foods), a Delaware corporation, which was in turn a wholly owned subsidiary of Post Holdings, Inc. (Post), a Missouri corporation. Filing 112 at 2 (¶¶ 2–3). Waldbaum was engaged in the poultry business. Filing 112 at 2 (¶ 2). The Court will refer to Waldbaum, Michael Foods, and Post collectively as the Insureds.

Defendant Henning is an Iowa limited liability company that does business in Nebraska. Filing 112 at 2 (¶ 4). In April 2017, Waldbaum and Henning entered into a written contract for Henning to design and construct twelve poultry houses and associated facilities to be built in Knox County, Nebraska (the Project). Filing 112 at 2 (¶ 5). Defendant Vencomatic is an Illinois corporation with its principal place of business in Iowa, but it also did business in Nebraska. CM/ECF 69 at 2 (¶ 4). On May 5, 2017, Vencomatic provided a "sales quote" to Henning, which was entered into by and between Vencomatic and Henning on May 5, 2017. CM/ECF 69 at 2 (¶ 6). The document cited as the "sales quote" shows the "quote date" throughout as April 4, 2017, although it was signed by the parties on May 5, 2017. See CM/ECF 80-4 at 15 (signature page).

---

[3] Where factual allegations are undisputed, the Court will cite only the allegations not both the allegations and the responses.

FM adds without contradiction that the General Terms and Conditions incorporated into the "sales quote" were between Vencomatic and Henning. CM/ECF 113 at 2 (¶ 6).

### 2. The "Sales Quote"

The sales quote from Vencomatic to Henning included the sale of the blower fan that has become the focus of these cases. CM/ECF 69 at 2 (¶ 7). The manufacturer of the blower fan at issue was not Vencomatic but Novenco. CM/ECF 69 at 2 (¶ 8). FM disputes that this fact is material. CM/ECF 113 at 2 (¶ 8). However, Vencomatic asserts that this fact is material. CM/ECF 118 at 2 (¶ 8). Nowhere in the sales quote or the Vencomatic invoice was Novenco identified as the manufacturer of the blower fan. Filing 113 at 11 (¶ 6).

A document that includes much of the same content as the "sales quote" between Vencomatic and Henning but from Vencomatic to Michael Foods is identified in FM's Complaint against Vencomatic as a "personal proposal." CM/ECF 1 at 2 (¶ 5). The "personal proposal" is not attached to FM's Complaint against Vencomatic, but it is attached to FM's Amended Complaint against Henning and shows a "quote date" of January 23, 2017. Filing 20-1 at 43. It does not include any signature page indicating acceptance of the "personal proposal." Filing 20-1.[4]

It is apparent that FM and Vencomatic disagree on whether the "sales quote" is for an "aviary system" or a "project." It is also apparent that they disagree on what is—or what is included in—the "aviary system." Specifically, FM alleges, "Vencomatic prepared a 'sales quote' for the

---

[4] The first paragraph of the "sales quote" from Vencomatic to Henning states the following:

> Thank you for your quotation request. Further to your meeting(s) with our representative, we are pleased to present you this quotation subject to the General Terms and Conditions attached hereto and incorporated herein this quotation by reference.

CM/ECF 80-4 at 2. In contrast, the "personal proposal" from Vencomatic to Michael Foods states the following:

> Thank you for your quotation request. Further to your meeting(s) with our representative, we are pleased to present you this personal proposal.

Filing 20-1 at 43.

aviary system that was 'created with the Vencomatic Group know how and expertise of commercial layer housing.'" CM/ECF 113 at 10 (¶ 3) (quoting CM/ECF 80-4 at 2). Vencomatic alleges that the sales quote is for a "project" that contained multiple different systems and multiple individual pieces of equipment. CM/ECF 113 at 10 (¶ 3). Vencomatic alleges further that the blower fan is a separate piece of equipment that was sold by Vencomatic to Henning. CM/ECF 118 at 2 (¶ 8) (citing CM/ECF 80-4). FM alleges that Vencomatic designed the "aviary system," which included the selection of its component parts. CM/ECF 113 at 10 (¶ 4). Vencomatic disputes that allegation and alleges that Vencomatic sold the Bolegg Gallery that was installed in Barn 12, and that the Bolegg Gallery is the "aviary system" at the project. CM/ECF 118 at 10 (¶ 4). FM agrees that the Vencomatic "aviary system" is referred to as the "Bolegg Gallery Air System," but FM alleges that the Bolegg Gallery Air System includes a multi-tier cage-free housing platform; manure belt systems; egg, feed, and water delivery mechanisms; manure blower fans and manifolded ductwork for manure drying and air movement; and integrated controls. CM/ECF 113 at 10–11 (¶ 5) (citing CM/ECF 80-4 at 2). Vencomatic disputes that allegation and alleges that the sales quote is for a "project" that "included multiple different systems, including the Bolegg Gallery, Vencomatic Manurebelt System, Feed system, Drink system, etc." CM/ECF 118 at 10 (¶ 5) (citing CM/ECF 80-4).

FM and Vencomatic both cite CM/ECF 80-4 as the "sales quote." That document states under the heading "**Think ahead in commercial layer housing**" that "[t]his quotation has been created with the Vencomatic know how and expertise of commercial layer housing, gained over many years of experience." CM/ECF 80-4 at 2. It also states the following under the heading "**Project Description**":

> The project consists of 1 house (4 compartments) for Layers with:
> • Bolegg Gallery

- Vencomatic Manurebelt System
- Feed system
- Drink system
- Perches
- Light
- Compartment
- Vencobelt
- Airducts and Blowers
- Scrapers
- Electrical control

CM/ECF 80-4 at 2.[5] The sales quote later states, "The Bolegg Gallery is Vencomatic's new multi-tier aviary system for layers that combines user friendliness with a clever and economic design." CM/ECF 80-4 at 4. It also states, "Drinking lines are integrated in the aviary system" and that "[i]n the Vencomatic Aviary Systems we use LED-tubes." CM/ECF 80-4 at 6.

FM and Vencomatic agree that the Vencomatic equipment, including the blower fan, was permanently incorporated into the poultry houses for the Project, including Barn 12. CM/ECF 69 at 2 (¶ 10). FM alleges that the blower fan was "included" as part of the "Vencomatic equipment." CM/ECF 113 at 2 (¶ 10). Vencomatic alleges that the blower fan was not included as part of the "Vencomatic equipment" but as a part of a project for which Vencomatic sold equipment to Henning. CM/ECF 118 at 2 (¶ 10).

FM and Vencomatic agree that by December 27, 2019, all the equipment sold by Vencomatic—including the blower fan—had been installed in Barn 12, all the equipment had been commissioned (*i.e.*, tested), and all punch list items and testing had been completed. CM/ECF 69 at 3 (¶ 11).

---

[5] The "personal proposal" from Vencomatic to Michael Foods contains the identical language under the identical headings. Filing 20-1 at 43.

*3. The Fire*

On or about February 27, 2020, a fire occurred in the northeast portion of the upper floor of the poultry house identified as Building 12. Filing 112 at 2 (¶ 6). Specifically, the fire originated in the mechanical room of Building 12 that contained the manure blower fan assembly. Filing 143 at 2 (¶ 6). The fire was so intense that within thirty-eight minutes of the first indication of an occurrence, the poultry house had collapsed and was nearly completely destroyed. Filing 112 at 2 (¶ 7).

The parties dispute whether the physical evidence left behind after the fire could be used to determine the cause and origin of the fire. Filing 112 at 2 (¶ 8). FM asserts that its expert on the cause and origin of the fire, Mr. Keena, testified that he could rely on the fire patterns in the northeast quadrant to assist with his origin determination by relying on "photographs from the fire department showing the fire originated in the northeast section of the building." Filing 143 at 2 (¶ 8). FM also alleges that Mr. Keena testified that by utilizing National Fire Protection Association (NFPA) 921 (Guide for Fire and Explosion Investigations) § 18.1.2, he was able to further define the area of origin. Filing 143 at 2 (¶ 8). Henning disputes the sufficiency of Mr. Keena's evidence because he is not a mechanical engineer. Filing 146 at 2 (¶ 8). Vencomatic alleges that Mr. Rambacher, as a mechanical engineer, testified to the lack of physical evidence left behind by the fire, making it impossible for him to identify a probable heat generating mode from the blower fan. CM/ECF 118 at 3 (¶ 14). Vencomatic alleges further that Mr. Keena testified that he stood by his statement that as a result of the severity of the fire damage, no reliable fire patterns were identified for analysis. CM/ECF 118 at 3 (¶ 14).

Henning and Vencomatic both allege that despite extensive discovery, none of FM's experts can testify to a reasonable degree of certainty as to what caused the fire, so that the only fact those experts were reasonably certain about was that the fire started in the northeast quadrant

7

of the poultry house. Filing 112 at 4 (¶ 14); CM/ECF 69 at 5 (¶ 23). FM disputes their allegations because Mr. Keena applied the scientific method outlined in NFPA 921 to determine the cause of the fire. Filing 143 at 3 (¶ 14); CM/ECF 113 at 4–5 (¶ 23). The parties have extensive disputes about the origin and the cause of the fire and the sufficiency of the testimony of various experts on those issues. However, those disputes need not be set out in detail here. Instead, the focus here is on a summary of the opinions of Mr. Rambacher and Mr. Keena, as those opinions are at the center of the dispute over whether Henning and Vencomatic are entitled to summary judgment on all of FM's claims against them.

### 4. Summary of Mr. Rambacher's Opinions

Mr. Rambacher is a mechanical engineer, but he does not hold himself out as a fire cause and origin expert. Filing 112 at 4 (¶¶ 15–16). Instead, he was asked to perform a suitability analysis of a blower fan installed in Building 12 and determine whether the blower fan assembly could have generated heat. Filing 112 at 4 (¶ 17). The parties agree that after completing his inspection and analysis of the fan, Mr. Rambacher determined that there were five possible ways the blower fan might have generated heat: (A) "Fan steel fan blades [sic] contacting the steel fan housing, which could create a spark"; (B) "Heat created by slipping fan belts"; (C) "The fan drive mechanism contacting the steel guard belt"; (D) "Fan imbalance causing dust to shake loose in the fan system or damage to the fan assembly"; and (E) "Any metal-to-metal contact in the fan assembly system." Filing 112 at 4–5 (¶ 18) (quoting Filing 110-4 at 5 (Rambacher's Report, § II. Conclusions, ¶ 1)).

Henning asserts that the critical part of Mr. Rambacher's testimony is the following:

Q.    I'm just trying to --

A.    Yes.

8

Q. -- identify if there's any physical evidence that you can tell me about that we can make this one more or less probable than any of the other ways that you've identified in this first paragraph of your report.

A.    No. I would say A through D are likely equally possible.

Filing 112 at 6 (¶ 25) (citing Filing 114-2 at 30 (Rambacher Depo., 116:5–13). In the interest of completeness, Mr. Rambacher also addressed possible heat source E as follows:

Q.    Okay. And then E is basically a summary of all of those opinions that any metal to metal contact in the fan assembly system could generate heat.

And then you leave it up to the fire guys to determine if the amount of heat generated is sufficient to cause a fire?

A.    Yes.

Filing 114-2 at 30 (Rambacker Depo., 116:14–21); *see also* CM/ECF 69 at 7 (¶ 31) (quoting Mr. Rambacher's testimony that "We don't know either way" which of the five possible heat sources was likely the source of heat causing the fire). FM responds to Henning's and Vencomatic's allegations by pointing out that Mr. Rambacher stated in an affidavit, "A correct fan selection would have eliminated the heat generation sources." Filing 143 at 5 (¶ 25) (quoting Rambacher Aff., Filing 129-1 at 4 (¶ 10)); *see also* CM/ECF 113 at 5 (¶ 31) (same). FM also adds that Mr. Rambacher stated in his affidavit, to a reasonable degree of engineering certainty, that "[b]ecause this fan was not suitable for the dusty environment, it was going to fail in at least one of five heat-producing ways." Filing 143 at 6 (¶ 31) (quoting Rambacher Aff., Filing 129-1 at 3 (¶ 7), 4 (¶ 11).

5.  *Summary of Mr. Keena's Opinions*

FM retained Mr. Keena to give opinions as to the cause and origin of the fire. Filing 112 at 6 (¶ 26). Mr. Keena has an associate's degree in fire administration from Johnson Community College, a bachelor's degree in fire protection and safety engineering from Eastern Kentucky University, and a master's degree in management from Colorado State University. Filing 112 at 6

9

(¶ 27). Henning and Vencomatic allege that Mr. Keena lacks the requisite education, training, and experience to determine mechanical failures. Filing 112 at 6 (¶ 28); CM/ECF 69 at 8 (¶ 37). However, FM alleges that Mr. Keena will not be giving an opinion on the potential failure modes of the manure blower fan; rather, FM asserts that Mr. Keena can properly rely on the opinions and expertise of mechanical engineers to assist in his origin and cause investigation. Filing 143 at 5 (¶ 28); CM/ECF 113 at 8 (¶ 37). Henning and Vencomatic allege that FM's response does not properly dispute that Mr. Keena lacks the qualifications to determine the cause of mechanical failures. Filing 146 at 4 (¶ 28); CM/ECF 118 at 6–7 (¶ 37).

Henning and Vencomatic allege that Mr. Keena relies "wholly" on Mr. Rambacher to determine a source of heat sufficient to ignite a first fuel. Filing 112 at 7 (¶ 29); CM/ECF 69 at 8 (¶ 38). FM responds that Mr. Keena relies "in part" on Mr. Rambacher's opinions regarding the potential failure modes of the manure blower fan, which Mr. Keena then used to determine if the heat generated was sufficient to ignite the fuel. Filing 143 at 6 (¶ 29); CM/ECF 113 at 7 (¶ 38). Henning and Vencomatic allege that Mr. Keena does not have any way to make any one of Mr. Rambacher's five theories of potential heat sources any more or less probable than Mr. Rambacher does. Filing 112 at 7 (¶ 30); CM/ECF 69 at 8 (¶ 39). FM disputes this allegation as immaterial and adds that Mr. Keena's fire-spread analysis concluded to a reasonable degree of origin-and-cause certainty that a failure of the manure blower fan produced sufficient heat to ignite the combustible dust in the manure blower fan assembly. Filing 143 at 6 (¶ 30); CM/ECF 113 at 7 (¶ 39).

Henning and Vencomatic allege that if Mr. Rambacher is incorrect in his analyses or opinions, then Mr. Keena's opinions would also be incorrect. Filing 112 at 7 (¶ 31); CM/ECF 69 at 9 (¶ 40). FM disputes this allegation as misrepresenting Mr. Keena's testimony, which was that

10

"[i]f there's no failure modes on the fan, then that would adjust my opinions." Filing 143 at 6 (¶ 31) (quoting Filing 114-5 at 23 (Keena Depo. 9/22/25, 88:8–9)); CM/ECF 113 at 7–8 (¶ 40).

The parties agree that Mr. Keena's opinion is that the fire occurred as a result of a series of events, although they dispute his opinions on the details or occurrence of those events. Filing 112 at 7–8 (¶ 32); CM/ECF 69 at 9–10 (¶ 41); Filing 143 at 6–7 (¶ 32); CM/ECF 113 at 8 (¶ 41). Specifically,

- The parties agree that Mr. Keena opines that a hot piece of metal shaving (or slag) was caused by metal-on-metal contact within a blower fan assembly. Filing 112 at 7 (¶ 32.a.). However, Henning and Vencomatic deny that there is any evidence that such a hot piece of slag was produced by the blower fan.

- Henning and Vencomatic allege that Mr. Keena opines that the slag traveled up a vertical air shaft about 10 feet, took a 90-degree right turn, and landed in an accumulation of dust that had settled in the horizontal shaft of an air duct. Filing 112 at 7 (¶ 32.b.); CM/ECF 69 at 9 (¶ 41.b.). FM asserts that this is a misstatement of Mr. Keena's testimony, which was that "[t]he flexi connection was at the manure blower fan. It was a hard duct making that transition to horizontal," and "that [i]t's not a straight 90. It first transitions to a – a degree and then to a 90. So they could – looks like they could route it to the left and then up to – and then go horizontal." Filing 143 at 7 (¶ 32.b.). Vencomatic disputes that it has misstated Mr. Keena's testimony. CM/ECF 118 at 8 (¶ 41.b.).

- Henning and Vencomatic allege that in Mr. Keena's scenario, the slag must have smoldered for about 23 minutes until it reached a minimum temperature of four hundred three (403) degrees centigrade (or about 752 degrees Fahrenheit), which

11

then ignited the dust. Filing 112 at 8 (¶ 32.c.) (citing EMSL Laboratory report on an ignition test of dust); CM/ECF 69 at 9 (¶ 41.c.). However, FM alleges that Mr. Keena testified that "based on the temperature of [a metal spark or slag], it would definitely ignite quicker than the dust sample" tested by EMSL Laboratory. Filing 143 at 7 (¶ 32.c.); CM/ECF 113 at 8 (¶ 41.c.). Henning and Vencomatic dispute FM's response because it is contrary to the EMSL Laboratory report. Filing 146 at 5 (¶ 32.c.); CM/ECF 118 at 8 (¶ 41.c.)

- Henning and Vencomatic allege that Mr. Keena opined that the dust fire burned so fiercely that it heated the metal ductwork to a point where the heat radiating off the ductwork caused the fiberglass reinforced plastic (FRP) material lining the walls of the poultry barn to combust. Filing 112 at 8 (¶ 32.d.); CM/ECF 113 at 8 (¶ 41.d.). FM disputes this allegation as a misstatement of Mr. Keena's testimony but does not explain in what way. Filing 112 at 7 (¶ 32.d.); CM/ECF 113 at 8 (¶ 41.d.). Henning and Vencomatic deny any misstatement of Mr. Keena's testimony. Filing 146 at 5 (¶ 32.d.); CM/ECF 118 at 8 (¶ 41.d.).

- Henning and Vencomatic allege that Mr. Keena opined that the fire from the combusted FRP then spread throughout the poultry barn and resulted in a complete and total loss of the barn and its contents. Filing 112 at 8 (¶ 32.e.). FM disputes this allegation as a misstatement of Mr. Keena's testimony, which was that the FRP "began to degrade at 100 degrees Fahrenheit and then ignite around 400 degrees Fahrenheit." Filing 143 at 7 (¶ 32.e.); CM/ECF 113 at 8 (¶ 41.e.). Henning and Vencomatic deny any misstatement of Mr. Keena's testimony. Filing 146 at 5 (¶ 32.e.); CM/ECF 118 at 8 (¶ 41.e.).

12

Henning and Vencomatic allege that, as a fire investigator, Mr. Keena is unable to determine which of Mr. Rambacher's five potential heat sources was more or less probable than another. Filing 112 at 9 (¶ 33); CM/ECF 69 at 10 (¶ 42). However, FM alleges that Mr. Keena's fire-spread analysis concluded that the fire was caused by a failure of the manure blower fan after eliminating other potential ignition sources and that the specific failure mode is not material to whether the manure blower fan caused the fire. Filing 143 at 7 (¶ 33); CM/ECF 113 at 8–9 (¶ 42). Henning asserts that FM's response is irrelevant to the fact that Mr. Keena cannot determine which of Mr. Rambacher's heat source theories is more or less likely to occur. Filing 146 at 6 (¶ 33). Vencomatic agrees with Henning and also disputes the basis for FM's allegation as a rebuttal report that should not be considered for purposes of summary judgment. CM/ECF 118 at 8 (¶ 42).

The Court will discuss additional allegations and factual disputes concerning opinions on the cause and origin of the fire as necessary in its legal analysis below.

### 6. FM's Subrogation and Lawsuits

FM alleges that it has paid $22,408,633.00 to its Insureds for damage to the poultry house pursuant to the terms of its Policy. Filing 20 at 2 (¶ 7). After indemnifying Michael Foods for the loss, FM initiated these subrogation actions against Henning, Filing 112 at 3 (¶ 9), and against Vencomatic, CM/ECF 69 at 4 (¶ 17)

### B.  Procedural Background

### 1. FM's Complaints Against Henning

As mentioned at the outset of this decision, FM filed a Complaint on December 15, 2022, and an Amended Complaint on March 31, 2023, as subrogee of its Insureds, against Henning. Filing 1; Filing 20 at (¶¶ 3–4). In its Amended Complaint, FM asserts three claims against Henning. FM's first cause of action against Henning is for breach of contract, Filing 20 at 3, alleging that Henning breached its agreement with the Insureds "with respect to the design,

13

construction, selection, use and installation of the manure blower fan assembly," Filing 20 at 4 (¶ 14). FM's second cause of action against Henning is for breach of warranty, Filing 20 at 4, alleging that Henning breached the warranties in the agreement it had with the Insureds, Filing 20 at 4–5 (¶ 17). FM's third cause of action against Henning is for negligence, Filing 20 at 5, alleging that Henning "breached the standard of care it owed to Plaintiff's Insureds and its subrogated Insurer Factory Mutual, by its negligent actions with respect to the materials, equipment, construction, design and installation of the same." Filing 20 at 5 (¶ 20). On its claims against Henning, FM "prays for damages in the fair and reasonable amount of $22,408,633.00, plus interest and costs as allowed by law." Filing 20 at 6 (Wherefore clause).

   2. *FM's Complaint Against Vencomatic*

   Subsequently, on February 23, 2024, FM filed a Complaint in a separate action against Vencomatic. CM/ECF 1. FM's first cause of action against Vencomatic is for negligence, CM/ECF 1 at 3, alleging that Vencomatic breached duties "to use due care and caution to design, manufacture, sell, and install manure blower fans free from defect and that function in a manner consistent with their intended and/or foreseeable use," CM/ECF 1 at 3–4 (¶¶ 15–16). FM alleges Vencomatic breached these duties by committing one or more of the following negligent acts or omissions:

> a. Carelessly and negligently designed, manufactured, marketed, and/or sold the Subject Manure Blower Fan that was installed at Plaintiff's Insured's facility with an internal defect that caused the Subject Manure Blower Fan to operate outside of its specified boundaries without any outside influence or manipulation when Vencomatic knew or should have known that this would pose a risk of significant property damage; and
>
> b. Carelessly and negligently represented that the Subject Manure Blower Fan was appropriate to use in the above referenced facility.

14

      c.      Carelessly and negligently failed to warn that its product was not appropriate to use in a cage free facility where the accumulation of dust on its equipment would occur.

      d.      Carelessly and negligently failed to warn post sale that its product was not appropriate to use in cage free facilities were the accumulation of dust on its equipment would occur.

      e.      Was otherwise careless and negligent.

CM/ECF 1 at 4 (¶ 16).

FM's second cause of action against Vencomatic is for breach of contract, CM/ECF 1 at 5, based on the following allegation:

20.      To the extent the "personal proposal," other documentation, and the course of dealings between Plaintiff's Insureds created a direct contractual relationship between Plaintiff's Insureds and Vencomatic Group, Defendant Vencomatic breached such agreement with respect to the design, manufacture, sales, and/or installation of the Subject Manure Blower Fan. These and other non-conforming items caused the February 27, 2020, fire and ensuing damages.

CM/ECF 1 at 5 (¶ 20). The "personal proposal" mentioned in this paragraph is from Vencomatic to Michael Foods found at Filing 20-1 at 42–59, not the "sales quote" from Vencomatic to Henning found at CM/ECF 80-4 at 1–15.

FM's third cause of action against Vencomatic is for breach of warranty. CM/ECF 1 at 5. The essence of this claim is the following allegations:

23.      To the extent the "personal proposal," other documentation, and the course of dealings between Plaintiff's Insureds created a direct contractual relationship between Plaintiff's Insureds and Vencomatic Group, Defendant Vencomatic breached the express warranties contained therein, including but not limited to the express warranties for defect and failure to perform in accordance with manufacturer's specifications.

24.      To the extent the "personal proposal," other documentation, and the course of dealings between Plaintiff's Insureds created a direct contractual relationship between Plaintiff's Insureds and Vencomatic Group, Defendant Vencomatic breached the implied warranty of fitness and the implied warranty of merchantability with respect to the design, manufacture, sales, and/or installation of the Subject Manure Blower Fan.

15

CM/ECF 1 at 6 (¶¶ 23–24). Again, the "personal proposal" mentioned in these paragraphs is from Vencomatic to Michael Foods found at Filing 20-1 at 42–59, not the "sales quote" from Vencomatic to Henning found at CM/ECF 80-4 at 1–15.

FM's fourth and last cause of action against Vencomatic is for strict liability. CM/ECF 1 at 6. The essence of this claim is the following allegations:

> 27.    Defendant Vencomatic designed, manufactured, assembled, tested, marketed, distributed, sold, and/or installed the Subject Manure Blower Fan in a defective and unreasonably dangerous condition, which led to the Subject Manure Blower Fan failing to function in a manner consistent with its intended and/or foreseeable use.

> 28.    At the time Vencomatic placed the Subject Manure Blower Fan into the stream of commerce, it was unreasonably dangerous, unsafe, and defective.

CM/ECF 1 at 6–7 (¶¶ 27–28).

On these claims against Vencomatic, FM "prays for damages in the fair and reasonable amount of $22,408,633.00, plus interest and costs as allowed by law." CM/ECF at 7 (Wherefore clause).

### 3.  Consolidation of the Cases

On April 10, 2024, FM filed a Motion to Consolidate in each case, which each respective Defendant opposed. Filing 56; CM/ECF 13; Filing 58; CM/ECF 16. On May 1, 2024, a magistrate judge of this Court granted the Motion in each case in identical orders to the extent of consolidating the cases "for discovery and pretrial preparation purposes only." Filing 60 at 3; CM/ECF 18 at 3. On August 29, 2025, FM filed a Motion to Consolidate Cases for Trial in each case, which Vencomatic opposed but to which Henning made no response. Filing 86; CM/ECF 40; CM/ECF 48. On October 2, 2025, the magistrate judge granted the Motion in each case in identical orders. Filing 94 at 6; CM/ECF 52. The consolidated trial of the two cases is set to begin on April 13, 2026. Filing 95; CM/ECF 53.

The Motions now before the Court followed in due course.

## II.  THE MOTIONS FOR SUMMARY JUDGMENT

As the Court observed at the outset of this ruling, the Motions for Summary Judgment are fully dispositive of these cases. Therefore, the Court begins its legal analysis with consideration of the Motions for Summary Judgment. The Court first summarizes the standards for summary judgment that are applicable to both Henning's Motion and Vencomatic's Motion.[6]

### A.  Applicable Standards

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, whether or not a court should grant summary judgment often turns on whether or not genuine issues of material fact are apparent on the record. *See Arnett v. Norris*, 160 F.4th 921, 925 (8th Cir. 2025) ("The district

---

[6] FM relies on an out-of-date and implicitly if not explicitly overruled case law when providing the Court the standard for granting summary judgment. FM states,

> The Eighth Circuit has cautioned that summary judgment is an "extreme remedy" that should be carefully invoked. *See Inland Oil & Transp. Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979), *cert. den.* 494 U.S. 991 (1979). Courts should be cautious when reviewing a grant of summary judgment; as the Fifth Circuit highlighted, "[s]ummary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611 (5th Cir. 1967).

Filing 142 at 2–3.

Almost four decades ago, the Supreme Court made clear that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quotation and citation omitted). A decade-and-a-half ago, in an en banc decision, the Eighth Circuit made clear that summary judgment "is designed for every action"; therefore, panel statements to the contrary, such as those cited by FM, "are unauthorized and should not be followed." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (expressly rejecting such statements as to employment discrimination cases); *see also Bates v. Hadden*, 576 F. App'x 636, 639 (8th Cir. 2014) (relying on *Celotex* and *Torgerson* to reject an assertion that "[s]ummary judgment is an extreme remedy which should be sparingly employed" in a case involving summary judgment on a § 1983 claim for malicious prosecution and unconstitutional confinement). The Court will summarize more recent and controlling statements of summary judgment standards set out by the Eighth Circuit post-*Torgerson*.

court at summary judgment determines 'whether there is a genuine issue for trial.'" (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).

"A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Wolterman v. Syverson*, No. 24-1482, 2026 WL 100608, at *2 (8th Cir. Jan. 14, 2026) (quoting *Flores v. United States*, 689 F.3d 894, 902 (8th Cir. 2012)). More specifically,

> If there is a genuine dispute of material fact, we view the disputed facts in the light most favorable to the nonmovant. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id*. (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009)).

*Siebrecht v. Mercy Health Servs. - Iowa Corp*., No. 24-3159, 2026 WL 22072, at *3 (8th Cir. Jan. 5, 2026); *Arnett,* 160 F.4th at 925. On the other hand, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Kampas v. City of St. Louis, Missouri*, 157 F.4th 937, 941 (8th Cir. 2025) (quoting *Steed v. Mo. State Highway Patrol*, 2 F.4th 767, 770 (8th Cir. 2021), in turn quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

As to the parties' respective burdens, "[t]he movant has the burden of showing that there is no genuine issue of fact. . . ." *Naylor v. Cnty. of Muscatine, Iowa*, 151 F.4th 973, 975 (8th Cir. 2025) (quoting *Hodge ex rel. Farrow v. Walgreen Co.*, 37 F.4th 461, 464 (8th Cir. 2022), in turn quoting *Liberty Lobby, Inc.*, 477 U.S. at 256). That burden requires the movant to "identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *LADS Network Sols., Inc. v. Agilis Sys., LLC*, 138 F.4th 1059, 1062 (8th Cir. 2025) (quoting *Torgerson*, 643 F.3d at 1042, in turn quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

18

In response, the non-movant "cannot simply rest on the allegations in [its] complaint; [it] must offer evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Sherman v. Collins*, 158 F.4th 904, 907 (8th Cir. 2025) (internal quotation marks and citations omitted). As to the court's role, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Arnett* 160 F.4th at 926 (8th Cir. 2025) (quoting *Torgerson*, 643 F.3d at 1042, in turn quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)). On the other hand, legal questions, which are typically decided by courts, may be decided at summary judgment. *Yassin v. Weyker*, 39 F.4th 1086, 1089 (8th Cir. 2022).

The Court will apply these standards first to the issues that are raised only in Vencomatic's Motion for Summary Judgment, then consider together issues raised in both Vencomatic's Motion and Henning's Motion.

### B. Issues Unique to Vencomatic's Motion for Summary Judgment

Vencomatic seeks summary judgment on all claims against it in FM's Complaint. CM/ECF 67 at 1. Vencomatic asserts six grounds for summary judgment that are unique to its Motion: (1) the strict liability claim will not lie because Vencomatic is not the manufacturer of the blower fan at issue; (2) the negligence claim was not initiated within the limitations period; (3) the breach-of-contract claim fails for lack of privity of contract between Vencomatic and FM; (4) the breach-of-contract claim also was not initiated within the limitations period; (5) the breach-of-warranty claim was not initiated within the limitations period; and (6) FM failed to comply with the express warranty provisions, and Vencomatic specifically disclaimed the implied warranty of merchantability and implied warranty of fitness. CM/ECF 67 at 2–3 (¶¶ 1–6).

1. *Vencomatic Is Entitled to Summary Judgment on FM's Claims of Breach of Contract and Breach of Warranties*

In response to Vencomatic's Motion, FM concedes that there is no evidence of a contract between Vencomatic and Michael Foods, so FM agrees to dismiss its claim of breach of contract against Vencomatic. Filing 112 at 10. This concession of the lack of any contract between Vencomatic and Michael Foods likewise means that Vencomatic is entitled to summary judgment on any express warranty claim because FM has not pointed to any other basis for a promise that would constitute an express warranty. *See Freeman v. Hoffman-La Roche, Inc.*, 618 N.W.2d 827, 844 (Neb. 2000) ("[I]n order to create an express warranty, the seller must make an affirmation of fact or promise to the buyer which relates to the goods and becomes part of the basis of the bargain."); *see also Sherman*, 158 F.4th at 907 (explaining that the non-movant "must offer evidentiary materials that set out specific facts showing that there is a genuine issue for trial" (internal quotation marks and citations omitted)). FM also concedes that any implied warranty would accrue on delivery rather than discovery, so it is untimely, and FM agrees to dismiss its breach of warranty claim. CM/ECF 112 at 11. Notwithstanding these concessions, FM has taken no steps to dismiss its contract or warranty claims against Vencomatic. Thus, the Court grants Vencomatic's Motion for Summary Judgment as to FM's second cause of action for breach of contract and its third cause of action for breach of warranties.

The Court turns to the questions of whether Vencomatic is also entitled to summary judgment on FM's strict liability and negligence claims against Vencomatic.

2. *FM's Strict Liability Claim Will Not Lie Against Vencomatic*

a. The Parties' Arguments

Vencomatic's ground for summary judgment on FM's strict products liability claim is that pursuant to Neb. Rev. Stat. § 25-21,181, Vencomatic cannot be liable because it is only the seller

of the blower fan at issue not the manufacturer. CM/ECF 68 at 4. Vencomatic argues that there is no dispute that the manufacturer of the blower fan was Novenco. CM/ECF 68 at 5. Going one step further, Vencomatic argues that Novenco incorporated into its blower fan an electric motor manufactured by Regal Beloit. CM/ECF 68 at 5. Vencomatic argues that Nebraska law is clear that a strict liability claim will lie against a seller only if the seller is also the manufacturer of the product, but Vencomatic is clearly not the manufacturer of the blower fan or its motor. CM/ECF 68 at 5.

In response, FM argues that the strict liability claim applies to the entire "aviary system" that Vencomatic placed on the market, even if Vencomatic did not manufacture all the aviary system's component parts, because the aviary system is the product at issue. CM/ECF 112 at 4. FM contends that Nebraska courts have held that strict liability applies to the completed product placed on the market, regardless of where the product's component parts were manufactured. CM/ECF 112 at 4 (citing *Ag Valley Coop. v. Servinsky Eng'g, PLLC*, 974 N.W.2d 324 (Neb. 2022)). FM argues that it is critical that Vencomatic also designed the aviary system and selected the blower fan for use in the facility, but the manure blower fan was not suitable for its intended use. CM/ECF 112 at 5–6. FM argues that Vencomatic is also liable under the "apparent manufacturer" doctrine because Vencomatic held itself out as the manufacturer of the blower fan in question. CM/ECF 112 at 7.

In reply, Vencomatic argues that FM identified the product at issue in its Complaint as the "manure blower fan assembly" not as an "aviary system." CM/ECF 117 at 4–5. Indeed, Vencomatic asserts that FM has never previously characterized the "product" at issue as anything other than the manure blower fan. CM/ECF 117 at 6. Furthermore, Vencomatic argues that the blower fan is not part of the "aviary system" but a separate system from the Bolegg Gallery, which

is the "aviary system." CM/ECF 117 at 8–9. Vencomatic also argues that the "apparent manufacturer" doctrine is inapplicable because there is no evidence in the record that Michael Foods or anyone employed by Michael Foods believed that Vencomatic was the manufacturer of the blower fan. CM/ECF 117 at 12.

  b.  The "Product" at Issue Is the "Blower Fan" Not the "Aviary System"

The Court rejects FM's belated attempt to change the basis for its strict liability claim from the "blower fan" to the "aviary system." There is not a single mention of an "aviary system" in FM's Complaint against Vencomatic. CM/ECF 1 *passim*. Instead, FM's fourth cause of action against Vencomatic alleging strict liability is premised on repeated allegations that the blower fan was the defective product:

> 27.  Defendant Vencomatic designed, manufactured, assembled, tested, marketed, distributed, sold, and/or installed the Subject Manure Blower Fan in a defective and unreasonably dangerous condition, which led to the Subject Manure Blower Fan failing to function in a manner consistent with its intended and/or foreseeable use.
>
> 28.  At the time Vencomatic placed the Subject Manure Blower Fan into the stream of commerce, it was unreasonably dangerous, unsafe, and defective.
>
> 29.  The Subject Manure Blower Fan was in the same condition on the date of the February 27, 2020, fire as it was manufactured and distributed by Vencomatic.
>
> 30.  The Subject Manure Blower Fan, at all relevant times, herein, was being used for its normal and intended purpose.
>
> 31.  That the Subject Manure Blower Fan's defective condition was the proximate cause of damage to Plaintiff's Insureds, and its subrogated Insurer, Factory Mutual.

CM/ECF 1 at 6–7 (¶¶ 27–31). Thus, the "product" at issue on the strict liability claim according to FM's Complaint is the "Manure Blower Fan."

22

FM has never amended its Complaint in the case against Vencomatic to change the basis of the strict liability claim from the "blower fan" to the "aviary system." Under the Final Progression Order in the case against Vencomatic, the deadline for FM to move to amend pleadings or add parties expired on August 30, 2024. CM/ECF 22 at 2 (¶ 3). FM's backdoor attempt at amendment by asserting a totally different "product" for its strict liability claim in response to Vencomatic's Motion for Summary Judgment, long after the deadline for amendments expired, will not be tolerated.

        c. Nebraska Law Bars the Strict Liability Claim against Vencomatic

Again, Vencomatic asserts that it cannot be liable on FM's strict liability claim because it did not manufacture the blower fan at issue. CM/ECF 68 at 4. Although FM originally alleged that Vencomatic "manufactured" the blower fan, CM/ECF 1 at 6–7 (¶¶ 27, 29), FM does not now dispute that the manufacturer of the blower fan at issue was not Vencomatic but Novenco. CM/ECF 69 at 2 (¶ 8). FM disputes only whether this fact is material, CM/ECF 113 at 2 (¶ 8), but as explained below the undisputed fact that Vencomatic did not manufacture the blower fan is plainly material under Nebraska law.

The Nebraska statute concerning actions based on strict liability in tort states the following:

> No product liability action based on the doctrine of strict liability in tort shall be commenced or maintained against any seller or lessor of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user, or consumer unless the seller or lessor is also the manufacturer of the product or the part thereof claimed to be defective.

Neb. Rev. Stat. § 25-21,181. Where FM cannot now assert that the "product" was the "aviary system" rather than the "blower fan," and where it is undisputed that the allegedly defective blower fan was not manufactured by Vencomatic, even if it was sold by Vencomatic, FM's strict liability

23

claim against Vencomatic will not lie, and Vencomatic is entitled to summary judgment on that claim. *Id*.

FM's reliance on *Ag Valley Coop. v. Servinsky Eng'g, PLLC*, 974 N.W.2d 324 (Neb. 2022), does not change this result. FM argues that *Ag Valley Coop.* held that strict liability applies to the completed product placed on the market, regardless of where the component parts of the product were manufactured. CM/ECF 112 at 4. Again, FM pleaded that the product at issue was the blower fan. CM/ECF 1 at 6–7 (¶¶ 27–31). Therefore, FM cannot now claim that something else—an "aviary system" encompassing everything that Vencomatic provided for the project—is the completed product placed on the market, whatever *Ag Valley Coop* may say.

Furthermore, no rational trier of fact could hold that the "blower fan" is a component of the "aviary system" rather than a separate component of a separate system. *See Siebrecht*, 2026 WL 22072, at *3 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (quoting *Torgerson*, 643 F.3d at 1042, in turn quoting *Ricci*, 557 U.S. at 586)); *Arnett*, 160 F.4th at 925 (same). The "sales quote" from Vencomatic to Henning does not state that it is for a "product" or an "aviary system"; rather, it states that it is for a "project." CM/ECF 80-4 at 2. It then identifies separate systems in the "project" including the "Bolegg Gallery," "Airducts and Blowers," and other systems. CM/ECF 80-4 at 2. It expressly identifies the "Bolegg Galery" as the "aviary system." CM/ECF 80-4 at 4. FM alleges that the Vencomatic "aviary system" is referred to as the "Bolegg Gallery Air System" and includes *inter alia* "manure blower fans and manifolded ductwork for manure drying and air movement." CM/ECF 113 at 10–11 (¶ 5) (citing CM/ECF 80-4 at 2). However, that allegation is blatantly contradicted by the record—that is, the "sales quote"—so that no reasonable jury could believe it, and the Court need not accept it as true. *Kampas*, 157 F.4th at 941. Contrary to FM's

24

allegation, the "sales quote" never refers to an "aviary system" as the "Bolegg Gallery Air System"; in fact, the "sales quote" never mentions a "Bolegg Gallery Air System" or even an "air system" at all. CM/ECF 80-4 *passim*.

Because Vencomatic is not the manufacturer of the blower fan at issue in this case, it cannot be held strictly liable. Neb. Rev. Stat. § 25-21,181.

> d. FM's "Apparent Manufacturer" Theory Lacks any Record Support

FM's final argument as to the strict liability claim is that Vencomatic can still be held strictly liable under the "apparent manufacturer" theory. CM/ECF 112 at 7. FM argues that Vencomatic held itself out as the manufacturer of the manure blower fan in question because the sales quote that Vencomatic presented to Henning and Henning subsequently accepted specifically identified the manure blower fan as a component of the aviary system sold by Vencomatic. CM/ECF 112 at 7. FM points out that nowhere in the proposal or the Vencomatic invoice is there an indication that the manure blower fan was manufactured by Novenco. CM/ECF 112 at 7. FM argues further that Vencomatic provided two user manuals for the entire aviary system but still did not identify the blower fan as manufactured by Novenco in the maintenance instructions. CM/ECF 112 at 8. Finally, FM argues that Vencomatic personnel responded when Michael Foods had issues with the blowers. CM/ECF 112 at 8.

Vencomatic responds that there is no evidence in the record that Michael Foods or anyone employed by Michael Foods believed that Vencomatic was the manufacturer of the blower fan. CM/ECF 117 at 12. Likewise, Vencomatic argues, there is no evidence that Vencomatic held itself out as the manufacturer of the fan or that the name "Vencomatic" appears anywhere on the blower fan. CM/ECF 112 at 12.

25

The Nebraska Supreme Court explained, "The apparent manufacturer doctrine stems from the Restatement (Second) of Torts § 400 at 337 (1965), which states: 'One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.'" *Stones v. Sears, Roebuck & Co.*, 558 N.W.2d 540, 544 (Neb. 1997). The court explained that even if it were inclined to adopt the doctrine, it would not do so in the case before it:

> [T]here is no evidence in the record that the Stoneses believed Sears was the manufacturer or that Sears held itself out as the manufacturer of the grill in question. In this regard, we note that there is no evidence in the record that the name "Sears" was on the grill. In fact, the assembly instructions for the grill explicitly referred to it as a "Kenmore" outdoor gas grill. While "Kenmore" may be commonly associated with Sears, there is no evidence supporting that contention in the record before us.
>
> The Stoneses give great weight to the fact that Sears sold a customer maintenance agreement plan along with the grill. The fact that this plan closely resembles a warranty does not convince us that it causes the public to believe that Sears manufactured the grill. Indeed, Sears' technician Dickman testified that Sears often provides service to customers for non-Sears appliances.
>
> While a grill owner's manual introduced into the record with Belina's testimony contained a picture of a grill with the word "Sears" on its base, there is simply no evidence that the grill in the picture was the same type of grill sold to the Stoneses. In fact, the manual was dated 1977, some 10 years before the Stoneses purchased their grill.

*Stones*, 558 N.W.2d at 545.

In this case, FM has failed to meet its burden to "offer evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Sherman*, 158 F.4th at 907 (internal quotation marks and citations omitted). FM has pointed to no facts to be viewed in the light most favorable to FM in support of an "apparent manufacturer" theory. *See Siebrech*, 2025 WL 22072, at *3 (explaining that if there is a genuine dispute of material fact the court reviews the disputed facts in the light most favorable to the nonmovant, but if a rational trier of fact could not find for the nonmoving party, there is no genuine issue of material fact (citing *Torgerson*, 643 F.3d at

26

1031)). As in *Stones*, FM has offered no evidence that anyone at the Insureds believed that Vencomatic was the manufacturer of the blower fan or that Vencomatic held itself out as the manufacturer of the blower fan. *Stones*, 558 N.W.2d at 545. As in *Stones*, there is no evidence that the name "Vencomatic" was on the blower fan. *Id*. In this case, the lack of any indication of the manufacturer on the blower fan is no more evidence that Vencomatic was the manufacturer than the presence of a brand name associated with the seller was in *Stones*. 558 N.W.2d at 545 (noting that "the assembly instructions for the grill explicitly referred to it as a 'Kenmore' outdoor gas grill [and] [w]hile 'Kenmore' may be commonly associated with Sears, there is no evidence supporting that contention in the record before us."). FM's "apparent manufacturer" argument relies entirely on an attorney's invention with no basis in the record. That theory—unsupported by any record evidence—is not enough to preclude summary judgment on FM's strict liability claim against Vencomatic.

### e. Summary

Vencomatic is entitled to summary judgment on FM's claim of product liability based on strict liability. Vencomatic is not the manufacturer of the blower fan, which is the product at issue. *See* Neb. Rev. Stat. § 25-21,181. Furthermore, Vencomatic cannot be held liable on that claim based on an "apparent manufacturer" theory. *See Stones*, 558 N.W.2d at 545.

### 3. *Vencomatic Has Not Carried Its Burden to Show that FM's Negligence Claim Is Untimely*

The last issue unique to Vencomatic's Motion for Summary Judgment is whether Vencomatic is entitled to summary judgment on FM's negligence claim because that claim is time-barred. The Court concludes that Vencomatic is not entitled to summary judgment on this claim on this ground.

27

a.    The Parties' Arguments

Vencomatic argues that all of FM's negligence claims are barred by the applicable statute of limitations, whether the Court applies the four-year "general" statute of limitations in Neb. Rev. Stat. § 25-207 or the four-year "special" statute of limitations in Neb. Rev. Stat. § 25-223. CM/ECF 112 at 5–6. Relying on the "occurrence rule," under which a claim accrues and the limitations period begins to run when a negligent act or omission occurs, Vencomatic argues that the latest time any alleged acts of negligence occurred was either the date that chickens were first introduced to compartment 12-1 of Barn 12, which was October 16, 2019, or the latest date chickens were first introduced into any compartment of Barn 12, which was December 27, 2019. CM/ECF 68 at 7. Thus, Vencomatic argues that the four-year statute of limitations ran on December 27, 2023, but FM did not file suit against Vencomatic until February 23, 2024. CM/ECF 68 at 7.

FM argues that Vencomatic improperly relies on the "occurrence rule" that applies to cases involving medical and legal malpractice claims subject to the statute of limitations in Neb. Rev. Stat. § 25-222, but the negligence claim at issue is subject to the statute of limitations in Neb. Rev. Stat. § 25-207. CM/ECF 112 at 9. Therefore, FM argues that its claim for ordinary negligence did not accrue—and the statute of limitations did not begin to run—until the product failed. CM/ECF 112 at 10. Indeed, FM argues that there is no way that it could have brought this action before the harm from failure of the blower fan—the fire—occurred on February 27, 2020. CM/ECF 112 at 10. Consequently, FM argues that its negligence claim against Vencomatic filed on February 23, 2024, is timely.

In reply, Vencomatic jettisons reliance the "occurrence rule" and instead centers its argument on FM's failure to dispute application of the statute of limitations found in Neb. Rev. Stat. § 25-223. CM/ECF 117 at 14. Vencomatic argues that this statute of limitations applies

28

because the equipment for Barn 12 was permanently installed in Barn 12, and FM admits as much. CM/ECF 117 at 15. Vencomatic argues further that the Nebraska Supreme Court has held that the limitations period under Neb. Rev. Stat. § 25-223 begins to run from the date of substantial completion of the project, giving consideration to the nature and scope of the project. CM/ECF 117 at 16. Vencomatic points out that FM has admitted that substantial completion of Building 12 occurred in December 2019, more than four years before FM filed suit against Vencomatic. CM/ECF 117 at 17. Vencomatic also argues that the "discovery rule" in Neb. Rev. Stat. § 25-223 does not save FM's negligence claim because FM had notice of a claim against the manufacturer of the blower fan in March 2021, when it received the Schaefer Engineering Report, but that was more than one year prior to when the limitation period under Neb. Rev. Stat. § 25-223 would have otherwise expired, so the limitation period was not extended. CM/ECF 117 at 17. Even if Neb. Rev. Stat. § 25-207 applies, as FM contends, Vencomatic argues that FM's negligence claim is untimely because FM could have instituted a cause of action before the fire occurred. CM/ECF 117 at 18. Vencomatic explains that the alleged negligence of Vencomatic, as claimed by FM's experts, is that the fan was unsuitable for the environment because it would accumulate dust at a rate that is too frequent for the fan to be maintained properly, and that harm began immediately after installation of the fan, where every flat surface in Barn 12 was coated with dust. CM/ECF 117 at 18.

> b.   The Applicable Statute of Limitations

"The determination of which statute of limitations applies is a question of law." *Sparks v. Mach*, 993 N.W.2d 119, 126–27 (Neb. 2023). The Nebraska Supreme Court has explained,

> In determining which statute of limitations applies in a particular case, we have established the principle that a special statute of limitations controls and takes precedence over a general statute of limitations because the special statute is a specific expression of legislative will concerning a particular subject matter.

*Hike v. State Dep't of Roads*, 899 N.W.2d 614, 624 (Neb. 2017). The Nebraska Supreme Court

has explained further,

> The general rule is that a claim accrues and the statute of limitations begins to run when the aggrieved party has the right to institute and maintain suit. A party is not aggrieved and cannot institute and maintain suit if any element of that party's claim depends upon abstract questions or issues that might arise in a hypothetical or fictitious situation or setting and may never come to pass. The essential attribute of a statute of limitations is that it accords and limits a reasonable time within which a suit may be brought upon causes of action which it affects. The mischief which statutes of limitations are intended to remedy is the general inconvenience resulting from delay in the assertion of a legal right which is practicable to assert. However, if an injured party is wholly unaware of the nature of an injury or the cause of it, it is difficult to see how the party may be charged with a lack of diligence or sleeping on its rights. Accordingly, Nebraska has adopted the "discovery rule," which provides an exception to a statute of limitations for a claim that would otherwise be outside the statutory period.

*Konecne v. Abram, LLC*, 26 N.W.3d 44, 63 (Neb. 2025) (citations omitted). The court then

acknowledged that there are different "discovery rules" for various types of actions that start the

running of specific statutes of limitations established either by statute or by judicial recognition.

*Id.* at 63–64 (citing Neb. Rev. Stat. §§ 25-207(4), 25-222, 25-223, and 25-224, and the discovery

rules applicable to the State Tort Claims Act and the Political Subdivisions Tort Claims Act). The

court also observed, "Though the differences between the various discovery rules may be slight, it

is necessary that the bench and bar ensure that the proper discovery rule is applied in any given

case." *Id.* at 64.

To determine which statute of limitations applies to FM's negligence claim against

Vencomatic, the Court begins by looking at the particular subject matter of the negligence claim

at issue. *Cf. Hike*, 899 N.W.2d at 624 (explaining that special statutes of limitations concern

particular subject matter). FM's negligence claim alleges first that "Vencomatic owed Plaintiff's

Insured a duty to use due care and caution to design, manufacture, distribute, sell, and install

30

manure blower fans free from defect and that function in a manner consistent with their intended

and/or foreseeable use." CM/ECF 1 at 3–4 (¶ 15). It then alleges the following breaches of duties:

    a.  Carelessly and negligently designed, manufactured, marketed, and/or sold the Subject Manure Blower Fan that was installed at Plaintiff's Insured's facility with an internal defect that caused the Subject Manure Blower Fan to operate outside of its specified boundaries without any outside influence or manipulation when Vencomatic knew or should have known that this would pose a risk of significant property damage; and

    b.  Carelessly and negligently represented that the Subject Manure Blower Fan was appropriate to use in the above referenced facility.

    c.  Carelessly and negligently failed to warn that its product was not appropriate to use in a cage free facility where the accumulation of dust on its equipment would occur.

    d.  Carelessly and negligently failed to warn post sale that its product was not appropriate to use in cage free facilities were the accumulation of dust on its equipment would occur.

    e.  Was otherwise careless and negligent.

CM/ECF 1 at 4 (¶ 16). The Court concludes that the negligence claim against Vencomatic—as

pleaded—is premised on negligence in the design, manufacture, marketing, selling, and failure to

warn with regard to a "product" specifically identified as the "Subject Manure Blower Fan."

    Vencomatic argues that the applicable statute of limitations is Neb. Rev. Stat. § 25-223.

CM/ECF 68 at 6. In pertinent part, that statute provides as follows:

> (1) Any action to recover damages based on any alleged breach of warranty on improvements to real property or based on any alleged deficiency in the design, planning, supervision, or observation of construction, or construction of an improvement to real property, except improvements to real property subject to the Nebraska Condominium Act, shall be commenced within four years after any alleged act or omission constituting such breach of warranty or deficiency. If such cause of action is not discovered and could not be reasonably discovered within such four-year period, or within one year preceding the expiration of such four-year period, then the cause of action may be commenced within two years from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier. In no event may any action be commenced to recover damages for an alleged breach of warranty on improvements to real property or deficiency in the design, planning, supervision, or observation

of construction, or construction of an improvement to real property more than ten years beyond the time of the act giving rise to the cause of action.

Neb. Rev. Stat. § 25-223(1). The Nebraska Supreme Court has explained that this statute of limitations applies to "builders and contractors," as distinguished from Neb. Rev. Stat. § 25-224, which applies to "product liability actions" and "necessarily appl[ies] to claims against manufacturers, sellers, and lessors of products." *Ag Valley Coop. v. Servinsky Eng'g, PLLC*, 974 N.W.2d 324, 335 (Neb. 2022). Thus, "[w]hen claims of defective construction are brought against contractors and builders, [the Nebraska Supreme Court] ha[s] consistently applied the limitations periods set out in § 25-223, whether the claims were based on theories of contract, tort, fraud, or breach of warranty." *Id.* at 336.

The Court concludes that § 25-223 is not the statute of limitations applicable to FM's negligence claim against Vencomatic as a matter of law. *Sparks*, 993 N.W.2d at 126–27 ("The determination of which statute of limitations applies is a question of law."). That statute applies to builders and contractors "based on any alleged deficiency in the design, planning, supervision, or observation of construction, or construction of an improvement to real property." *See* Neb. Rev. Stat. § 25-223(1); *See Ag Valley Coop.*, 974 N.W.2d at 335. Such a claim is different from the "product liability action" at issue here that has been brought against Vencomatic as the alleged "manufacturer[ ] [or] seller[ ] of [the] product[ ]," the blower fan. *See* CM/ECF 1 at 3–4 (¶¶ 15–16); *see also Ag Valley Coop.*, 974 N.W.2d at 335. Although Vencomatic argues that the claim "concern[s] a deficiency in the design, planning, supervision, or observation of construction by Vencomatic," CM/ECF 117 at 13–14, parroting the language of § 25-223, the claim as alleged involves "negligently design[ing], manufactur[ing], market[ing], and/or s[elling]" of the blower fan. CM/ECF 1 at 3–4 (¶¶ 15–16). Thus, § 25-223 is inapplicable because it does not concern the subject matter of this product liability negligence claim.

FM argues that Neb. Rev. Stat. § 25-207 is the statute of limitations applicable to its negligence claim. CM/ECF 112 at 9. That statute provides in its entirety as follows:

> The following actions can only be brought within four years: (1) An action for trespass upon real property; (2) an action for taking, detaining or injuring personal property, including actions for the specific recovery of personal property; (3) an action for an injury to the rights of the plaintiff, not arising on contract, and not hereinafter enumerated; and (4) an action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud, except as provided in sections 30-2206 and 76-288 to 76-298.

Neb. Rev. Stat. § 25-207. The Nebraska Supreme Court identifies § 25-207(3) as the statute of limitations for a negligence claim. *See Johnson v. Antoniutti*, 16 N.W.3d 864, 869 n.8 (Neb. 2025) (citing *Susman v. Kearney Towing & Repair Ctr.*, 970 N.W.2d 82 (Neb. 2022)); *Trausch v. Hagemeier*, 985 N.W.2d 402, 412 (Neb. 2023) (explaining that § 25-207(3) was the applicable statute of limitations for a claim that "sounded in negligence"). More specifically, the Nebraska Supreme Court describes § 25-207 as "a general statute of limitations" for such claims. *Murphy v. Spelts-Schultz Lumber Co. of Grand Island*, 481 N.W.2d 422, 426 (Neb. 1992). FM itself describes Neb. Rev. Stat. § 25-207 as the statute of limitations applicable to its "general" or "ordinary" negligence claim. CM/ECF 112 at 9.

"However," the Nebraska Supreme Court explained in *Murphy*, "there are special statutes of limitations concerning other causes of action based on negligence." *Id.* Specifically, "there is a special statute of limitations pertaining to product liability, namely, Neb. Rev. Stat. § 25–224 (Reissue 1989)." *Id.* That statute provides in pertinent part,

> (1) All product liability actions, except [those involving exposure to certain chemical compounds], shall be commenced within four years next after the date on which the death, injury, or damage complained of occurs.

Neb. Rev. Stat. § 25-224(1); *see also Murphy*, 481 N.W.2d at 426 (quoting the statute with the bracketed insertion). This "special" statute of limitations for product liability cases is controlling here over the "general" statute of limitations for negligence actions in § 25-207. *Hike*, 899 N.W.2d

33

at 624. However, "Section 25–224(1), effective July 22, 1978, preserved the 4–year statute of limitations previously found at Neb. Rev. Stat. § 25–207 (Reissue 1995)." *Farber v. Lok-N-Logs, Inc.*, 701 N.W.2d 368, 373 (Neb. 2005).

### c. The Applicable Statute of Limitations Did Not Run before Suit Was Filed as a Matter of Law

The controlling question here on the timeliness of FM's negligence claim against Vencomatic is whether § 25-207(3), on which FM relies, and § 25-224(1), the statute of limitations that the Court finds is applicable, use different "discovery rules" to start the running of the four-year statute of limitations. *Konecne*, 26 N.W.3d at 63 (explaining that "the bench and bar [must] ensure that the proper discovery rule is applied in any given case"). The Court concludes that they do not apply different discovery rules, or if they do, the discovery rules do not lead to different results in this case.

The discovery rule that is applicable under § 25-207(3) provides that "the running of the statute of limitations is tolled until the discovery of the cause of action." *Id.* at 64 (explaining the discovery rule under § 25-207(3) in relation to a claim of breach of fiduciary duty). More specifically,

> "'Discovery of a cause of action'" occurs when there is knowledge of facts constituting the basis of the cause of action or awareness of the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which, if pursued, would lead to the discovery of the cause of action. The cause of action in any case embraces not only the injury which the complaining party has received, but it includes more. All the facts which, taken together, are necessary to fix the responsibility are parts of the cause of action.

*Konecne*, 26 N.W.3d at 64 (citations omitted). Similarly, "the 4-year statute of limitations set forth in § 25-224(1) begins to run on the date on which the party holding the cause of action discovers, or in the exercise of reasonable diligence should have discovered, the existence of the injury or damage." *Condon v. A. H. Robins Co.*, 349 N.W.2d 622, 627 (Neb. 1984). The Nebraska Supreme

34

Court then clarified, "Discovery, as we apply it to § 25-224(1), refers to the fact that one knows of the existence of an injury or damage and not that one knows he or she has a legal right to seek redress in the courts." *Id.* Thus, although framed in slightly different language, the discovery rules for both statutes of limitations turn on the claimant's knowledge of facts that would have led to discovery of the injury.

In *Konecne*, the Nebraska Supreme Court explained,

> We have long recognized that the question as to a plaintiff's knowledge of the facts which should have put a person of ordinary intelligence and prudence on notice is a question of fact. Accordingly, the point at which a statute of limitations begins to run must be determined from the facts of each case, and, in an action at law, the decision of the fact finder will not be set aside by an appellate court unless clearly wrong.

*Konecne*, 26 N.W.3d at 64 (citations omitted). This case is at the summary judgment stage of the proceedings, so for Vencomatic to establish that FM should have discovered its negligence claim against Vencomatic more than four years prior to filing that claim on February 23, 2024, Vencomatic must present evidence showing that there is no genuine issue of material fact that FM knew or should have known facts sufficient to discover its injury prior to the fire on February 27, 2020. *Naylor*, 151 F.4th at 975 ("The movant has the burden of showing that there is no genuine issue of fact. . . ." (citations omitted)). Specifically, Vencomatic must "identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact'" that FM's injury was or should have been discovered prior to the fire. *See LADS Network Sols., Inc.*, 138 F.4th at 1062 (quoting *Torgerson*, 643 F.3d at 1042, in turn quoting *Celotex Corp.*, 477 U.S. at 323)). Vencomatic has not carried its burden.

Specifically, under the § 25-207(3) "discovery rule," Vencomatic has not pointed to any evidence suggesting that, prior to the fire, FM's Insureds had "knowledge of facts constituting the basis of the cause of action or awareness of the existence of facts sufficient to put a person of

35

ordinary intelligence and prudence on inquiry, which, if pursued, would lead to the discovery of the cause of action." *Konecne*, 26 N.W.3d at 64. Similarly, under the § 25-224(1) "discovery rule," Vencomatic has not pointed to any evidence suggesting that, prior to the fire, FM had "discover[ed], or in the exercise of reasonable diligence should have discovered, the existence of the injury or damage" from the fire. *Condon*, 349 N.W.2d at 627.

Vencomatic's contention is that FM could have instituted its negligence cause of action before the fire occurred because if dust accumulation is the "harm" caused by installation of the fan, dust buildup was apparent on every surface of Barn 12 immediately after the fan was installed. CM/ECF 117 at 18. That argument is not sufficient to establish that FM's negligence claim is untimely as a matter of law. Dust buildup generally on surfaces of Barn 12 is not the alleged deficiency in the blower fan; rather, the deficiency alleged was accumulation of combustible dust on, in, and around the blower fan, because the blower fan was unsuitable for use in the dusty environment. CM/ECF 1 at 2–3 (¶ 8), 4 (¶ 16). Vencomatic has not pointed to any evidence that anyone at Michael Foods knew or should have known that dust was accumulating on, in, or around the blower fan at any time prior to the fire on February 27, 2020. *See LADS Network Sols., Inc., 138 F.4th at 1062* (explaining that the movant's burden requires the movant to "identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" (quoting *Torgerson, 643 F.3d at 1042*, in turn quoting *Celotex Corp., 477 U.S. at 323*)). Moreover, Vencomatic's argument that the presence of dust was sufficient to put FM's Insureds on notice that a fire could occur resulting in the Insureds' injury or harm relies on abstract questions or issues that might arise in a hypothetical or fictitious situation or setting that might never have come to pass. *Konecne*, 26 N.W.3d at 64 ("A party is not aggrieved and cannot institute and

maintain suit if any element of that party's claim depends upon abstract questions or issues that might arise in a hypothetical or fictitious situation or setting and may never come to pass.").

Thus, the Court concludes that Vencomatic has failed to show that as a matter of law the four-year statute of limitations had run on FM's negligence claim.

### d.  Summary

The applicable statute of limitations is Neb. Rev. Stat. § 25-224(1), not Neb. Rev. Stat. § 25-223, as Vencomatic contends. However, whether Neb. Rev. Stat. § 25-224(1) or the statute of limitations asserted by FM, Neb. Rev. Stat. § 25-207(3), applies, Vencomatic has failed to carry its burden at summary judgment to show that the negligence claim against it is untimely.

## C.  The Overlapping Proximate Cause Issue

Henning seeks summary judgment on the ground that FM's evidence is insufficient as a matter of law to demonstrate proximate cause on any of its claims. Filing 113 at 3. Henning argues that FM's causation theories are premised on a choice of possibilities, which is insufficient under Nebraska law, so Henning is entitled to judgment as a matter of law. Filing 113 at 3. Likewise, Vencomatic seeks summary judgment on the ground that FM cannot prove causation to a sufficient degree under Nebraska law to sustain its burden of proof on any claim. CM/ECF 67 at 3 (¶ 7).[7] FM disputes Henning's and Vencomatic's positions.

### 1.  The Parties' Arguments

Henning and Vencomatic both argue that in a diversity action such as this one the burden of proof is a substantive matter controlled by state law. Filing 113 at 5; CM/ECF 68 at 15. Thus, they assert that Nebraska law governs whether the testimony of FM's experts is adequate support

---

[7] As a corollary or additional ground for summary judgment, Vencomatic argues that is entitled to summary judgment because after application of *Daubert* standards, FM's experts must be precluded from giving expert opinion testimony, so FM cannot prove proximate causation, and Vencomatic is therefore entitled to judgment as a matter of law. CM/ECF 67 at 3 (¶ 8). The Court does not reach this argument.

for FM's claims against them. Filing 113 at 6; CM/ECF 68 at 15. Henning argues that under Nebraska law, proximate cause based on possibilities not probabilities is insufficient to sustain a claim as a matter of law, and all of FM's claim require proof of proximate cause. Filing 113 at 6. Although Henning acknowledges that circumstantial evidence may be used to prove causation, Henning argues that does not mean that guess, speculation, conjecture, or a choice of possibilities can generate a genuine issue of material fact on causation. Filing 113 at 7. Henning argues that FM's experts can provide only a choice of possibilities as to what caused the fire in the poultry house. Filing 113 at 14.

More specifically, Henning and Vencomatic argue that both Mr. Rambacher's opinions and Mr. Keena's opinions are required for FM to causally link the fire to the blower fan assembly. Filing 113 at 14; CM/ECF 68 at 16. Henning asserts, "Before Mr. Keena can take the causation baton from Mr. Rambacher and run rampant with his wildly speculative (and preposterous) theory, Mr. Rambacher must first have a causation baton to hand off," but he does not. Filing 113 at 14. This is so, Henning argues, because Mr. Keena's theory of how the fire started is wholly reliant upon Mr. Rambacher's opinions and testimony about a heat source from the blower fan. Filing 113 at 15–16. Yet, Henning and Vencomatic both argue that Mr. Rambacher has five theories about how the blower fan could be a heat source and can only establish that those five theories are equally possible. Filing 113 at 16; CM/ECF 68 at 18. Henning and Vencomatic argue that Mr. Keena cannot select and incorporate one heat source into his theory of the cause of the fire from Mr. Rambacher's speculative opinions about five heat sources. Filing 113 at 18; CM/ECF 68 at 16–17 ("Before Mr. Keena is able to espouse his theory as to what causes the fire, Mr. Rambacher needs to be able to point to a singular cause of the fire" but he cannot do so).

38

In response, FM argues that Henning and Vencomatic have presented no argument that the damage could not have arisen in the manner FM has asserted and instead rely on "condescension," like Henning's description of FM's theory as the "magic slag theory." Filing 142 at 1. FM also argues that the fire's cause is known to its experts based upon sound methodology and that their testimony and opinions are reliable and generate genuine issues of material fact that the manure blower fan assembly caused the fire. Filing 142 at 2. FM argues that it need only establish that the manure blower fan assembly more likely than not caused the fire and it may do so through circumstantial evidence. Filing 142 at 6; CM/ECF 112 at 12. FM argues that its experts will testify that heat generated by a failure within the blower fan caused a metal spark to ignite compacted dust within the ductwork. Filing 142 at 7.

FM explains that Mr. Rambacher will testify that the blower fan was not suitable for the duty environment and that had a suitable fan been selected, it would not have failed in the dusty environment, thus eliminating the heat sources he identified. Filing 142 at 7–8; CM/ECF 112 at 13–14. FM argues that Mr. Rambacher will testify to scientific research that confirms a fan failure would create sufficient heat to start a fire. Filing 142 at 9; CM/ECF 113 at 15. FM argues that Mr. Keena will then properly use Mr. Rambacher's opinion in his analysis "to testify to his hypotheses regarding the cause of the fire, and specifically whether the manure blower fan assembly was a competent ignition source." Filing 142 at 9. FM asserts that Mr. Keena will then apply the scientific method outlined in NFPA 921 to determine that the only competent ignition source in the fire's area of origin was the manure blower fan. Filing 142 at 9–10; CM/ECF 112 at 15. FM argues,

> [B]ecause [Mr. Keena] confirmed through Mr. Rambacher that the manure blower fan assembly was capable of generating heat high enough to start a fire and the compacted dust was capable of ignition, he was able to conclude to a reasonable degree of origin and cause certainty that the manure blower fan assembly caused the fire.

Filing 142 at 10; *see also* Filing 142 at 14, 16; CM/ECF 112 at 12–13. Thus, unlike the cases cited by Henning and Vencomatic, FM argues that its experts have identified the specific component part of the aviary system that failed—the blower fan. Filing 142 at 12. FM points out that Mr. Keena opines that when the hot slag or metal shaving from the fan was discharged into the ductwork above the manure blower fan, the dust ignited in a matter of minutes. Filing 142 at 10; CM/ECF 112 at 16. FM contends that the weight and credibility to be given to expert opinions is for the factfinder to determine not the trial court. Filing 142 at 11; CM/ECF 112 at 17.

In reply, Henning argues that FM's experts have built that causation theory on speculation about possible causes of heat generated by the blower fan. Filing 145 at 1, 4. As Vencomatic puts it, no person on behalf of FM can connect the various hypothetical theories of heat generation in a manner sufficient to establish the cause of the fire. CM/ECF 117 at 19. Henning argues that Mr. Rambacher's theories accepted as true are insufficient to generate genuine issues of material fact because they are speculative choices of possibilities not probable causes of heat. Filing 145 at 4. Henning argues that Mr. Rambacher refused to testify in his deposition to a reasonable degree of certainty that any event occurred that was capable of generating a spark and starting a fire, only that five events are possible. Filing 145 at 8. Vencomatic argues that Mr. Rambacher suggested five possible ways the blower fan could have generated heat, but he does not know if any one of them actually occurred or that any one is more probable than the others. CM/ECF 117 at 19. Henning argues that Mr. Keena could not narrow Mr. Rambacher's five possible heat sources to one probable heat source. Filing 145 at 8. Vencomatic points out that Mr. Keena's assertion that the dust would have ignited in minutes is contrary to the EMSL test, which is the only evidence of the time it would take to ignite the dust. CM/ECF 117 at 20. Thus, Henning argues that Mr. Keena's metaphysical possibility is not enough to establish probability. Filing 145 at 9. Vencomatic argues

that FM can never offer competent evidence that the blower fan caused the fire, only choices of possibilities. Filing 117 at 21.

2. *Proof of Proximate Cause under Nebraska Law*

The parties do not dispute that FM must establish proximate cause to prevail on any of its claims. "Proximate cause is the cause that in a natural and continuous sequence unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred." *Pitts v. Genie Indus., Inc.*, 921 N.W.2d 597, 609 (Neb. 2019). In *Pitts*, the Nebraska Supreme Court stated that it has held "that expert testimony 'based upon possibility or speculation is insufficient [to establish causation]; it must be stated as being at least "probable," in other words, more likely than not.'" *Pitts*, 921 N.W.2d at 612 (quoting *Fackler v. Genetzky*, 638 N.W.2d 521, 528 (Neb. 2002)). Moreover, "[b]ecause failure of proof concerning an essential element of the nonmoving party's case on a motion for summary judgment necessarily renders all other facts immaterial," failure to establish a genuine issue of material fact on the causation element entitled the movant to summary judgment. *Id.* at 612–13.

In *Pitts*, a products liability case against the manufacturer and designer of an aerial lift that malfunctioned and tipped over, *see* 921 N.W.2d at 604, the plaintiffs' expert conceded several times that he had no opinion as to what specifically failed. *Id.* at 606. He set out six "possible causes of an electrical malfunction." *Id.* at 610. He later attempted to clarify his opinion that the lift was unreasonably dangerous for four reasons, but he "did not retract his prior testimony that he had no opinion as to what specifically failed and caused the accident." *Id.* The Nebraska Supreme Court explained,

> Even assuming that Boye's reasons for the lift's being in an "unreasonably dangerous condition" were all affirmatively connected to the lift's design, he failed to sufficiently connect the possible causes of the malfunction stated in his report to these design defects. Throughout his opinion, Boye merely speculated that defects could have been related to the ultimate cause of the malfunction, while also

41

> proposing potential causes that overtly did not relate to Genie's design, such as the failure of a limit switch, the taped over leveling button, or faulty components. Because of the intermingling of possible causes that are related and unrelated to the design, with no testimony that any one of them was more probable than another, there is no way for a fact finder to determine without speculation whether a defective design was the proximate cause of the electrical malfunction and Pitts' injuries.

*Pitts*, 921 N.W.2d at 612. The court concluded that the expert's "testimony as to causation was too speculative for a jury to conclude that the specific alleged design defect or defects were the 'but for' cause of the electrical malfunction leading to Pitts' injuries." *Id.*

The case of *Larsen v. 401 Main St., Inc.*, 923 N.W.2d 710 (Neb. 2019), is rather more like this case than *Pitts* in that it involved a negligence action by neighbors of a bar against the operator alleging that a fire and resulting damages to their premises were caused by negligent maintenance of the bar's mechanical equipment in the basement. 923 N.W.2d at 712. In that case, the plaintiff (Plattsmouth Chiropractic) argued that summary judgment was improper even though the district court had excluded its expert's opinion that negligence on the part of the bar (Quart House) proximately caused the fire. *Id.* at 716. Specifically,

> Plattsmouth Chiropractic points to evidence that on the night of the fire, smoke first emerged from the area above the boiler and water heater. It also points to testimony from the bartender that it was cold inside the bar on the night of the fire and suggests the cold temperature is consistent with a failure of the boiler. Plattsmouth Chiropractic argues this is sufficient circumstantial evidence to create a genuine issue of fact as to the cause of the fire.

*Larsen*, 923 N.W.2d at 716-17. The court stated,

> To avoid summary judgment, . . . Plattsmouth Chiropractic had to adduce evidence from which a finder of fact could conclude, without engaging in guess, speculation, conjecture, or choice of possibilities, that a negligent failure to adequately maintain equipment caused the fire and resulting damage. *See Swoboda v. Mercer Mgmt. Co.*, 251 Neb. 347, 557 N.W.2d 629 (1997). The evidence [in the case] suggests, at most, that the fire originated near or in the boiler. It does not constitute a basis for the finder of fact to conclude that negligent maintenance on the part of Quart House caused the fire. Since the record did not contain evidence that would allow a finder of fact to find that negligent maintenance caused the fire, without engaging in guess,

42

speculation, conjecture, or a choice of possibilities, we find that the district court did not err in granting summary judgment.

*Larsen*, 923 N.W.2d at 717.

*Stones v. Sears, Roebuck & Co.*, 558 N.W.2d 540 (Neb. 1997), involved claims of fire damage to the plaintiffs' home after their gas grill caught fire and the fire spread to their house causing damage. 558 N.W.2d at 542. The plaintiffs brought claims against Sears, the seller and servicer of the gas grill. 558 N.W.2d at 542–43. Although the plaintiffs' expert, Belina, "repeatedly stated he had no opinion as to whether Sears' service technicians were negligent in installing the replacement parts, he offered two possible causes for the fire: a manufacturing defect in the replacement parts *or* improper assembly of those parts by Sears' service technicians." *Stones*, 558 N.W.2d at 543 (emphasis in the original); *see also id.* at 546. However, he "could not provide an opinion as to the exact failure of the grill leading to the fire." *Id.* at 543, 546. The court stated,

> Belina provided a choice of possibilities as to what caused the fire. Additionally, in so doing, Belina could not supply any concrete opinion as to what part was defective, nor could he form an opinion as to whether the actions of Dickman and Wacker [the service technicians] contributed to the cause of the fire. Conclusions based upon guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for purposes of summary judgment. *See Swoboda v. Mercer Mgmt. Co.*, 251 Neb. 347, 557 N.W.2d 629 (1997). Because the only evidence produced by the Stoneses regarding their negligence cause of action was provided by Belina and was based upon his speculation and providing a choice of possibilities, the district court was correct in granting summary judgment.

*Stones*, 558 N.W.2d at 546.

### 3. FM Has Insufficient Evidence of Proximate Cause

In this case, to avoid summary judgment, FM must adduce evidence from which a finder of fact could conclude, "without engaging in guess, speculation, conjecture, or choice of possibilities," that a defect in the blower fan caused the fire in Barn 12. *Larsen*, 923 N.W.2d at 717 (citing *Swoboda*, 557 N.W.2d at 629). FM cannot do so.

43

Much like the experts in *Pitts* and *Stones*, Mr. Rambacher sets out several possible ways the blower fan could have been a heat source. *See Pitts*, 921 N.W.2d at 610 (the expert offered multiple possible failures that could have caused the accident); *Stones*, 558 N.W.2d at 543, 546 (the expert offered two possible causes of the fire). However, like the experts in *Pitts* and *Stones*, Mr. Rambacher could not state that any one of those ways was more probable than the others. *Pitts*, 921 N.W.2d at 610; *Stones*, 558 N.W.2d at 543, 546; Filing 110-4 at 5 (Rambacher's Report, § II. Conclusions, ¶ 1) (stating five possible ways); Filing 114-2 at 30 (Rambacher Depo., 116:5–21) (admitting that he could not testify that any one way was likely to cause heat). Without identifying which of Mr. Rambacher's five possible ways the blower fan could have generated heat was more likely than not the source of the fire, Mr. Keena opined that the blower fan produced sufficient heat to ignite combustible dust in the manure blower fan assembly. Filing 143 at 6 (¶ 30); CM/ECF 113 at 7 (¶ 39). This chain of reasoning is speculation about possible heat sources followed by speculation that one of those heat sources could have produced sufficient heat to ignite combustible dust in the blower fan assembly (or vent). *See Pitts*, 921 N.W.2d at 612 (the expert merely speculated that the defects could have caused the malfunction); *Stones*, 558 N.W.2d at 543, 546 (the expert was unable to provide an opinion about the exact failure of the grill leading to the fire).

FM then relies on more speculation by Mr. Keena that based on the temperature of a hypothetical metal spark or slag from the blower fan, dust in the blower fan assembly or vent "would definitely ignite quicker than the dust sample" tested by EMSL Laboratory, that is, in minutes rather than after 23 minutes. Filing 143 at 7 (¶ 32.c.); CM/ECF 113 at 8 (¶ 41.c.); Filing 114-4 at 25 (Keena Depo., 97:13–99:2). What Mr. Keena does not provide is an explanation of how his "interpretation" of the EMSL Laboratory test justifies such a different conclusion about

44

ignition time. As in *Pitts* and *Stones*, all this amounts to mere speculation that defects in the blower fan could have caused it to malfunction causing a fire. *Pitts*, 921 F.3d at 612; *Stones*, 558 N.W.2d at 543, 546.

FM asserts that Mr. Rambacher stated in his affidavit, to a reasonable degree of engineering certainty, that "[b]ecause this fan was not suitable for the dusty environment, it was going to fail in at least one of five heat-producing ways." Filing 143 at 6 (¶ 31) (quoting Rambacher Aff., Filing 129-1 at 3 (¶ 7), 4 (¶ 11). This assertion does nothing to remove the speculative nature of assertions about five possible ways heat was generated where there is no opinion about which way was more probable than the others. FM also alleges that Mr. Keena's fire-spread analysis concluded to a reasonable degree of origin-and-cause certainty that a failure of the manure blower fan produced sufficient heat to ignite the combustible dust in the manure blower fan assembly. Filing 143 at 6 (¶ 30); CM/ECF 113 at 7 (¶ 39). Again, this conclusion—even offered to a reasonable degree of certainty—requires speculation as to the specific cause of heat from the blower fan.

Moreover, both Mr. Rambacher's belated assertion in his affidavit to a reasonable degree of engineering certainty that the blower fan would have failed and Mr. Keena's assertion to a reasonable degree of origin-and-cause certainty are premised on the "aviary system" being a product and the blower fan purportedly being a component of that product. The Court has already rejected FM's attempt to reframe its claim about a defect in a "product" in terms of an "aviary system" rather than "the blower fan." Even if the Court had not rejected that theory, the decision in *Larsen* would make it untenable. In *Larsen*, the court held that the plaintiff's evidence suggested at most that the fire originated near or in the boiler, just as FM's evidence at most suggests that the fire originated in or near the blower fan. 923 N.W.2d at 717. The evidence in *Larsen* was not enough to establish a specific failure (negligent maintenance) caused the fire, and FM's evidence

45

is not enough to establish any specific failure of the blower fan generating enough heat to cause the fire. *Id.*

Thus, Henning and Vencomatic are both entitled to summary judgment on all of FM's claims against them for inability to generate a jury question on causation under Nebraska law.

### III. THE MOTIONS CHALLENGING EXPERTS

As the Court noted at the beginning of this decision, matters before the Court include numerous motions challenge experts on *Daubert*/Rule 702 or Rule 403 grounds and some before a magistrate judge challenging experts on Rule 26 and Rule 37 grounds. However, "[b]ecause failure of proof concerning an essential element of the nonmoving party's case on a motion for summary judgment necessarily renders all other facts immaterial," failure to establish a genuine issue of material fact on the causation element entitles Henning and Vencomatic to summary judgment on all claims against them. *Pitts*, 921 N.W.2d at 612–13. Tjhus, the motions challenging experts on *Daubert*/Rule 702 and Rule 403 grounds and Rule 26 and Rule 37 grounds are moot.

### IV. CONCLUSION

FM agrees that dismissal is appropriate as to its second claim against Vencomatic alleging breach of contract and its third cause of action against Vencomatic for breach of warranties. Therefore, the Court grants Vencomatic's Motion for Summary Judgment as to FM's second cause of action for breach of contract and its third cause of action for breach of warranties. Vencomatic is entitled to summary judgment on FM's claim of product liability based on strict liability because Vencomatic is not the manufacturer of the blower fan, which is the "product" at issue in this case. The Court has determined that statute of limitations on FM's negligence claim against Vencomatic is Neb. Rev. Stat. § 25-224(1), not Neb. Rev. Stat. § 25-223, as Vencomatic contends. The Court also concludes that Vencomatic has failed to carry its burden to show that the negligence claim against it is untimely, so Vencomatic's Motion of Summary Judgment is denied on that claim on

46

that ground. On the other hand, the Court concludes that Henning and Vencomatic are both entitled to summary judgment on all claims against them because FM cannot generate a jury question on proximate cause under Nebraska law. Finally, the Court concludes that the motions challenging experts on *Daubert*/Rule 702 grounds and Rule 26 and Rule 37 grounds are moot.

Upon the foregoing,

IT IS ORDERED that

1.      Vencomatic's Motion for Summary Judgment, CM/ECF 67, is

a.      denied as to FM's first cause of action against Vencomatic alleging negligence because Vencomatic has failed to show the claim is untimely;

b.      granted as to FM's second cause of action against Vencomatic alleging breach of contract because FM concedes that cause of action should be dismissed;

c.      granted as to FM's third cause of action against Vencomatic for breach of warranties because FM concedes those causes of action should be dismissed;

d.      granted as to FM's fourth cause of action against Vencomatic alleging strict liability claim because Vencomatic is not the manufacturer of the blower fan at issue;

e.      granted as to all of FM's causes of action against Vencomatic because FM cannot generate genuine issues of material fact on proximate cause under Nebraska law.

IT IS FURTHER ORDERED that Henning's Motion for Summary Judgment, Filing 111, is granted as to all of FM's causes of action against Henning's because FM cannot generate genuine issues of material fact on proximate cause under Nebraska law.

IT IS FURTHER ORDERED that the following motions are denied as moot:

1.      Henning's and Vencomatic's Motion (or Amended Motion) to Exclude Testimony of Richard Rambacher on *Daubert* grounds, Filing 108; CM/ECF 82

47

2.      Henning's and Vencomatic's Motion (or Amended Motion) to Exclude Testimony of Phillip Keena on *Daubert* grounds, Filing 105; CM/ECF 83;

3.      Vencomatic's Amended Motion to Exclude the Testimony of Dr. Lauren Eichaker on Daubert grounds, CM/ECF 85;

4.      FM's identical Motions to Exclude Proposed Expert Opinions and Testimony as to five of Defendants' experts, Filing 115; CM/ECF 62; and

5.      FM's Motion in the lead case to Exclude Cumulative Expert Opinion Testimony pursuant to Federal Rule of Evidence 403 relating to Henning's experts Robert Whitemore and Scott Dillon, Filing 118; .

FINALLY, IT IS ORDERED that the following motions are referred back to the undersigned from United States Magistrate Judge Jacqueline M. Delucca and are denied as moot:

1.      Henning's Motion in the lead case to Strike Plaintiff's Supplemental Expert Disclosures and Rebuttal Expert Gregory Smith, Filing 102;

2.      Vencomatic's Motion in the case against it to Strike Plaintiff's Tardy Expert Disclosure and Motions in Limine, CM/ECF 59;

3.      FM's Motion in the case against Vencomatic to Exclude Vencomatic's Non-Retained Experts, CM/ECF 65.

Judgment shall enter accordingly.

Dated this 6th day of February, 2026.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge

48